1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   AGK SIERRA de MONTSERRAT, L.P.,        No.  2:15-cv-01280-DAD-DB

12              Plaintiff,

13        v.                                FINDINGS OF FACT AND CONCLUSIONS
                                            OF LAW
14   COMERICA BANK,

15              Defendant.

16

17        This case concerns a contract dispute between plaintiff AGK Sierra de Montserrat, L.P.

18   ("AGK") and defendant Comerica Bank ("Comerica").  Plaintiff AGK contends that defendant

19   Comerica breached their contract by refusing to indemnify AGK against losses it incurred in

20   connection with AGK's purchase of a residential development from Comerica.

21        A six-day bench trial in this case commenced on May 25, 2022.  (Doc. No. 92).  At trial,

22   the court heard from seven witnesses and admitted 85 exhibits into evidence.  (Doc. No. 97.)  The

23   witnesses who were sworn and testified at trial included:  Nader Pakfar (an attorney who

24   represented AGK in the underlying real estate transaction with Comerica, appearing by Zoom

25   videoconference), Alvin Galstian (an attorney who represented AGK in the underlying real estate

26   transaction with Comerica, appearing by Zoom videoconference), Don Murphy (the founder of

27   Kinetic Homes Limited Partnership, one of the two entities comprising AGK), Louis Friedel (a

28   member representative for Angelo Gordon Real Estate, Inc., the second of the two entities

                                            1

1  comprising AGK), Timothy Gorry (counsel for plaintiff), Keith Maruska (an officer in

2  Comerica's Special Assets department), and Francis Ferrer (the Vice President of Corporate

3  Counsel at Comerica).  Following the bench trial, the court directed the parties to submit post-trial

4  briefs and proposed findings of fact and conclusions of law, which the parties filed on July 29,

5  2022 and August 18, 2022.[1]  (Doc. Nos. 110, 111, 113, 116).

6      Having considered the testimonial evidence and exhibits admitted at trial, the parties'

7  arguments, and the applicable law, the court sets forth the following findings of fact and

8  conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

9                          **FINDINGS OF FACT**

10  **A.      The Parties**

11     Plaintiff AGK is a partnership formed by Angelo Gordon Real Estate, Inc. ("AGRE"), a

12  large real estate investment trust, and Kinetic Homes Limited Partnership ("Kinetic Homes"), a

13  company that partnered with professional investment firms to acquire and sell real estate

14  properties.  (Doc. Nos. 100 at 105:10–17; 101 at 168:2–169:10.)   AGK was formed for the sole

15  purpose of purchasing and developing the residential property underlying this action.  (Doc. Nos.

16  103 at 47:1–4; 84 at 3.)  Defendant Comerica is a bank incorporated in the state of Texas.  (Doc.

17  No. 100 at 112:7–14.)

18  **B.      Development and Foreclosure of Sierra de Montserrat**

19     In 2005, Westwood Montserrat, Ltd. ("Westwood"), a limited partnership owned by

20  Curtis Westwood ("Mr. Westwood"), began developing a residential subdivision in Loomis,

21  California, commonly known as Sierra de Montserrat.  (Doc. No. 84 at 2; JX-118 at 25.)  As the

22  developer, Westwood recorded a Declaration of Covenants, Conditions, and Restrictions for

23  Sierra de Montserrat (the "CC&Rs").  (Doc. No. 84 at 2; *see also* JX-118 at 25–100).   Pursuant

24  /////

25  _____

26  [1]  On July 29, 2022, when attempting to file its post-trial brief, Comerica mistakenly filed a
    different document with the court.  (*See* Doc. Nos. 112, 117).  As a result of this error, Comerica

27  did not file its post-trial brief until August 18, 2022.  (Doc. No. 116.)  However, Comerica
    successfully filed its proposed findings of fact and conclusions of law on July 29, 2022.  (Doc.

28  No. 113.)

1   to those CC&Rs, Westwood possessed certain rights as the "declarant" of Sierra de Montserrat.[2]

2   (Doc. No. 84 at 2; *see also* JX-118 at 27.)  In order to develop Sierra de Montserrat, Westwood

3   obtained a loan from defendant Comerica, which was secured by a deed of trust that, *inter alia*,

4   assigned to Comerica certain rights in Sierra de Montserrat in the event of Westwood's default.

5   (Doc. No. 84 at 2.)

6          Around the time of the 2008 financial crisis, Westwood defaulted on its loan to Comerica.

7   (*See* Doc. No. 84 at 2.)  Subsequently, Comerica initiated a nonjudicial foreclosure of most of the

8   Sierra de Montserrat lots.  (*Id.*)  On October 27, 2009, a few days before the foreclosure sale,

9   Westwood recorded a document titled Supplemental Declaration Regarding Construction

10  Obligation and Memorandum of Repurchase Right (the "Supplemental Declaration") with the

11  Placer County Recorder.  (*See* JX-37 at 1–3.)  The Supplemental Declaration purported to impose

12  additional construction requirements on the lots at Sierra de Montserrat and to give Westwood

13  additional rights as declarant, including the right to repurchase certain lots at Sierra de

14  Montserrat.  (*Id.* at 2.)

15         On November 6, 2009, Comerica acquired 51 lots in Sierra de Montserrat through a

16  nonjudicial foreclosure sale.  (Doc. No. 84 at 2.)  That day, Comerica recorded a trust deed

17  pursuant to the sale, which provided that Comerica received those 51 lots as well as certain rights

18  related to those lots, including

19              [a]ll present and future right [sic], title and interest . . . in and to all
             accounts, general intangibles . . . interest and documents . . . and all
20           other agreements, obligations, rights and written materials . . .
             relating to or otherwise arising in connection with or derived from
21           the Property . . . .

22  (JX-120 at 1, 3.)

23         Thereafter, Comerica sought to sell the Sierra de Montserrat lots through a team within its

24  Special Assets Group, called the "Other Real Estate" team.  (Doc. No. 104 at 53:3–19, 59:24–

25  60:8.)  Keith Maruska, a manager in Comerica's California Other Real Estate Department, was

26  ─────────────────────
    [2]  The CC&Rs provide that "[t]he 'Declarant' means Westwood Montserrat, Ltd., and its

27  successors and assigns, if such successors or assigns should acquire five or more undeveloped
    Lots from Declarant for the purpose of development and sale and be designated as a successor

28  Declarant in a recorded instrument."  (JX-118 at 27.)

1    one of the main individuals at Comerica who was responsible for the marketing and sale of the

2    lots.  (Doc. Nos. 84 at 2; 104 at 54:1–9, 59:24–60:12.)  At trial, Mr. Maruska testified that it was

3    Comerica's practice to "dispose of these bank-owned properties as quickly as possible" due to the

4    risk of "something happening at the property that could potentially bring liability to the bank" and

5    the cost of maintaining ownership over distressed property.  (Doc. No. 104 at 59:13–23.)

6    Consistent with that practice, Mr. Maruska began the process of procuring a broker shortly after

7    the foreclosure sale, and with the approval of his superiors at Comerica, selected Steve

8    Chamberlain of Colliers International to serve as the broker for the Sierra de Montserrat sale

9    process.  (*Id.* at 60:2–14; *see also* Doc. No. 84 at 3.)

10   **C.    Comerica's Sale of Sierra de Montserrat to AGK**

11          On March 19, 2010, Don Murphy, the president of Kinetic Homes, sent a letter of intent to

12   Mr. Chamberlain, expressing his intent to purchase the bank-owned lots at Sierra de Montserrat

13   on behalf of AGRE and Kinetic Homes.[3]  (JX-21 at 1.)  The letter proposed a purchase price of

14   $8,050,000.  (*Id.* at 2.)  Over the coming weeks and months, the parties negotiated for the sale of

15   the 51 lots, with Keith Maruska serving as the primary point of contact for Comerica and Don

16   Murphy serving as the primary point of contact for AGRE and Kinetic Homes.  (Doc. Nos. 84 at

17   ───────────────

18   [3]  Prior to founding Kinetic Homes, Mr. Murphy was the president of Shea Homes in Sacramento, California.  (Doc. No. 101 at 167:12–16.)  His business plan for Kinetic Homes was to "acquire land, . . . build[] up a land portfolio," and either sell property throughout the distressed economic period as the market improved, or eventually build homes.  (*Id.* at 168:18–24.)  Mr. Murphy planned to fund his ventures using "outside capital" from "professional investment firms."  (*Id.* at 159:5–6.)  Through his work at Shea Homes, Mr. Murphy had a prior relationship with AGRE, which led to their partnership in purchasing Sierra de Montserrat lots from Comerica.  (*Id.* at 169:6–10.)  It was understood among AGRE and Kinetic Homes that AGRE would serve as the "money partner" for the transaction, whereas Mr. Murphy on behalf of Kinetic Homes would "tak[e] the lead in the [Purchase and Sale Agreement] negotiations and the business points," which would in turn need to be "fully approved" by AGRE.  (*Id.* at 177:8–10, 177:18–178:25.)  As explained further below, these parties formally formed AGK in order to purchase and develop the 51 lots at Sierra de Montserrat.  (*See* Doc. No. 103 at 47:1–4; 84 at 3.)  At trial, Mr. Murphy testified that he "believe[d] the structure was [AGRE] had 95 percent [equity ownership], . . . another Angelo Gordon entity . . . had one percent, and then [Mr. Murphy] was a two percent equity partner."  (Doc. No. 101 at 178:11–14.)  Pursuant to this structure, Mr. Murphy was "responsible for day-to-day management of really every type, . . . but then [he] would report back to [AGRE] for approval on any matters of substance."  (*Id.* at 178:15–19.)  Thus, Mr. Murphy was effectively AGK's "boots on the ground" in the transaction, whereas AGRE served as AGK's money partner.  (*See id.*)

19

20

21

22

23

24

25

26

27

28

2; 104 at 63:12–14; 101 at 176:14–17.)  In addition, Francis Ferrer, in-house counsel for
Comerica, served as Comerica's legal point of contact on the transaction, and attorneys Nader
Pakfar and Alvin Galstian served as counsel for AGRE (later, AGK) in connection with the
transaction.  (Doc. Nos. 84 at 3; 100 at 105:14–16.)  As noted above, Mr. Chamberlain acted as
Comerica's real estate agent for the sale of the Sierra de Montserrat lots.  (*Id.*)

       1.    Purchase and Sale Agreement

     On May 17, 2010, AGRE and Comerica entered into a purchase and sale agreement
("PSA") regarding the 51 lots at Sierra de Montserrat.  (JX-27.)  The PSA provided for a deposit
of $450,000 and a purchase price of $8,200,000, set a thirty-day due diligence period prior to
closing, and stated that "[t]he Property is being purchased and sold "AS IS" and "WHERE IS,"
with all faults."[4]  (JX-27 at 1, 7, 13.)  The second page of the PSA contains a handwritten
interlineation, initialed by Keith Maruska, appointing Arah Tresler from First American Title
Company ("FATCO") as the escrow agent for the deal.  (*See* JX-27 at 2; Doc. No. 105 at 25:19–
26:23.)  At trial, Mr. Maruska testified that the PSA was drafted using a Comerica template
document, that FATCO was Comerica's preferred escrow vendor, and that the handwritten
addition of Arah Tresler at FATCO as the escrow agent was made at Comerica's request.  (Doc.
No. 105 at 24:10–26:23.)

     During the subsequent due diligence period, AGK identified several potential issues with
the sale of Sierra de Montserrat.  In particular, AGK raised concerns regarding the possibility that
Westwood remained the declarant of Sierra de Montserrat, notwithstanding the foreclosure sale
and subsequent trust deed.  (*See* Doc. No. 100 at 127:5–128:13.)  The declarant of Sierra de
Montserrat wields significant control over the development, through control of the homeowners'
association ("HOA"), the HOA board, and the design review committee ("DRC").  (*See* JX-39 at
1–2.)  AGK believed that having control over Sierra de Montserrat was a critical issue because
without control over the development, it would be difficult to obtain the requisite approvals to

---

[4]  At trial, Mr. Maruska testified that in accordance with Comerica's preference for "finality" in
transactions—in other words, selling properties without any contingent liability following the
sale—it was Comerica's intent to sell the property "as is, where is" with "no representations or
warranties."  (Doc. Nos. 104 at 56:18–57:6, 74:10–17; 105 at 34:17–18.)

1   improve lots or modify existing homes, and in turn, "relatively high-net-worth" and

2   "sophisticated" parties would be reluctant to buy into the development.  (*See* Doc. Nos. 102 at

3   126:15–21; 101 at 17:4–9.)  AGK's concern that Westwood retained the status of declarant was

4   exacerbated by AGK's diligence research indicating that Mr. Westwood himself was "very

5   unhappy with the foreclosure," that Sierra de Montserrat was Mr. Westwood's "personal pet

6   project that he was planning for his retirement," and that Mr. Westwood had a reputation among

7   the "greater development community" for being quite litigious.  (*See id.* at 124:4–8; Doc No. 101

8   at 185:10–16); (*see also* Doc. No. 102 at 127:3–5) (attorney Galstian testifying that "[w]hat I

9   recall at this time was hearing that Mr. Westwood was a fighter, you know, was an aggressive

10   person, and that he was not afraid to litigate").  Moreover, AGK learned through its due diligence

11   that Westwood had sued Comerica alleging fraud and that such litigation was still ongoing at that

12   time.[5]  (Doc. No. 104 at 129:10–22; JX-66 at 2.)  Based on this information, AGK feared that the

13   risk of litigation with Mr. Westwood over control of Sierra de Montserrat "was substantially

14   high" and that "Mr. Westwood was not going to go down without a fight."  (Doc. No. 100 at

15   124:12–14.)

16        As early as May 21, 2010, Mr. Chamberlain emailed Mr. Maruska and Mr. Murphy to

17   schedule a call between the parties and an HOA expert who had been recommended by Comerica.

18   (JX-28 at 2–3; Doc. No. 100 at 128:1–29:14.)  On that call, the parties discussed whether, under

19   the CC&Rs, Comerica's foreclosure had allowed it to successfully assume the declarant role, or

20   whether there was an open question as to who was the declarant because there was not a specific

21   assignment of those declarant rights from Westwood to Comerica in the sale or trust deed.  (Doc.

22   No. 100 at 129:18–22.)  Similarly, AGK consulted with HOA experts of their own choosing as

23   well as HOA experts from FATCO to discuss the declarant issue.  (Doc. No. 100 at 128:1–6,

24   132:19–133:4; JX-29; JX-31 at 2–3.)  On June 1, 2010, Mr. Murphy summarized his call with the

---

25   [5]  At trial, Mr. Maruska testified that he "definitely did not volunteer [the] information" about
26   Comerica's lawsuit with Mr. Westwood; rather, AGK learned of the existence of such a lawsuit
     on its own through due diligence research.  (Doc. No. 104 at 129:10–22, 132:12–24.)  Similarly,
27   Mr. Maruska testified that Comerica had "strong concerns" about whether it held the declarant
     rights to Sierra de Montserrat, but did not disclose its concerns—or its knowledge of the
28   Supplemental Declaration—to AGK.  (*Id.* at 132:23–133:25.)

1    FATCO experts in an email to Mr. Maruska, stating that FATCO's "experts confirmed our read

2    that there are challenges in gaining control of the HOA, the Architectural Committee, and the

3    Board."  (JX-32 at 1.)

4            On June 2, 2010, attorney Pakfar sent an email to Mr. Murphy, attorney Galstian, and

5    Louis Friedel, a representative for AGRE, summarizing the CC&R issues relating to the

6    transaction:

> In sum, there are significant concerns as to whether Comerica, or AGK as successor, have sufficient rights as "Declarant" under the CC&Rs or control over the Design Review Committee ("DRC").  As you know, the title of Declarant is typically passed along by way of a recorded "Assignment of Declarant Rights," which did not occur in this instance given the foreclosure.  Alternatively, there may be foreclosing lender provisions in the CC&Rs themselves that automatically transfer Declarant rights upon foreclosure, but those provisions are not present in these CC&Rs.  Accordingly, there is a debate as to who is the Declarant under the CC&Rs.  The "experts" we consulted . . . had a variety of opinions, but the majority opinion was that Westwood could have a reasonable claim to be the Declarant, either as to the entire property or just the Lots over which [Westwood] retained ownership.
>
> A disagreement as to the identity of the Declarant has a myriad of ancillary effects.  For example, . . . . Westwood has already made claims as to his retention of some level of control, whether of the DRC or otherwise . . . and any buyer would need to have certainty as to its status as Declarant prior to effectively being able to operate and manage the property.
>
> Finally, in any case, [Mr.] Westwood has apparently taken the clever step of assigning himself a certain number of lots [through the Supplemental Declaration].   Accordingly, even if he were to relinquish (or be deemed to relinquish) his status as Declarant, he would still be able to hold the project hostage by virtue of voting provisions. . . . Accordingly, even under the assumption you could successfully become the "Declarant," you would still need to obtain [Mr.] Westwood's consent to take certain major actions, which given his demeanor and stated hostility would not be a favorable position to you. . . .
>
> The most efficient way to clarify matters is to deal directly with Westwood.  Alternatively, there may be ways to mitigate the risk by doing additional research and attempting to draft around our concerns, but ultimately these steps can not [sic] fully protect you against the time/costs of fighting Westwood . . . .

27   (JX-33 at 2–3.)  Mr. Murphy forwarded this email to Mr. Chamberlain, who in turn forwarded the

28   email to Mr. Maruska.  (*See* JX-33 at 1.)  In addition, Mr. Maruska forwarded the email internally

to senior leadership at Comerica, with the description, "Summary of why Sierra de Montserrat sale maybe [sic] falling apart. . . . lets [sic] review and see if we think this is true/accurate . . . ." (JX-66 at 3.)  In response, Nancy Kordoban, a senior vice president group manager within the Special Assets Group, wrote, "Can we not sue Westwood requesting relief from the court?  If the analysis [from attorney Pakfar] is correct, and the CC&R's do not contain language transferring Declarant rights upon foreclosure I don't see any other way around this." (JX-66 at 2; *see also* JX-65; Doc. No. 104 at 61:2–4.)  After being informed by senior leadership that Westwood "has sued us claiming 'Fraud'" and is "[s]eeking declaratory relief so [Westwood] may ascertain its rights and duties . . .," Ms. Kordoban responded that "[i]t seems that any savvy buyer is going to figure this out unless the info below is wrong."  (JX-66 at 1–2; *see also* JX-65; Doc. No. 104 at 61:5–8.)  In another email, Ms. Kordoban wrote that "if there are provisions that should be included as standard (auto transfer of Declarant rights and control of voting rights in foreclosure), legal should be in the loop so that when the bank makes loans going forward, those provisions are always there unless specifically negotiated out."  (JX-65 at 1.)  At the bench trial in this case, Mr. Maruska testified that he disagreed with Ms. Kordoban's concerns, because "the buyer has the opportunity to walk, if they want," so Comerica need not "solve this issue" for the buyer.  (Doc. No. 104 at 144:10–24.)

At trial, attorney Pakfar, Mr. Murphy, and Mr. Friedel all testified that the satisfactory resolution to the potential declarant issue was a "condition precedent" to AGK closing the deal to purchase the Sierra de Montserrat lots.  (Doc. No. 100 at 138:14–139:5) (attorney Pakfar describing resolution of the declarant issues as "the very least that AGK would need in order to close"); (Doc. No. 102 at 65:14–20) (Mr. Murphy explaining that AGRE was "sufficiently concerned about control issues" such that if AGK's requested solutions were not granted, AGRE "[was] not going to close the deal"); (Doc. No. 103 at 17:4–7) (Mr. Friedel explaining that if the parties could not come to a resolution on this issue, "that would be a failure of a condition precedent.  We would terminate the purchase and sale agreement and get our deposit back and move on.").  Specifically, AGK internally identified three feasible solutions to the potential control issues, in order of its preference:  (1) a written settlement agreement between Comerica

8

1    and Westwood in which Westwood would agree to relinquish his rights as declarant; (2) a

2    reduction in the purchase price to account for the litigation-related and control-related risks; or (3)

3    for Comerica and AGK to "draft around the issue," namely, to "contractually get comfort from

4    [Comerica] that this issue wasn't going to complicate AGK's life" through an indemnity

5    provision.[6]  (*See* Doc. No. 100 at 135:10–137:2.)  Attorney Pakfar testified that a written

6    settlement agreement between Mr. Westwood and Comerica was "by far the best solution,"

7    because it was the only resolution that was "airtight," ensuring that AGK would become the

8    declarant of Sierra de Montserrat.  (*See id.* at 135:18–22.)  Beyond such a settlement, attorney

9    Pakfar considered the other options "much worse."  (*See id.* at 136:9.)  With respect to a price

10   reduction to offset the costs of potential control issues, it would be difficult to "predict the

11   future[] and monetize how many different ways Mr. Westwood could complicate [AGK's] life."

12   (*Id.* at 136:9–13.)  Similarly, attorney Pakfar thought an indemnity provision was "[t]he very

13   worst result we could get because, . . . we didn't want a fight," and an indemnity provision would

14   have the effect of AGK "really inheriting a lawsuit."  (*Id.* at 137:6–12.)  For these reasons, AGK

15   "strongly preferred" the settlement option; by contrast, an indemnity provision "was the last

16   straw," the "very least that [Mr. Friedel] needed in order to be able to get [AGRE] to authorize

17   the closing."  (*Id.* at 139:21–140:10.)

18          2.      The "Mission Critical" Email

19          With these concerns in mind, on June 15, 2010, prior to the expiration of the due diligence

20   period, Mr. Murphy emailed Mr. Chamberlain identifying certain issues as "mission critical" to

21   the deal (the "mission critical email").  (JX-38 at 2.)  Therein, Mr. Murphy identified two major

22   issues.  First, AGK posited that due to the way the property was titled, AGK would need to pay a

23

24   [6]  Attorney Pakfar also testified that, in addition to these three potential options to rectify the
     declarant's rights issue, AGK separately sought to obtain "title insurance" from FATCO
25   "certifying that the declarant right had actually passed to Comerica, and would pass to [AGK]."
     (Doc. No. 100 at 132:4–7; *see also* Doc. No. 101 at 19:8–11.)  Although it appears that FATCO
26   did provide AGK with title insurance related to the Sierra de Montserrat sale, the scope of that
     title insurance—including whether AGK obtained the certification it sought from FATCO—is not
27   clear from the evidence introduced by the parties in this action at trial.  (*See* Doc. Nos. 103 at
     73:22–25; 101 at 36:5–7, 36:23–25; 100 at 151:14–15.)
28

9

1    $15,000 deposit to the Wildlife Heritage Foundation for each lot purchased.  (*Id.*; *see also* Doc.

2    No. 101 at 192:2–193:15.).  In light of this extra expense, Mr. Murphy wrote that the Wildlife

3    Heritage Foundation deposits would "reduce[] what we can pay by approximately $400,000 to

4    $470,000."  (JX-38 at 2.)

5           Second was the issue of control.  Mr. Murphy summarized this issue as follows:

6                When we put in our offer for the property the view from the Bank
             was that we could easily gain full control of the property (i.e., the
7            HOA, Design Review Committee (DRC), and Board) via gaining
             declarant rights.  In reality, it is not explicitly stated in the CC&Rs
8            that the declarant rights transfer upon bulk sale and/or upon
             foreclosure.  The Bank's recorded Deed of Trust states that they
9            receive 'all rights', etc, [sic] but there was not a single expert that we
             consulted that could/would state that this clause guarantees declarant
10           status . . . .  Thus, there [is] . . . a high likelihood that we will have to
             either defend our position against legal challenges and/or take legal
11           action ourselves to attempt to gain control.    Further, and
             significantly, if we are not the declarant and the [Supplemental
12           Declaration] that Westwood filed late last year stands up in court he
             has the ability to buy the lots back from us three years from the
13           foreclosure/transfer date . . . .

14                . . . [I]t hurts the value of the property by not being able to make
             changes and/or have total control. . . .
15

16    (*Id.* at 2–3.)  Mr. Murphy stated that the control issue in turn created "significantly more return

17    risk" for AGK, particularly as it related to legal costs, delays, and "muddy waters."  (*See id.* at 3;

18    Doc. No. 102 at 38:21–24.)  More specifically, AGK "would need to allocate legal dollars and

19    personnel resources to either defending . . . or asserting" AGK's control rights.  (JX-38 at 3.)  The

20    control challenges would also cause delays, which would "hurt[] [AGK's] returns (on both

21    principal and deposits) and reduce[] . . . what [AGK] can pay."  (*Id.*)  Finally, "any control issues

22    and/or legal challenges will muddy the waters and hurt prospect [sic] buyer's confidence in our

23    project," which would in turn cause potential buyers to "sit and wait or create a scenario where

24    they need a deeper discount to take the risk of buying a lot without everything being settled."

25    (*Id.*)

26           In outlining potential solutions to these control issues, Mr. Murphy wrote,

27                I have not heard back from [Comerica] regarding their status with
             Westwood and whether or not they are trying to cut a deal with him.
28           . . .

10

> [W]e would be prepared to close at contract price on schedule (or with an extension) if we can get satisfactory resolution on our two primary due diligence concerns.  Alternatively, we will still buy the property 'as-is' but would require an appropriate price reduction to reflect the challenged nature of the circumstances.  We would need a $435,000 reduction for the deposit issue and an additional $1,150,000 for legal/control risk, return risk, return loss on the 11 compromised lots,[7] and time costs for all personnel involved.  Thus, we are prepared to waive feasibility[8] tomorrow with a revised contract price of $6,615,000.  If we waive tomorrow we would require that the PSA be modified such that the bank would record an assignment of declarant rights to us to at least create as [sic] additional hurdle for Westwood to clear.

(*Id.* at 1, 3.)  At trial, Mr. Friedel explained in his testimony that he provided the $435,000 and $1,150,000 figures to Mr. Murphy after running calculations of AGK's estimated fees and losses associated with the Wildlife Heritage Foundation deposits and the control issues.  (Doc. No. 103 at 25:7–26:6.)  Mr. Murphy testified that an "assignment of declarant rights" would contain an acknowledgement that Comerica was the declarant of Sierra de Montserrat and that Comerica would assign those rights to AGK.  (Doc. No. 102 at 52:23–53:2.)

Although the mission critical email did not explicitly mention indemnification, Mr. Murphy and Mr. Friedel testified at trial that indemnification was being considered by AGK at this time as an element of the proposed solutions in the mission critical email.  (Doc. Nos. 102 at 95:12–22; 103 at 26:16–21.)  Specifically, they testified that AGK would not have required an

---

[7]  These eleven "compromised lots" referred to eleven lots "that have smaller building envelopes and relatively significant slope coming off the main road," rendering them more suitable for building homes that are smaller than the minimum square footage requirements at the development.  (JX-38 at 2.)  As a result, AGK believed these lots would be "very difficult to sell" if AGK was not able to "reach an agreement" to allow the building of around ten smaller homes in the development.  (*Id.* at 2–3.)  Without control of the development, AGK feared it would not be able to reach such an agreement and the eleven lots would be difficult to sell, and consequently, this issue "reduces what [AGK] can pay" for the 51 lots at Sierra de Montserrat.  (*See id.*)  These eleven "compromised lots" are not otherwise relevant to the outcome of this action.

[8]  The PSA in this transaction provided for a 30-day due diligence period during which AGK's $450,000 deposit would be "contingent," meaning that AGK's deposit would be refundable if it decided not to proceed with the deal during the due diligence period.  (*See* JX-27 at 1; Doc. No. 101 at 69:19–70:24.)  In this context, "waiving feasibility," also referred to as "waiving contingency" or "waiving due diligence," refers to the buyer waiving the contingent nature of its deposit, such that the buyer's deposit would only be refundable under certain limited circumstances.  (*See* Doc. No. 101 at 69:23–25.)

11

1   indemnification provision in order to close the deal *if* Comerica had entered into a settlement with

2   Westwood regarding the declarant status—which Mr. Murphy alluded to when describing

3   Comerica "cutting a deal" with Mr. Westwood—or *if* AGK had received the full amount of the

4   requested price reduction and the assignment of declarant rights.  (*See* Doc. No. 102 at 23:8–12)

5   (Mr. Murphy explaining that "[m]y recollection is [Comerica was] working on a release.  My

6   recollection was at some point they actually had an agreement with Westwood.  I believe he was

7   either going to, or filed for bankruptcy protection, and there was a release of some sort, either in

8   the works, or completed."); (Doc. No. 103 at 26:16–21) (Mr. Friedel explaining that if AGK had

9   received the full price reduction and the assignment of declarant rights, AGK "would have still

10  asked for" an indemnification provision, but "would have closed without it"); (Doc. No. 102 at

11  95:12–22) (Mr. Murphy explaining that "[a]t that point, in my mind, had we gotten the full

12  reduction, . . . we would have closed "as is" with the full reduction and with the transfer of

13  declarant rights . . . . When that was not granted, . . . we required a release and/or indemnity.").

14  Mr. Murphy and Mr. Friedel testified that, without either a settlement between Comerica and

15  Westwood or the requested price reduction, AGK's remaining feasible solution to close the deal

16  was to pursue an assignment of declarant rights that included an indemnification provision

17  relating to the declarant's rights issue.  Therefore, the court finds that AGK's position at time of

18  mission critical email was that it would not have necessarily required an indemnification

19  provision in order for the deal to close.[9]  (*See* Doc. Nos. 102 at 95:12–22; 103 at 26:19–27:7.)

20         Mr. Chamberlain forwarded the mission critical email to Mr. Maruska, who replied on

21  June 16, 2010, "Comerica Bank will allow a $500,000 reduction in price (adjusted price of

22  $7,700,000) if they waive contingency and the deal can still close on time."  (JX-38 at 1.)

23

---

24  [9]  At trial, attorney Pakfar testified that, as AGK's lawyer on this transaction, he viewed the
25  inclusion of an indemnity provision as "part and parcel" to an assignment of declarant rights; in other words, as a matter of course, any assignment of declarant rights would include a clause
26  through which Comerica agreed to indemnify AGK for costs arising out of disputes over who was the true declarant of Sierra de Montserrat.  (Doc. No. 101 at 160:2–161:15.)  However, attorney
27  Pakfar conceded that the meaning of AGK's reference to an "assignment of declarant's rights" in the mission critical email would best be determined by Mr. Friedel, "the ultimate decision-
28  maker."  (*Id.* at 161:15–18.)

12

1          3.      Amendments to the PSA

2          Also on June 16, 2010, while the discussion of the mission critical issues remained

3   ongoing, the parties executed the first of three amendments to the PSA.  (*See* JX-60.)  This

4   amendment extended the due diligence period through June 18, 2010 and was transmitted

5   between the parties by email, with Mr. Maruska, attorney Pakfar, Ms. Tresler, Mr. Murphy, Mr.

6   Ferrer, Ms. Kordoban, Mr. Chamberlain, another Comerica employee, and a colleague of Mr.

7   Chamberlain all copied on the email chain.  (*Id.*)

8          Two days later, on June 18, 2010, the parties executed the second amendment to the PSA

9   (the "second amendment").  (*See* JX-61.)  The second amendment, also transmitted by email to

10  the same individuals as the first amendment to the PSA, reduced the purchase price by only

11  $500,000—from $8,200,000 to $7,700,000—rather than the $6,615,000 proposed by Mr. Murphy

12  in his June 10, 2010 email.  (*See id.* at 6.)  In addition, the second amendment extended the due

13  diligence period to June 25, 2010.  (*Id.*)

14         Following the execution of the second amendment, on June 21, 2010, Mr. Murphy

15  circulated a revised version of the mission critical email to Mr. Maruska, copying Mr.

16  Chamberlain, Mr. Friedel, and attorney Pakfar.  (JX-39.)  Once again, Mr. Murphy outlined two

17  major issues, the first being the $15,000 per lot deposits to the Wildlife Heritage Foundation and

18  the second being the control issues.  (*Id.* at 1.)  Mr. Murphy added more detail to his explanation

19  of the ambiguity surrounding who was the declarant of Sierra de Montserrat and the

20  consequences for AGK stemming from this ambiguity.  (*See id.* at 2.)  Despite the parties having

21  already negotiated a $500,000 reduction in the purchase price in the second amendment, Mr.

22  Murphy retained his statement from the June 16, 2010 version of the mission critical email that

23  AGK "would need a $435,000 reduction for the [Wildlife Heritage Foundation] deposit issue and

24  an additional $1,150,000 for legal/control risk, return risk, return loss on the 11 compromised

25  lots, and time costs for all personnel involved" in order for the deal to close.  (*See id.* at 3.)  Mr.

26  Murphy also restated that AGK would be prepared to "waive feasibility tomorrow with a revised

27  /////

28  /////

1   contract price of $6,615,000"[10] and a modification to the PSA "such that the bank would record

2   an assignment of declarant rights to us to at least create as [sic] additional hurdle for Westwood to

3   clear." (*Id.*)  Mr. Murphy added,

> [Attorney Pakfar] could also provide references of other [Department of Real Estate] attorneys/experts that he spoke with as well that confirmed the control challenges.  He would also be happy to discuss the assignment of declarant rights provisions that we included in our initial second amendment proposal with [Mr. Ferrer].  We are trying to keep legal costs down but it appears that the Bank will require at least one further conversation in this regard.  [Mr. Maruska], when you choose to forward this on to [Mr. Ferrer] I would appreciate it if [attorney Pakfar] and [Mr. Ferrer] could coordinate schedules for a call sooner rather than later.
>
> . . .
>
> It is my goal to try to get you any further supporting documentation that you need early this week so that we can attempt to come to final terms early enough to still close this month.

13  (*Id.* at 3.)  Despite Mr. Murphy's request, a subsequent call between Attorney Pakfar and Mr.

14  Ferrer, the Vice President of Corporate Counsel at Comerica, to discuss these control challenges

15  never occurred.  (Doc. Nos. 101 at 20:4–5; *see also* Doc. No. 104 at 98:6–11.)  When questioned

16  at trial about the lack of a call, attorney Pakfar pointed to AGK's "increasing level of frustration

17  with Mr. Ferrer's unavailability," because Mr. Ferrer was the [AGK's] legal point of contact at

18  Comerica, "and it was tough to get work done when he just wouldn't respond to [AGK], despite

19  [Mr. Murphy's] urging." [11]  (Doc. No. 101 at 20:5–10.)  Indeed, Mr. Maruska did not forward Mr.

20  Murphy's email onto Mr. Ferrer, because "there was nothing for us to gain by [doing] that," "[i]t

---

21  [10]  This reduced price would be the result of subtracting $435,000 (for the Wildlife Heritage
22  Foundation deposit) and $1,150,000 (for legal/control related risks) from the original $8,200,000
    contract price provided for by the initial PSA.  (*See* JX-39 at 3; JX-27 at 1.)

23
24  [11]  Attorney Pakfar testified that "Mr. Ferrer was generally hard to reach the whole time.  This
    wasn't a very helpful seller in that sense. . . . [Comerica wasn't] engaging a lot with us . . .
25  certainly when it counted around closing time, [Mr. Ferrer's] unavailability was more
    pronounced, and more frustrating, because that's when we were trying to close."  (Doc. No. 101
26  at 118:7–16.)  Similarly, attorney Galstian testified that he "had really very little luck in dealing
    with the seller side in terms of communications."  (Doc. No. 102 at 143:9–12.)  At trial, Mr.
27  Ferrer testified that he was "pretty sure" that he spoke with attorney Pakfar about the PSA, but
    did not recall speaking to attorney Galstian at all or speaking to attorney Pakfar about any of the
28  deal documents other than the initial PSA.  (Doc. No. 105 at 60:8–62:1.)

1    didn't have substance," and he simply "just didn't want to set up a phone call between the two of

2    them" without there being a specific document to discuss.[12]  (Doc. No. 104 at 98:6–11, 156:–

3    157:22.)  Instead, Mr. Maruska—who believed this email was part of "an ongoing attempt to

4    lower the price" of the deal—asked Comerica's HOA expert for an opinion letter that could help

5    justify a further price reduction to Comerica's management.  (*Id.* at 97:3–4.)  It is unclear what

6    the outcome was, if any, of Mr. Maruska's inquiry to Comerica's HOA expert in that regard.

7         On June 25, 2010, the parties executed a third amendment to the PSA (the "third

8    amendment").  (*See* JX-43.)  The third amendment was also transmitted by email in a

9    continuation of the same email thread between Mr. Maruska, attorneys Pakfar and  Galstian, Ms.

10   Tresler, Mr. Murphy, Mr. Ferrer, Mr. Friedel, Ms. Kordoban, Mr. Chamberlain, another Comerica

11   employee, and a colleague of Mr. Chamberlain that had been used to transmit the first and second

12   amendments.  (JX-43 at 1, 7.)  The third amendment set a closing date of June 30, 2010[13] and

13   further reduced the purchase price by another $350,000, from $7,700,000 to $7,350,000.  (*Id.*)  In

14   addition, the third amendment required that the parties enter into

15        an original Assignment of Declarant Rights, duly executed and
16        acknowledged by Seller and in recordable form, assigning to Buyer
          all of "Declarant's interest in the Development," as contemplated by
17        Section 10.03 of the Declaration of Covenants, Conditions,
          Restrictions and Easements for Sierra de Montserrat, and otherwise
          *in form and substance acceptable to Buyer*[.]
18

19   (*Id.*) (emphasis added).  Although the third amendment required the assignment of declarant's

20   rights to be "in form and substance acceptable to" AGK, no such assignment of declarant's rights

21   ────────────────
     [12]  In contrast to his trial testimony, Mr. Maruska testified in his deposition in this case that he
22   "believe[d]" he forwarded the email to Mr. Ferrer.  (Doc. No. 104 at 157:5–12.)  When
     questioned at trial about this inconsistency, Mr. Maruska clarified that he did not believe he
23   forwarded the email.  (*Id.* at 158:6–11.)  He explained that Comerica counsel does not help with
     pricing; rather, the deal price is a "business decision by the business unit," and he did not want to
24   involve Mr. Ferrer unless there was a document for Mr. Ferrer to review.  (*Id.* at 159:3–4,
     159:22–24.)
25

26   [13]  The closing date and the end of the due diligence period are two distinct deadlines.  (*See* JX-27
     at 2) (describing the closing date as "no later than five (5) days after the end of the Buyer's Due
27   Diligence Period.")  Thus, following the third amendment, the due diligence period was set to
     expire on June 25, 2010 and the deal's closing deadline was June 30, 2010.  (*See* JX-61 at 6)
28   (extending the buyer's due diligence period to June 25, 2010).

1    had been drafted by the parties as of that time.  Further, the third amendment did not provide

2    information concerning the substance or material terms of such an assignment of declarant's

3    rights.  Instead, the third amendment simply included the yet-to-be-drafted assignment of

4    declarant's rights among the list of documents required for closing.  (*See id.*; JX-27 at 3.)

5    Attorney Pakfar testified that this structure was typical of a provision in a PSA listing documents

6    required for closing, since these portions of a PSA simply provide a "list of closing documents"

7    and do not contain the "crude material terms" of those closing documents.  (Doc. No. 101 at

8    132:4–5.)  Rather, according to him, the material terms of such closing documents would only be

9    reflected within the contents of those documents, when they were eventually drafted.  (*See id.*)

10        The rationale underlying including this assignment-of-declarant's-rights provision in the

11   third amendment stemmed from the parties' plans with respect to the drafting of the assignment

12   of declarant's rights.  AGK wished to draft the assignment of declarant rights and negotiate it

13   with Mr. Ferrer; however, because Comerica was not comfortable with AGK preparing the first

14   draft of the assignment, the parties agreed that FATCO, serving in a nonpartisan capacity, would

15   prepare the first draft.  (*See* Doc. No. 101 at 29:4–18, 30:8–10, 125:18–126:3.)  With the due

16   diligence period set to expire at 5:00 p.m. on June 25, 2010, AGK had just a few hours to decide

17   whether to waive contingencies in order to proceed with the deal.  (*See* JX-61 at 6; Doc. No. 101

18   at 69:23–25; JX-43 at 7.)  Because AGK was unable to draft the assignment of declarant rights

19   and "couldn't get ahold of Mr. Ferrer [to discuss the provisions of the assignment of declarant's

20   rights]," AGK felt that its "only other option" was to agree to waive contingencies but require that

21   AGK would have sole discretion on the ultimate form of the assignment of declarant rights.

22   (Doc. No. 101 at 29:19–22; *see also* JX-39 at 3.)  Thus, as attorney Pakfar explained during his

23   trial testimony, AGK wanted the provision about the assignment of declarant rights added to the

24   third amendment because AGK "wanted to make it clear that AGK would only close if the form

25   of the declarant assignment was acceptable in [AGK's] sole and absolute discretion."  (Doc. No.

26   100 at 122:7–10.)  Although by waiving contingencies, AGK would lose its deposit, Comerica

27   "would potentially be subject to an Assignment of Declarant Rights they weren't 100 percent

28   comfortable with, so this was a way to essentially keep the deal as contingent"; in other words,

1   "despite the due diligence expiring, AGK would still [effectively] have the right to terminate the

2   deal in its sole discretion if it was not fully satisfied with the declarant assignment."[14]  (*Id.* at

3   122:11–18.)

4          The third amendment also required Comerica's closing documents to include "an original

5   notarized instrument, duly executed and acknowledged by [Comerica] and in recordable form,

6   that has the effect of removing as a matter of record and encumbrance on title" Westwood's

7   Supplemental Declaration.  (JX-43 at 7; *see also* JX-27 at 3.)  Similar to the provision for the

8   assignment of declarant's rights, the revocation of the Supplemental Declaration had to be "in

9   form and substance acceptable" to AGK.  (JX-43 at 8.)

10  /////

11  /////

12  /////

13  /////

14  /////

15  /////

16  /////

17  /////

18  /////

19  /////

20  /////

21  /////

22  /////

23  /////

24  /////

25  /////

26

27  [14]  AGK did, in fact, waive due diligence on June 25, 2010, as memorialized by an email from attorney Pakfar in the same email chain the parties employed to transmit the draft and executed

28  versions of the third amendment.  (*See* JX-47 at 1.)

1    In the email chain attaching the executed third amendment, attorney Pakfar also attached

2 what he described as "a redline to the Second Amendment circulated last week."[15]   (JX-43 at 2.)

3 The redline, which was generated by a computer program to show the differences between two

4 documents, displays a stricken-out paragraph titled "Settlement with Westwood."  (Doc. Nos. 100

5 at 123:7–9; 101 at 72:18–25, 76:8–20; JX-43 at 16.)  The stricken-out paragraph would have

6 required Comerica to enter into a settlement with Westwood and Mr. Westwood, pursuant to

7 _____

8    [15]  There appeared to be some confusion at trial regarding which version of the second
amendment was used to generate this redline, which in turn led to confusion regarding the size of
the price reduction provided for by the third amendment.  (*See, e.g.*, Doc. Nos. 101 at 76:21–77:9;

9 102 at 58:17–22.)  The court thus provides the following clarification:  The redline does not
appear to have been run against the finalized version of the second amendment that was executed

10 by the parties.  For example, the executed second amendment provided for a purchase price of
$7,700,000, but the version of the second amendment used in attorney Pakfar's redline provided

11 for a purchase price of $7,200,000.  (*See* JX-61 at 6; JX-43 at 15.)  Mr. Murphy explained in his
testimony that at some point during these negotiations, the parties may have discussed a

12 $7,200,000 purchase price, but he could not recall exactly what brought the price down to
$7,200,000 in the draft second amendment or back up to $7,350,000 as provided for by the

13 finalized third amendment, citing "ongoing conversations" regarding the "continuum of [AGK's]
concession requests."  (*See* Doc. No. 102 at 58:10–59:16.)  Likewise, as described below, the

14 version of the second amendment attorney Pakfar used in this redline contained a "Settlement
with Westwood" section that was not in the parties' executed second amendment.  (*See* JX-61 at

15 6–7; JX-43 at 16.)  At trial, attorney Pakfar clarified during his testimony that "there was a draft
Second Amendment that included the settlement with Westwood," and the version of the second

16 amendment he used in the redline was "some version" of the second amendment, though he
couldn't remember which.  (Doc. No. 101 at 77:5–9, 77:18–19.)  The court also notes that the

17 redline does not reflect that the "Assignment of Declarant Rights" section was a new addition; in
other words, it appears that there was a version of the second amendment that included an

18 Assignment of Declarant Rights section, though the executed version of the second amendment
did not include this provision.  (*See* JX-43 at 15; JX-61 at 6–7.)  This inference is supported by

19 the fact that Mr. Murphy's June 21, 2010 mission critical email states that attorney Pakfar would
"be happy to discuss the assignment of declarant rights provisions that [AGK] included in our

20 initial second amendment proposal with [Mr. Ferrer]."  (JX-39 at 3.)  Accordingly, the court finds
that AGK proposed both the settlement with Westwood provision and the assignment of declarant

21 rights provision, *at the latest*, at some point during negotiations with Comerica over the second
amendment, which was executed on June 18, 2010.  The court notes, however, that Mr. Murphy

22 also referenced both of these options in his June 15, 2010 mission critical email, and AGK may
have raised them even earlier.  (*See* JX-38 at 2.)  At trial, Mr. Maruska testified that AGK raised

23 the issue of Comerica's lawsuit prior to the execution of the PSA on May 17, 2010 and "brought
up" settlement with Westwood at some point, though he could not recall when.  (Doc. No. 104 at

24 130:13–16, 130:22–131:14; *see also* JX-27.)  Mr. Maruska also testified that an assignment of
declarant rights was discussed between the parties as early as June 15, 2010 in the mission critical

25 email, though it was possible that it could have been brought up by AGK even earlier.  (*See* Doc.
No. 104 at 150:19–151:20.)

26

27

28

1    which Westwood would agree to relinquish all rights as declarant and acknowledge that the

2    declarant status had been transferred to Comerica.  (*See* Doc. No. 100 at 123:13–18; JX-43 at 16.)

3    This provision was proposed by AGK but deleted at Comerica's instruction.[16]  (Doc. No. 101 at

4    76:8–20; *see also* Doc. No. 102 at 130:18–24.)

5           As noted above, a settlement between Comerica and Westwood was AGK's preferred

6    "gold standard" method to resolve the control issues related to Sierra de Montserrat.  (*See* Doc.

7    No. 102 at 46:9–10.)  At trial, Mr. Murphy testified that AGK likely maintained the belief that

8    such a settlement was possible up until the parties' negotiation of the third amendment.  (*Id.* at

9    46:19–25.)  Although he could not remember precisely when AGK realized that such a settlement

10    would not occur, Mr. Murphy testified that AGK "probably" realized that a settlement with

11    Westwood would not happen once the "Settlement with Westwood" provision was removed from

12    the draft third amendment.  (*Id.*)  Mr. Murphy testified that in his experience, it is "very typical"

13    for his residential real estate deals to involve "negotiating down to the wire."  (*Id.* at 47:2–6.)

14    Nonetheless, given how close AGK's realization in this regard was (around June 25, 2010) to

15    when the deal was supposed to close (June 30, 2010), Mr. Murphy testified that it is "likely" that

16    he presumed the parties would extend the deal deadlines again after this point, noting that it

17    /////

---

18    [16]  At trial, there was some confusion as to which party proposed this provision and which party

19    deleted it.  (*See* Doc. No. 101 at 75:24–76:22.)  Attorney Pakfar clarified in his testimony that AGK proposed the "settlement with Westwood" provision.  (*Id.* at 76:8–13.)  Nonetheless, based

20    on the programmatically-generated notations on the document, it may have been him (or someone else on the AGK side of the transaction) who actually deleted the text from the draft document at

21    Comerica's direction.  (*See id.*) ("I [was the one] sending this document . . . . [s]o they wouldn't

22    have struck it out.  They would have presumably communicated to [Mr. Murphy] that they won't agree with that, but they wouldn't be the one striking it out, because they are not running the

23    Delta View [computer program].")  At trial, Mr. Maruska testified that he "was extremely confident that we [Comerica] weren't going to reach a settlement with Mr. Westwood, and did

24    not want to promise to force that . . . . I wasn't going to get management at Comerica to agree on settling with Mr. Westwood so that we could sell this property."  (Doc. No. 104 at 130:9–16.)

25    Thus, it is unclear to the court who at Comerica determined that the settlement with Westwood

26    provision had to be deleted, particularly in light of the above-described emails and testimony that Ms. Kordoban was concerned about Comerica's ability to sell Sierra de Montserrat in light of its

27    ongoing litigation with Westwood and the declarant's rights issues, but that Mr. Maruska disagreed with her and took the position that Comerica need not "solve this issue" for a buyer.

28    (*See* JX-66 at 1–2; JX-65 at 1–2; Doc. No. 104 at 144:10–24.)

1   would not be unusual for deals he had worked on to receive four or five time extensions.  (*Id.* at

2   47:1–11.)

3       4.   Timing and Pressure Surrounding the Deal

4       The parties did not, in fact, enter into any subsequent amendments further extending the

5   due diligence period past June 25, 2010 or the closing deadline past June 30, 2010.  At trial,

6   attorney Pakfar testified that he was not aware of any internal pressure from AGK for the deal to

7   close on June 30, 2010, particularly because AGK was the buyer rather than a seller trying to get

8   property off of its books by a certain date.  (Doc. No. 101 at 60:11–22.)  Similarly, attorney

9   Galstian testified that he does not believe he, attorney Pakfar, or AGK put any "time pressure" on

10  Comerica to sign closing documents, and indeed, Galstian had a handful of closings at that time,

11  which made him wish he had more time on the Sierra de Montserrat deal.  (Doc. No. 102 at

12  144:20–145:5.)  Mr. Friedel likewise testified that AGRE did not need the deal to close by June

13  30, 2010 and would have been willing to close after that date.  (Doc. No. 103 at 40:14–20.)

14      In contrast, Mr. Murphy, attorneys Pakfar and Galstian, and Mr. Friedel all testified that

15  Comerica and/or Mr. Maruska were under pressure to close the deal by the end of the quarter on

16  June 30, 2010.  As attorney Pakfar explained his understanding of the timing,

17          [A] quarter is a measurement period, a significant measurement
            period for companies and banks, so there was some incentive for Mr.
18          Maruska . . . I'm not exactly sure what the incentive was, whether
            there was a bonus involved, or just your books and records look
19          cleaner.  There definitely was a hard push to close June 30th on their
            end. . . . I don't believe [Mr. Maruska ever communicated that to me
20          directly] . . . .  But it was . . . very clear why that date was picked,
            and there was a closing push to get it done, which, as I was saying,
21          that's why . . . everything was delicate at this point. . . . we were
            under the gun to close June 30 . . . . there was pressure from them—
22          significant pressure . . . to close on time because of the bank's
            demand.
23

24  (Doc. No. 101 at 59:10–22, 60:23–61:1).  Mr. Friedel testified that his "understanding, at the

25  time, was that there was sensitivity on the bank's part to get this off the books by the end of the

26  quarter, which would be a June 30th quarter end date."  (Doc. No. 103 at 30:25–31:3.)  Attorney

27  Galstian testified that he did not put any time pressure on Mr. Maruska to sign closing documents

28  and "if anything, it was the other way around," and that his "recollection was [that] Comerica

20

1    wanted this off their books at the end of the quarter." (Doc. No. 102 at 144:20–23, 145:4–5.) Mr.

2    Murphy similarly testified that, "[m]y recollection is there was a deadline for the bank. I believe

3    they were trying to get it in a certain quarter to get the asset off the books." (Doc. No. 102 at

4    63:24–64:1.) The court finds that all of this testimony was credible and suggests, at the very

5    least, that AGK perceived Comerica to be putting pressure on the deal to close by June 30, 2010.

6        Mr. Maruska also testified—albeit in a less consistent manner—as to the sensitivity in

7    connection with the timing of the sale. When asked if there was "any significance" to the June

8    30, 2010 closing date, Mr. Maruska responded, "[n]ot really. It is end of quarter. However, it

9    wouldn't have mattered if it had drug over to another quarter." (Doc. No. 104 at 92:14–17.)

10   Although his compensation was tied to "[d]ollars or assets sold, and sales dollars for a calendar

11   year," Mr. Maruska testified that it would not have mattered, with respect to his compensation,

12   whether the Sierra de Montserrat sale closed on or before June 30, 2010. (*Id.* at 92:18–25.)

13       The court finds that Mr. Maruska's trial testimony is not wholly credible in this regard,

14   however, because he also testified that closing the deal was important and to feeling at least some

15   pressure to do so by the end of the quarter. On cross-examination, Mr. Maruska testified that

16   Comerica "always want[s] to sell the assets as quickly as we can" and that it was "very

17   important" for Comerica to remove real estate owned from its portfolio generally. (*Id.* at 180:25–

18   181:6.) When asked if the quarter-end in particular is a "very important reporting period," Mr.

19   Maruska answered that it is "important, [but] not very important" and said that closing the Sierra

20   de Montserrat deal by the end of the quarter would have been "helpful" but "not critical." (*Id.* at

21   181:7–11, 181:22–24.) When confronted with his deposition testimony, in which he stated that it

22   is "very important" to move real estate owned off of his portfolio, Mr. Maruska responded that "I

23   do recall delays in the process from when we started, and so we were trying to—every day that an

24   asset is still owned, it's still liability for the bank" and conceded that getting real estate owned off

25   of his portfolio by the end of the quarterly reporting period is "important." (*Id.* at 182:3–16.)

26   Thereafter, Mr. Maruska testified that he felt "some pressure" to finish the deal by the end of the

27   quarter, but reiterated that "[i]t wasn't critical." (*Id.* at 182:17–19.) Thus, although it appears Mr.

28   Maruska's compensation might not have been directly impacted by the closing of the deal by the

21

1    end of the quarter, it also appears that his testimony as to the importance of the quarter-end date

2    and the level of pressure he felt to close the deal by then is at best unclear, and at worst,

3    somewhat inconsistent.  The court therefore attributes more credibility to the testimony of Mr.

4    Murphy, attorneys Pakfar and Galstian, and Mr. Friedel and finds that Mr. Maruska felt at least

5    some pressure from Comerica to close the deal by June 30, 2010, and this time-pressure was

6    observable to AGK.

7         Although the court concludes that the *time* pressure on closing the Sierra de Montserrat

8    deal derived mostly, if not totally, from Comerica's side of the negotiations, the court notes that

9    Mr. Murphy was also under pressure in a general sense to close the deal.  As noted above, Mr.

10   Murphy was AGK's "boots on the ground," whereas AGRE served as the money partner with

11   ultimate authority over the transaction.  (Doc. No. 101 at 177:7–178:2.)  In addition, as noted

12   above, Mr. Murphy had only recently left his employment with Shea Homes to found his

13   individual venture, Kinetic Homes.  (*Id.* at 167:12–16.)  In his own words,

14         It was important for me [to get the deal across the finish line].  At
           that time, I was probably seven or eight months in from departing
15         from Shea [Homes].  The housing market was still pretty bad.  So for
           me, this was a deal that I put a lot [of] time and effort and energy
16         into.  For me, it was the closest deal to completion that would launch
           my independent efforts as Kinetic Partners, so it was pretty important
17         to me personally.

18   (Doc. No. 102 at 24:23–25:6.)  Mr. Murphy testified that at one particularly fraught point during

19   the negotiations, his "heart sank, [when he] thought the deal was going to blowup [sic]," and he

20   recalls "pacing" while discussing pertinent issues with attorney Pakfar during that time.  (*Id.* at

21   65:1–8.)  Thus, although there is no evidence before the court suggesting that Mr. Murphy felt

22   pressure to close the deal by a specific deadline date, the court observes that both of the parties

23   serving as primary points of contact on either side of the transaction—Mr. Maruska for Comerica

24   and Mr. Murphy for AGK—were eager for this deal to close and perhaps were more personally

25   invested in the deal's outcome than were Comerica and AGRE.

26        5.    Preparation of Closing Documents

27        On June 25, 2010, the escrow agent, Ms. Tresler, responded to attorney Pakfar's email

28   attaching the executed third amendment and asked whether "anyone ha[s] a draft of the proposed

1   release to be sufficient to meet your requirements to remove the Supplemental Declaration as

2   required under the 3rd Amendment. . . . Also under what section of the CC&R's that you feel the

3   seller has the authority to sign such a document." (JX-45 at 2–3.)  When asked about his

4   understanding of Ms. Tresler's inquiry, attorney Pakfar testified that

5           the [third] amendment required that the effect of th[e] revocation of
        the [supplemental] declaration be that the matter is removed from

6           title. . . . so she's, I think, responding to that and . . . . [s]he's saying
        ["]why do you feel seller, Comerica, has the authority.["]  This goes

7           to the heart of the issue, which is that . . . the seller would only have
        that authority if they were the declarant. . . . she's basically asking

8           ["]are you sure Comerica is the declarant and can effectively sign
        that.["]

9

10  (Doc. No. 101 at 31:19–32:10.)  Attorney Pakfar further explained that by this time in the deal,

11  AGK had "done the research, and [AGK] thought that it was an open question as to who was the

12  declarant, and absent Comerica settling with Mr. Westwood, and resolving that issue in writing,

13  we weren't going to be able to resolve that issue.  Otherwise it was going to be a gray area." (*Id.*

14  at 34:11–16.)  Therefore, it was "frustrating" for attorney Pakfar that Ms. Tresler did not "already

15  have her arms around the issue" by June 25, 2010, though he noted that "she's an escrow officer,"

16  and "[e]scrow officers don't always need to know the intricacies." (*Id.* at 34:17–35:15.)

17  Attorney Pakfar added,

18          [W]e were very stressed and frustrated by Mr. Ferrer as well, to be
        honest, because this is not, ideally, how you do a deal.

19

20          If he would have just contacted us a week ahead, he could have
        comfortably negotiated a form and had a joint strategy.  But, you

21          know, he was playing his cards close to his [chest], not
        communicating with us, going through [Ms. Tresler].  So it was a
        game of telephone.

22

23  (*Id.* at 35:18–25.)

24        In response to Ms. Tresler's email, and consistent with the above-described testimony that

25  the parties agreed to have FATCO draft the assignment of declarant rights, attorney Pakfar

26  clarified that on a call with FATCO's title officer the previous day, the title officer "offered to

27  provide forms for both the [Assignment] of Declarant Rights and the Revocation of Supplemental

28  Declaration and confirmed that the former would be recorded and the latter would be sufficient to

remove the Supplemental Declaration from title." (JX-45 at 2.)  Attorney Pakfar testified that in his view by agreeing to record the revocation of the Supplemental Declaration, the FATCO title officer had demonstrated that he was "comfortable enough" with the gray area surrounding the declarant issues for FATCO to "take the position that Comerica is the declarant." (Doc. No. 101 at 36:5–7.)

Ms. Tresler then confirmed that she spoke with the title officer, received the forms, and would "include [the forms] in the documents for closing to be signed by the seller, and *send*[] *out for review by the buyer*." (JX-45 at 1) (emphasis added).  Four minutes later, Ms. Tresler responded to her own email attaching "the examples of the forms that I will be preparing" and asking the parties to "confirm they are sufficient—we are willing to insure based on these forms."[17]  (JX-46 at 1–2.)

Ms. Tresler's email contained two one-page PDF attachments. (*Id.* at 11–12.)  The first attachment was titled "RECISSION [sic] OF DECLARATION OF RESTRICTIONS" and contained several blanks throughout the three sentences of text appearing on the page, as well as blanks for signature and date entries ("template RDR"). (*Id.* at 11.)  The page was stamped with a large "SAMPLE" watermark across the page. (*Id.*)  Intended to serve as the revocation of the Supplemental Declaration required by the third amendment, the body text of the template RDR stated:

> The undersigned owners hereby rescind, cancel and revoke al those Covenants, Conditions and Restrictions recorded on [BLANK] in Book [BLANK] at Page [BLANK] of Official Records in the Office of the County Recorder of [BLANK] County, State of California.
>
> The affected property is lots [BLANK] through [BLANK] inclusive, as shown upon that certain map entitled [BLANK], filed for record on [BLANK] in Bookof [sic] Maps, at Page [BLANK] in the Office of the County Recorder of [BLANK] County, State of California.
>
> The undersigned are all the owners of the property as shown on that certain map entitled: [BLANK]

---

[17]  As the court explained above, while it is apparent that FATCO provided title insurance to AGK with respect to Sierra de Montserrat, based on the evidence presented at the trial of this action, the exact scope of that title insurance is somewhat unclear. (*See* Doc. Nos. 103 at 73:22–25; 101 at 36:5–7, 36:23–25; 100 at 151:14–15.)

1    (*Id.* at 11; *see also* JX-45 at 2.)

2         The second attachment was titled "ASSIGNMENT," bore the "SAMPLE" watermark

3 across the page, and contained only one sentence of text with several blanks in which to add

4 inserted text ("template ADR"):

5                FOR VALUE RECEIVED, the undersigned hereby grants, assigns,
               and transfers to [BLANK] all [BLANK] interest under that certain

6                [BLANK] dated [BLANK], executed by [BLANK] to [BLANK],
               and recorded as instrument No. [BLANK] on [BLANK] in Book

7                [BLANK] at Page [BLANK] of Official Records in the Office of the
               County Recorder of [BLANK] County, State of California, and more

8                particularly described as follows: [BLANK]

9 (JX-46. at 12.)  The bottom of the form contained a date and signature line for "Assignor(s)," and

10 the top of the page contained an information box "FOR RECORDER'S USE ONLY."  (*Id.*)  In

11 other words, the attachments to Ms. Tresler's email were mere empty templates.

12         Mr. Maruska replied to Ms. Tresler's email (with all parties from the third amendment to

13 the PSA email chain still copied) stating that Comerica had "reviewed and approved the form

14 templates" and instructing Ms. Tresler to "*send completed forms (ready for execution by seller)*

15 *over to us for final blessing by legal counsel*."  (*Id.* at 1) (emphasis added).  At trial, Mr. Ferrer

16 confirmed that he had reviewed Ms. Tresler's sample forms and did not have any concerns about

17 them, other than the fact that they were blank and needed additional information.  (Doc. No. 105

18 at 40:14–16.)

19         During closing arguments at trial, defendant asserted that "within minutes" of Mr.

20 Maruska sending this email approving of the template RDR and template ADR, attorney Pakfar

21 sent his email waiving due diligence.  (Doc. No. 105 at 133:12–17.)  From Mr. Maruska's

22 perspective, defendant argued, "it sure felt like . . . when he gave the initial approval to the forms

23 . . . and then got this waiver of due diligence a few minutes later, that the parties had a deal."  (*Id.*

24 at 133:18–22.)  Despite defense counsel's characterization of the events in his closing argument,

25 attorney Pakfar's email waiving due diligence in fact bears a "19:40:41 EDT" timestamp, nearly

26 one-and-a-half hours after Mr. Maruska's email approving the form templates, which is

27 timestamped "18:15:13 EDT."  (*See* JX-47 at 1; JX-46 at 1.)  Similarly, although Mr. Maruska

28 testified at trial that he thought "this was pretty much a done deal" at this point, this testimony is

1    inconsistent with Mr. Maruska's later testimony in which he acknowledged that he intended to

2    show the completed version of these documents to Mr. Ferrer so that Mr. Ferrer could "make sure

3    it's accurate and that [Comerica] concur[s]." (*See* Doc. No. 104 at 103:4–7, 107:13–14.)  In other

4    words, Mr. Maruska knew that the template forms still needed to be filled out and then would still

5    be subject to, at the very least, internal legal review and approval.  This fact would suggest that

6    Mr. Maruska did not view the deal negotiations as having been fully concluded at this time,

7    because there still was a possibility that Mr. Ferrer would offer revisions to the forms, which

8    would in turn require another round of review and approval by AGK.  Furthermore, the trial

9    exhibits in this case do not indicate whether AGK ever responded to Mr. Maruska's email

10   approving of the templates or communicated anything to Comerica indicating that AGK also

11   approved them.[18]  Accordingly, while the court acknowledges that AGK's waiver of due

12   diligence took place within two hours of Mr. Ferrer approving of the template RDR and template

13   ADR, the court is unable to conclude whether Mr. Maruska at that time actually thought that the

14   parties had fully concluded their negotiations or by extension, whether Mr. Maruska at that time

15   thought that the template RDR and template ADR were "in form and substance acceptable to

16   Buyer," as was required by the parties' third amendment.  (*See* JX-43 at 7–8.)

17        Although the evidence introduced at trial does not suggest that anyone from AGK's side

18   of the transaction replied to Ms. Tresler's June 25, 2010 email attaching the template RDR and

19   template ADR or Mr. Maruska's June 25, 2010 email approving of them, attorney Pakfar testified

20   at trial that his understanding of the template ADR was "that it wasn't really a great Assignment

21   of Declarant Rights form." (Doc. No. 101 at 39:24–25.)  Attorney Pakfar thought that "[i]t was

22   not at all tailored to the transaction" and "was just a very generic assignment form" that would

23   require "a lot of work" to be effective, and both this document and the template RDR were

24   "definitely not in recordable form."  (*Id.* at 39:25–40:8.)

---

25   [18]  Although both Mr. Maruska's email approving of the template forms and attorney Pakfar's
26   email waiving due diligence both were sent in the email thread that had been used earlier to
     transmit the executed third amendment, their emails were not in direct response to each other.
27   (*See* JX-46 at 1; JX-47 at 1.)  Mr. Maruska's email was in direct response to Ms. Tresler's email
     attaching the templates, while attorney Pakfar's email was in direct response to Mr. Maruska's
28   email attaching the executed third amendment.  (*See* JX-46 at 1–2; JX-47 at 1–2.)

a. *Emails between FATCO and Comerica on June 27–28, 2010*

On Sunday, June 27, 2010, escrow agent Ms. Tresler started a new email chain in which she emailed only Mr. Maruska, Mr. Ferrer, Ms. Kordoban, and another Comerica employee, saying:

> Here are my closing documents for review, and if acceptable for execution by you—*I await the buyer's comments on the Recission* [sic] *and Assignment*.
>
> When approved and ready please execute, complete where necessary, have notarized and send over night [sic] to my attention, at the earliest AM delivery for that day.
>
> If we are to record on Wednesday [June 30, 2010] I need these documents no later than 8am on Wednesday—Federal Express is the suite next door so their 8am is usually here by 7:30 or so.
>
> Should you have any questions don't hesitate to let me know.

(JX-70 at 2) (emphasis added).  Attached to her email were nine documents related to closing, including updated versions of the assignment of declarant's rights and recission of declaration of restrictions with the information added to the blank spaces from the template versions of these documents ("June 27 ADR" and "June 27 RDR," respectively).  (*See* DX-B at 1, 6, 250; *see also* Doc. No. 104 at 111:1–16 (Mr. Maruska confirming that the only changes to the June 27 ADR was that it had been filled-in with transaction-specific information.))  The draft closing documents in Ms. Tresler's email referred to the buyer as "AG Sierra de Montserrat, L.P."  (*See* DX-B at 6, 9, 13, 25, 28.)  As Ms. Tresler noted in her email, she had not yet received feedback from AGK regarding the June 27 ADR and June 27 RDR.  (*Id.* at 1; *see also* Doc. No. 104 at 109:11–23.)  At trial, Mr. Maruska testified he understood Ms. Tresler's email to be asking Comerica to read and execute the documents "and return with Fed-Ex under [a] . . . pretty tight time frame," despite the fact that Ms. Tresler indicated that the assignment of declarant's rights and ADR had not yet been approved by AGK.  (Doc. No. 104 at 109:3–7, 109:14–18.)  Although Mr. Maruska stated that Ms. Tresler's request did not "make sense" in light of AGK's then-pending feedback, he also noted that no one from AGK had communicated to him that FATCO's template ADR and template RDR forms were unacceptable.  (*Id.* at 109:22–23, 111:1–6.)  Mr. Maruska testified that Comerica would not typically execute an assignment of declarant's rights or a rescission of declaration of restrictions at closing, but he did not have any concerns about the

27

1  forms at that time. (*Id.* at 110:4–8, 112:1–3, 112:13–23.) In addition, Mr. Maruska testified that

2  he did not think the third amendment required the assignment of declarant's rights to include

3  anything beyond what was contemplated by the June 27 ADR. (Doc. No. 104 at 111:23–25.)

4        On Monday, June 28, 2010, Mr. Ferrer replied to Ms. Tresler's email saying, "Assignment

5  of Declarant rights and rescission are ok." (JX-70 at 1.) During his trial testimony, Mr. Ferrer

6  recalled having reviewed the June 27 ADR,[19] though he did not recall discussing it with Mr.

7  Maruska or anyone else. (Doc. No. 105 at 63:18–22.) Mr. Ferrer testified that he "didn't have

8  issues with these documents, and [he] expected that if the buyer had issues with these documents,

9  they would convey the issues."[20] (*Id.* at 65:18–18.) Although Ms. Tresler's email stated that she

10  was awaiting AGK's comments on the June 27 ADR and June 27 RDR, Mr. Ferrer never saw or

11  reviewed any subsequent drafts of these documents until after the initiation of this action. (*See*

12  Doc. No. 105 at 67:1–20, 68:1–9, 69:2–4, 69:8–11, 69:22–25) (Mr. Ferrer confirming that he was

13  not included on any deal emails after June 28, 2010, did follow up with anyone at Comerica to

14  see what happened to the deal, and did not look at the closing documents on this deal until after

15  the initiation of this action, despite being the primary lawyer on the deal for Comerica).

16             b.    *Emails between FATCO and AGK on June 27–28, 2010*

17        On June 27, 2010, Ms. Tresler also started a new email chain with only AGK parties,

18  specifically, attorneys Pakfar and Galstian, along with Mr. Friedel. Her email read, in relevant

19  part:

20                 Here are the drafts of the closing documents for review and

21                 comment.

22  [19]  The court notes that Mr. Ferrer also admitted on cross-examination that he had testified at his

23  deposition in this action that he did not specifically recall seeing a filled-out version of the
assignment of declarant's rights at any time. (Doc. No. 105 at 63:18–65:4.) Although the court

24  acknowledges that Mr. Ferrer's deposition and trial testimony are contradictory in this regard, the
court finds that, given his June 28, 2010 email approving of the June 27 ADR and June 27 RDR,

25  it is likely Mr. Ferrer reviewed these documents at that time. (*See* JX-70.)

26  [20]  According to Mr. Ferrer's testimony, he never called attorney Pakfar or attorney Galstian

27  following the execution of the third amendment to inquire about what should be included in the
assignment of declarant's rights or revocation of the supplemental declaration provided for by the

28  third amendment. (Doc. No. 105 at 65:8–12.)

> In the interest of time—I prepared the Deed as I was not aware who might be drafting the final version.
>
> If acceptable please complete, execute those that require you [sic] signature and fax or email back to me for closing—retaining the originals for your records. . . .
>
> I will need a copy of the buying entity partnership and related entity documents for our underwriters [sic] review.

(JX-49 at 1.)

The next day, on June 28, 2010 at 6:31 p.m. Pacific Daylight Time,[21] attorney Galstian replied to Ms. Tresler's email, adding Mr. Murphy to the email chain but not anyone from Comerica, and stating, in relevant part:

> I attach handwritten comments to the Documentary Transfer Tax page and the Rescission of Declaration of Restrictions you circulated yesterday.  I also attach an insert (in MS Word) intended to replace the relevant text currently set forth in the draft Assignment of Declarants [sic] Rights.  Lastly, I attach a further updated Deed (and a redline to show changes made), which has been updated to match the relevant text to be set forth in the Assignment of Declarants Rights.  Please update the Deed accordingly.

(*Id.*)  Attached to his email was:  (1) a Documentary Transfer Tax page with a handwritten edit by AGK changing the buyer entity's name from "AG Sierra de Montserrat, L.P." (a name that FATCO had used throughout the draft closing documents it prepared) to "AGK Sierra de Montserrat, L.P."; (2) a scanned copy of the June 27 RDR containing handwritten edits and notes made by AGK;[22] (3) a Microsoft Word document containing new, revised language for the assignment of declarant rights (the "AGK ADR insert"); (4) a redline showing AGK's digital\

---

[21]  The joint exhibit containing attorney Galstian's email simply lists a timestamp of 6:31 p.m., without explicitly listing time zone information.  (JX-49 at 1.)  Indeed, some of the emails contained in the joint exhibits bear Eastern Daylight Time timestamps, while others simply list a time without any identification of the time zone.  (*Compare* JX-121 at 1 *with* JX-49 at 1.)  The parties did not provide an explanation for this discrepancy at trial.  Nonetheless, a comparison of emails that were reprinted in multiple joint trial exhibits suggests that the timestamps of emails lacking time zone descriptions are listed in Pacific Daylight Time.  (*See, e.g.*, JX-60 at 1) (email from Mr. Maruska bearing a timestamp of 20:53 p.m. Eastern Daylight Time); (JX-61 at 2) (same email from Mr. Maruska bearing a timestamp of 5:53 p.m. without time zone information).  Therefore, the court concludes that attorney Galstian's email on June 28, 2010 was sent at 6:31 p.m. Pacific Daylight Time.

[22]  AGK's specific edits to this document are not relevant to the disposition of this action.

29

edits to FATCO's draft grant deed; and (5) a "clean" copy of the draft grant deed with AGK's edits incorporated into the document.  (*Id.* at 3–10.)

For the purposes of this action, AGK's edits to the draft closing documents prepared by FATCO can be summarized as proposing two relevant changes to the deal.  First, AGK's edits sought to correct the buyer's name on the closing documents.  (*See id.* at 3.)  Second, AGK's edits sought to replace the text in the June 27 ADR with modified and additional language, such that the assignment of declarant's rights would state as follows:

> FOR VALUE RECEIVED, the undersigned herby grants, assigns and transfers to:
>
> AGK SIERRA DE MONTSERRAT, L.P., a Delaware limited partnership ("Successor Declarant"), all of its right, title and interest, as Declarant, in and to the Declaration of Covenants, Conditions, Restrictions and Easements for Sierra de Montserrat, recorded with the Placer County Recorder as Document Number 2006-0131950-00, as modified by the First Amendment to Declaration of Covenants, Conditions, Restrictions and Easements for Sierra de Montserrat, recorded with the Placer County Recorder as Document Number 2007-0038051-00, as may be modified from time to time (collectively, the "CC&Rs").  Hereafter, the undersigned shall no longer be entitled to exercise any of Declarant's rights under the CC&Rs.
>
> Successor Declarant hereby accepts the foregoing assignment of Declarant rights under the CC&Rs from the undersigned.  Upon recordation of this instrument, all references to "Declarant" in the CC&Rs shall be deemed to refer to Successor Declarant for all purposes.
>
> The undersigned agrees to indemnify, defend and hold Successor Declarant harmless from and against any and all loss, liability, claims or causes of action existing in favor of or asserted by any party arising out of the undersigned's position as "Declarant" under the CC&Rs on or before the date first above written.  In accordance herewith, the undersigned expressly acknowledges that the undersigned shall remain responsible for all obligations, responsibilities and liabilities that accrued before the date of this assignment.

(*Id.* at 5.)  The court notes that, beginning with "AGK SIERRA DE MONTSERRAT," every single sentence of the AGK ADR insert differed from the June 27 ADR.  (*See id.* at 5; DX-B at 6.)  Most notably, however, is the addition of the final paragraph providing that the undersigned (Comerica) would indemnify, defend and hold AGK harmless under certain circumstances (the "indemnity paragraph").  (JX-49 at 5.)  At trial, attorney Galstian testified that AGK sent its edits

30

to the June 27 ADR in the format of a Microsoft Word insert, rather than a redline, because the version of the assignment of declarant's rights that Ms. Tresler had sent was in a PDF format, and attorney Galstian could not "red line a scanned PDF against something." (Doc. No. 102 at 142:20–143:1.) Because attorney Galstian "didn't have anything to red line against," he and attorney Pakfar drafted the AGK ADR insert in a new document, which is what AGK "ultimately sent out here." (*Id.* at 142:20–143:2; *see also id.* at 138:4–13.)

In drafting the AGK ADR insert, both attorneys Galstian and Pakfar testified that it was their intent for the indemnity paragraph to be "as broad as possible." (*Id.* at 140:1–3; Doc. No. 101 at 56:24.) Attorney Galstian also testified that they intended for the text "on or before the date first above written" to relate to Comerica's position as the declarant, such that "any claim arising, or asserted by anyone while Comerica was the declarant, up until the date it was no longer declarant, would be a claim that is—that they indemnify [AGK] over, even if the filing of the claim happens whenever." (Doc. No. 102 at 140:21–141:5.) In addition, their "idea" behind the language "shall remain responsible" in the indemnity paragraph "was that anything that accrued during Comerica's period as the declarant, would be within the indemnity." (*Id.* at 141:12–14.) Similarly, attorney Pakfar testified that "we were intending to have [Comerica] indemnify our client for anything that arises out of [the declarant] issue[,] . . . their position as declarant prior to assigning it to us" such that "[a]nything that pertained to whether or not Comerica was declarant, would be covered." (Doc. No. 101 at 56:15–18, 56:25–57:1.) Attorney Pakfar also testified that it was their intent, for example, that "[i]f AGK's not the declarant after the date hereof because there wasn't an effective assignment, that would be covered," and HOA and community related issues would similarly be covered, because if Comerica was "not the declarant, they couldn't have assigned it to us [AGK], then we're not the declarant, then we don't have control of the board, then we have problems." (*Id.* at 57:5–15.)

When asked why he did not include anyone from Comerica on his response to Ms. Tresler attaching AGK's proposed closing document revisions, attorney Galstian testified that he "didn't

/////

/////

think of including Comerica" because "all [he] did was hit 'reply all.'"[23]  (Doc. No. 102 at 137:5–8.)  Attorney Galstian further testified that he "was just continuing on this [email] chain, to which, no seller group was a party, and as an ancillary matter, I had really very little luck in dealing with the seller side in terms of communications."  (*Id.* at 143:9–12.)  According to attorney Galstian, Comerica was not "really responsive" and AGK was "having a lot of difficulty in getting through with them."  (*Id.* at 143:14–17, 135:21–136:3.)  He "expressed frustration to Ms. Tresler on this issue," and she "said that she was in in touch with the seller side."  (*Id.* at 143:14–20, 135:21–136:3.)  Because "[s]he wasn't having the same [communication] problems," Ms. Tresler "agreed to facilitate . . . the closing of the transaction by being the go-between."  (*Id.* at 143:18–20.)  Accordingly, attorney Galstian expected that Ms. Tresler would "literally, press forward and send [his June 28, 2010 email response attaching AGK's edits to the draft closing documents] to the seller group."  (*Id.* at 143:6–7.)  With the expectation that Ms. Tresler would directly forward his email to Comerica, attorney Galstian "took care in drafting" the email and "wanted it to be very detailed."  (*Id.* at 136:4–7.)

It remains unclear to the court whether AGK and Comerica had explicitly discussed a provision such as the indemnity paragraph up until this point in their deal negotiations.  As described above, attorney Pakfar testified that he was under the impression throughout the negotiations over the deal that any assignment of declarant rights entered into by the parties would necessarily include an indemnity provision.  (*See, e.g.,* Doc. No. 101 at 138:7–10, 161:3–

---

[23]  The court observes that although attorney Galstian may have hit "reply all" on Ms. Tresler's June 27, 2010 email to AGK, it appears that attorney Galstian did in fact add Mr. Murphy—whom Ms. Tresler had not included in her June 27, 2010 email to AGK—as a recipient on the email chain.  (*See* JX-49 at 1.)  However, there is no evidence before the court suggesting that attorney Galstian's decision not to add Comerica representatives to this email chain was nefarious in any way, particularly in light of the fact that *both* AGK and Comerica responded to Ms. Tresler's separate June 27, 2010 emails to the parties without copying the opposing side of the deal on their responses.  (*See* JX-70 at 1.)  Indeed, Mr. Maruska testified at trial that he "understood Ms. Tresler's decision was acting as the go-between for closing documents in the last few days of the transaction" and that "at the very end" of the transaction, Ms. Tresler would ask questions of each side separately, and Comerica would respond to her inquiries without copying AGK. (Doc. No. 104 at 177:5–8; 169:8–170:3, 176:12–20.)  Therefore, the court does not infer ill-intent from either AGK's or Comerica's decisions not to copy the opposing party on their responses to Ms. Tresler's separate June 27, 2010 emails to each side.

10.)  However, as also noted above, Mr. Friedel's and Mr. Murphy's trial testimony suggests that they did not view an indemnity provision as inherent to an assignment of declarant's rights as a matter of course; rather, as the deal progressed, it became clear to them that AGK would require some sort of indemnification from Comerica in order to close on the deal.  (*See, e.g.,* Doc. No. 102 at 95:12– 22, 97:1–11) (Mr. Murphy explaining his impression that if AGK had received the price reduction it requested from Comerica, AGK would have closed with just the reduction and an assignment of declarant rights, but when that price reduction was not granted, AGK at that point also "required a release and/or indemnity"); (Doc. No. 103 at 26:16–23, 27:2–7) (Mr. Friedel explaining the same).  Based on this testimony, it is apparent that AGK engaged in internal discussions surrounding indemnification prior to June 28, 2010, the date of attorney Galstian's email with the AGK ADR insert.

Notwithstanding these internal discussions, the evidence before the court is mixed with regard to AGK's discussions with Comerica surrounding possible indemnification.  At trial, Mr. Maruska testified that as of June 25, 2010, he had not discussed Comerica indemnifying AGK with anyone at AGK, and up through the close of the deal, no one at AGK had informed him that AGK would not close without an indemnification.[24]  (*See* Doc. No. 104 at 100:22–25, 117:5–8, 120:8–11.)  Similarly, Mr. Ferrer testified that he did not have a discussion with attorney Pakfar about indemnity at any time during deal negotiations, and he would have remembered if they had discussed the topic, because it was Comerica's position that the sale of Sierra de Montserrat would be "as is, where is" with "no representations or warranties."  (Doc. No. 105 at 34:14–35:4.) By contrast, Mr. Murphy stated at trial that, after it became clear that AGK would not receive the full price reduction it requested and Comerica would not settle with Westwood, Mr. Murphy "believe[s]" he "made it clear" to Mr. Maruska and Mr. Chamberlain that AGK would require Comerica to indemnify it in order to close the deal, though he couldn't "remember exactly how it was phrased or in what context."  (Doc. No. 102 at 98:16–101:4.)  More specifically, he testified

---

[24]  The specific phrasing of Mr. Maruska's testimony in this regard leaves open the possibility that he discussed the possibility of Comerica indemnifying AGK internally with others at Comerica.

1    as follows:

2        In this instance, I'm sure I was having conversations with the bank
         and the broker, Steve Chamberlain, related to [AGRE]'s requirement
3        to get an indemnity in there.  I don't recall specifics of conversations
         with the bank or with Steve Chamberlain.  My most vivid
4        recollection was talking to [attorney Pakfar], related to the
         indemnity, and he was saying that the bank was pushing back on the
5        indemnity.  I also—it was related at the time to title insurance, that
         First American was having heartburn . . . related to the [revocation
6        of the Supplemental Declaration].  So certain things in this deal are
         etched in my mind forever. . . . [including] my conversations with
7        [attorney Pakfar], because I recall specifically I was on vacation in
         Tahoe, and I never forget pacing the deck of that home we rented,
8        and talking to [attorney Pakfar] about how the bank was pushing
         back on the indemnity, and First American was pushing back on our
9        title insurance.

10   (Doc. No. 102 at 64:14–65:6.)  Mr. Murphy testified that conversations regarding indemnity

11   occurred after June 25, 2010, and his conversation with attorney Pakfar while on vacation in

12   Tahoe would have happened "late in June" 2010, "very close to the final date, . . . because again,

13   I was very concerned we wouldn't have enough time to address the issue if the bank was pushing

14   back on the indemnity."  (*Id.* at 66:17–20; 65:21–66:7.)  It is not apparent from the evidence

15   presented at trial what precisely Mr. Murphy meant when he referred to FATCO "pushing back"

16   on AGK's title insurance, but as the court has described above, on June 25, 2010, FATCO did

17   question why AGK felt Comerica would have the authority to execute a revocation of the

18   Supplemental Declaration, but this issue appeared to have been resolved that same day.  (*See* JX-

19   45 at 1–2.)  Therefore, if the conversations described in Mr. Murphy's testimony took place, it

20   appears likely that they occurred on and/or perhaps shortly after June 25, 2010.  Similarly, Mr.

21   Murphy also testified as to his belief that (at some unspecified time) attorney Pakfar

22   communicated to Comerica that without indemnity, AGK would not close on the deal.  (Doc. No.

23   102 at 99:15–18.)  Attorney Pakfar testified that prior to June 28, 2010, he recalls "generally

24   speaking [with Comerica] about how [the declarant issue] is not a risk that we could take" and

25   how AGK "would need Comerica to . . . assume the risk somehow," but he did not recall whether

26   /////

27   /////

28   /////

34

he specifically discussed indemnity with Mr. Ferrer, due to Ferrer's limited communication.[25] (Doc. No. 101 at 48:15–23, 49:1–5.)  Instead, it was attorney Pakfar's understanding that the indemnity was something "our side had discussed with their side, via [Mr. Murphy]."  (Doc. No. 101 at 49:3–5.)  Thus, there was conflicting testimony presented at trial in this regard, which may be attributable to the unfortunate nearly-twelve-year gap between the deal negotiations and the trial of this action.  As a result, and in any event, the court is ultimately not persuaded that, prior to attorney Galstian's June 28, 2010 email to Ms. Tresler attaching the AGK ADR insert, anyone at AGK spoke with anyone at Comerica regarding the possibility of Comerica indemnifying AGK with respect to the declarant's rights issue.[26]

In commenting on the progression of the deal and AGK's insertion of the indemnity paragraph into the AGK ADR insert relatively late in the deal's lifecycle, attorney Pakfar testified:

> If Comerica a week before would have let us draft the [assignment of declarant rights], I can assure you, it would have been much more robust.  It would have had all kinds of reps and warranties and an indemnity, and Comerica would have had a week to negotiate. . . . So what was going on through my mind was . . . nobody wants to close a deal like this.  We would want to do a normal exchanging of drafts at an earlier date, carefully going through a law firm prepared form of assignment.  We were doing things this way because of Comerica.  This is how they wanted it done.

(*See* Doc. No. 101 at 136:25–137:7, 138:3–6, 139:5–12.)  According to attorney Pakfar, in drafting the AGK ADR insert, AGK was "just commenting as requested and [AGK] expected Comerica to comment and do legal review" in return.  (Doc. No. 101 at 58:23–25; *see also id.* at 140:9–10, 49:14–18.)

/////

---

[25]  Attorney Pakfar also testified that no one at Comerica ever communicated to him that the bank would not enter into an agreement providing for an indemnification provision and that he did not discuss the bank's internal policies with anyone at Comerica.  (Doc. No. 101 at 58:10–18.)

[26]  Mr. Friedel testified that he never communicated to anyone at Comerica that such an indemnity provision was a condition precedent for AGK to close on the deal.  (Doc. No. 103 at 42:21–23.)  Friedel's testimony in this regard is not inconsistent with other testimony or evidence admitted at trial, and the court thus concludes that Mr. Friedel did not personally discuss such an indemnification provision with anyone at Comerica at any point prior to the close of this deal.

1          c.      *Buyer Entity Name Change*

2          On June 28, 2010—a few hours before attorney Galstian sent Ms. Tresler his email

3   attaching AGK's edits to the proposed closing documents and the AGK ADR insert—the parties

4   also engaged in a separate email conversation pertaining to the proper name of the buyer entity.

5   (*See* JX-121.)  As noted above, the draft closing documents Ms. Tresler had transmitted to the

6   parties on June 27, 2010 referred to the buyer as "AG Sierra de Montserrat, L.P.," and the PSA

7   was between Comerica and AGRE.  (*See generally* JX-27, DX-B, JX-49.)

8          On June 28, 2010, AGRE and AGK entered into an Assignment and Assumption of

9   Purchase and Sale Agreement whereby AGRE assigned its interest in the PSA to AGK.  (JX-100

10  at 1–3.)  Thereafter, attorney Pakfar started a new email chain with Ms. Tresler, Mr. Maruska,

11  and Mr. Ferrer in the "to" field, and attorney Galstian, Mr. Murphy, and Mr. Friedel in the "cc"

12  field ("buyer name change email").  (JX-121.)  Attorney Pakfar attached to that email the

13  executed Assignment and Assumption of Purchase and Sale Agreement, explaining that the

14  document assigns "Buyer's rights under the PSA to the specially formed joint venture entity

15  beneficially owned by AG and Kinetic (and their affiliates)."  (*Id.* at 1.)  He instructed the email

16  recipients to "please note the new Buyer entity name for all purposes going forward."  (*Id.*)

17         Based on the evidence presented at trial, after attorney Pakfar sent the buyer name change

18  email on the afternoon of June 28, 2010, Mr. Ferrer was not included as a recipient on any further

19  deal-related communications, despite Ms. Tresler having informed Mr. Ferrer the previous day

20  that she was still awaiting AGK's comments on the June 27 ADR and June 27 RDR.  (*See* Doc.

21  No. 105 at 68:16–69:4; JX-70 at 2.)

22         6.     Execution and Recording of Closing Documents

23         Less than five minutes after attorney Pakfar sent the buyer name change email, Ms.

24  Tresler emailed Mr. Maruska informing him that she was in the process of correcting the buyer's

25  /////

26  /////

27  /////

28  /////

36

1  name on the closing documents.[27] (JX-72 at 3.) She attached a revised version of the deed "[t]o

2  make sure this gets executed in time" and stated that she would "make the changes to the rest and

3  send them back out." (*Id.* at 3–4.) Mr. Maruska requested that Ms. Tresler resend any closing

4  documents that needed to be signed with Karen Balmer, who assisted Mr. Maruska with deal

5  closings, being copied on the email. (JX-72 at 2; Doc. No. 104 at 119:4–18.) According to Mr.

6  Maruska, Ms. Balmer would print documents for him to sign, flag the execution lines, print

7  FedEx labels, and ship closing documents, "especially when time frames were tight," such as in

8  this deal. (Doc. No. 104 at 119:14–20.) At trial, Mr. Maruska testified that he did not instruct

9  Ms. Tresler to copy Mr. Ferrer on the closing documents because he thought the documents Mr.

10 Ferrer had previously reviewed were "the final documents" and that negotiations had concluded.

11 (*See* Doc. No. 104 at 170:11–20.) This is despite the fact that in her June 27, 2010 email that he

12 received Ms. Tresler had stated she was still awaiting comments to those same documents from

13 the buyer.

14      On Tuesday, June 29, 2010, Ms. Tresler emailed Mr. Maruska and Ms. Balmer new

15 versions of the closing documents, which incorporated AGK's changes. (JX-72 at 1.) The body

16 of her email read, "Here you go—these will need to arrive at the earliest overnight delivery you

17 can send them in order to close tomorrow." (*Id.*) Her email included nine attachments of closing

18 documents. (*Id.*) All of the attachments bore the word "new" at the start of the file name,

19 including the attachment "New Assign Dec Rights," which had been revised to include the

20 language from the AGK ADR insert, including the indemnity paragraph ("final ADR"). (*Id.* at 1,

21 8.) The attachments also included a revised version of the June 27 RDR, labeled "New Recission

22 /////

23 /////

24 /////

_____

25 [27] The buyer name change email (JX-121 at 1) bears a 17:09 p.m. Eastern Daylight Time

26 timestamp, whereas Mr. Tresler's email (JX-72 at 3) was sent at 2:13 p.m. Pacific Daylight Time. (*See also* Doc. No. 100 at 78:15–20.) At that time, attorney Galstian had not yet sent Ms. Tresler

27 the email containing AGK's comments on the closing documents and the AGK ADR insert, which, as described above, was sent at June 28, 2010 at 6:31 p.m. Pacific Daylight Time. (*See*

28 JX-49 at 1.)

1   [sic]" ("final RDR").[28]  (*Id.* at 1, 28.)  Apart from relabeling all the attachments with the word

2   "new," Ms. Tresler did not otherwise describe in her email any changes that had been made to the

3   closing documents.  (*See id.* at 1; DX-B.)

4          At trial, Mr. Maruska testified that he noticed that the attachments were all described as

5   "new," but he assumed that this denotation was only added to reflect the change to the buyer's

6   name—despite the fact that some of the closing documents labeled "new" did not even include

7   the buyer's name in them.  (*See* Doc. No. 104 at 119:21–120:1, 172:12–20, 175:13–16; JX-72 at

8   6, 18.)  Because no one specifically notified him as to any other changes to the closing

9   documents, Mr. Maruska then signed the documents, including the final ADR and final RDR,

10  without reading them or sending them to Mr. Ferrer for approval.[29]  (Doc. No. 104 at 175:25–

11  176:11.)  Although the June 27 ADR was only one paragraph long, and the final ADR was three

12  paragraphs long with the indemnity paragraph just above his signature line, Mr. Maruska testified

13  that he nonetheless did not notice the changes to the final ADR:

14              I had a lot of other duties.  I [knew] it was one page. . . . if it turned
                into three pages, I probably would have noticed it, but with it just
15              being one page, I did not see the subsequent two paragraphs.  It was
                about the same size.
16

17  (Doc. No. 104 at 173:12–25.)[30]

18         Because the final ADR contained substantive modifications from the June 27 ADR that

19  Mr. Ferrer had reviewed, under Comerica's internal policies, Mr. Maruska should have forwarded

20  the final ADR to Mr. Ferrer for his approval prior to signing.  (Doc. No. 105 at 67:11–20.)  In

---

21  [28]  The body text of the final RDR stated that "The undersigned owner as Declarant hereby
22  rescinds, cancels and revokes all those Covenants, Conditions and Restrictions contained in that
    [Supplemental Declaration]."  (JX-72 at 28.)

23  [29]  On June 30, 2010, Ms. Balmer emailed Ms. Tresler an executed copy of a form authorizing
24  Mr. Maruska to sign instruments on Comerica's behalf.  (JX-73 at 1, 6.)

25  [30]  AGK has suggested that Mr. Maruska in fact noticed the indemnity paragraph in the final ADR
26  but made a "business decision" that it was fine to nonetheless sign the final ADR, motivated by
    the time pressure he felt to close the deal by June 30, 2010.  (*See, e.g.*, Doc. No. 104 at 182:20–
27  183:1.)  Mr. Maruska denied this suggestion at trial.  (*Id.* at 183:2.)  The court need not and does
    not resolve this credibility determination.  However, it does appear plausible to the court that Mr.
28  Maruska did not notice the new indemnity paragraph in the final ADR.

38

1    addition, Mr. Maruska testified that he would not have had authority to agree to an

2    indemnification of any kind in favor of a buyer; instead, the department head and legal team

3    would have had to authorize such a provision.  (Doc. No. 104 at 75:4–21.)

4         The final ADR and final RDR were recorded in Placer County on June 30, 2010.  (*See* JX-

5    51 at 1; JX-103 at 1.)  Mr. Maruska never sent Mr. Ferrer the closing documents, and Ferrer never

6    followed up to inquire about what had happened with regard to AGK's comments on the June 27

7    ADR or with the closing of the deal more generally.  (*See* Doc. No. 105 at 67:21–68: 9.)

8    Attorney Pakfar testified that because Comerica is a "sophisticated party," AGK assumed

9    Comerica read and agreed to the indemnity paragraph set out in the final ADR.  (Doc. No. 101 at

10   140:9–15.)  Attorney Pakfar did not think it was AGK's "job" to suggest to Comerica that they

11   might not want to agree to such the indemnity provision, just as Comerica did not caution AGK

12   about agreeing to portions of the PSA that were unfavorable to AGK.  (*Id.* at 138:17–139:4,

13   140:10–15.)

14   **D.    Post-Sale Litigation with Mr. Westwood**

15        Following Comerica's sale of Sierra de Montserrat to AGK, Mr. Westwood brought

16   several lawsuits against AGK, its owners, and/or other individuals affiliated with Sierra de

17   Montserrat.  (*See, e.g.*, JX-117, JX-118, JX-119, JX-134.)  Two of these lawsuits are relevant to

18   this action:  (1) *Westwood Montserrat, LTD v. AGK Sierra de Montserrat et al.*, No. S-cv-

19   0029131, initiated in the Placer County Superior Court on May 2, 2011 (the "Kincade Action");

20   and (2) *Westwood Montserrat, LTD v. AGK Sierra de Montserrat, L.P. et al.*, No. S-cv-0032447,

21   initiated in the Placer County Superior Court on January 25, 2013 (the "Murphy Action"),

22   (collectively, the "Westwood litigation").[31]  (*See* JX-6; JX-118.)

23

24   ───────────────────
     [31]  At the trial before this court, attorney Gorry testified as a witness on the issue of the attorneys'
25   fees that AGK had accrued in the Westwood litigation.  Attorney Gorry further testified that Mr.
     Westwood additionally filed some "ancillary" lawsuits that were dismissed, as well as a lawsuit
26   that Mr. Westwood filed against AGK to enforce covenants on behalf of the Wildlife Heritage
     Foundation.  (Doc. No. 103 at 57:20–58:1, 58:20–22; JX-117.)  AGK does not seek
27   indemnification from Comerica for its expenses incurred in defending against those lawsuits, nor
     does AGK argue that those lawsuits fall within the scope of the indemnity paragraph of the final
28   ADR.  (*See* Doc. No. 103 at 58:12–25.)

1              1.      The Kincade Action

2          The Kincade Action was brought by Westwood against defendants AGK, the Sierra de

3    Montserrat HOA, and Robert and Jennielyn Kincade, individuals who had purchased unimproved

4    lots at Sierra de Montserrat.  (JX-6 at 2; Doc. Nos. 103 at 59:6–10; 104 at 5:22–6:1.)  At trial, the

5    parties did not dispute that the Kincade Action was eventually submitted to arbitration and

6    bifurcated into two phases.  (Doc. No. 103 at 61:12–17.)  The first phase of the arbitration

7    pertained to whether Westwood or AGK was the declarant of Sierra de Montserrat, and the

8    arbitrator determined that Westwood was the declarant.  (*Id.* at 61:22–25, 62:11–18.)  The second

9    phase of the arbitration pertained to whether certain building design elements—such as spiked

10   fence caps, chimney caps, front doors, and drainage management measures—that AGK and the

11   Kincades sought to implement violated design guidelines and the CC&Rs.  (*Id.* at 63:1–14, 64:1–

12   4.)

13         AGK agreed to indemnify the Kincades and provided the Kincades with a defense in the

14   Kincade Action.  (Doc. No. 104 at 7:12–14.)  Attorney Gorry testified that it was his

15   understanding that AGK decided to defend the Kincades in part because "the underlying claims

16   all arose from [Mr. Westwood's] declarant status."  (Doc. No. 104 at 8:3–13.)  Similarly, in

17   AGK's closing argument at the trial of this action, AGK asserted that it indemnified the Kincades

18   because "all of the arguments, all of the law, everything was the same" between AGK's defense

19   and the Kincades' defense.  (Doc. Nos. 103 at 63:18–22; 105 at 106:2–6.)  AGK represents that it

20   incurred $1,000,331.09 in legal fees and costs in connection with its defense (both on its own

21   behalf and on the Kincades' behalf) in the Kincade Action.  (Doc. No. 103 at 78:11–12; JX-108;

22   JX-109).  At the trial of this case, attorney Gorry testified that AGK received an attorneys' fee

23   award in the Kincade Action for its fees incurred in defending the Kincades (but not as to its own

24   fees), but that AGK has been unable to collect upon that award.  (Doc. No. 104 at 45:10–20.)

25             2.      The Murphy Action

26         The Murphy Action was initially brought by Westwood against AGK, Colliers

27   International, Mr. Murphy, and Mr. Chamberlain, but Westwood's fourth amended complaint in

28   that action named AGK, Mr. Murphy, AGRE, Kinetic Homes, FATCO, and Kinetic Partners, Inc.

40

1    as defendants.  (JX-118, JX-142; Doc. No. 103 at 69:5–6.)  The parties do not dispute that the

2    Murphy Action pertained to Mr. Westwood's attempt to exercise his purported rights under the

3    Supplemental Declaration to repurchase certain lots at Sierra de Montserrat for a reduced price.

4    (*See* Doc. No. 103 at 68:21–25.)

5            Attorney Gorry testified at the trial in this action that FATCO felt as though some, but not

6    all, of the claims in the Murphy Action were covered by the title insurance FATCO provided

7    AGK.  (Doc. No. 104 at 45:21–20.)  FATCO assigned the law firm Steyer Lowenthal Boodrookas

8    Alvarez & Smith ("Steyer Lowenthal") to defend the claims FATCO had "accepted on tender

9    under the title insurance policy" such that Steyer Lowenthal served as co-counsel with AGK's

10   counsel in the Murphy Action.  (Doc. No. 103 at 73:23–74:2.)

11           After AGK and AGRE prevailed at a bifurcated bench trial in the Murphy Action, the

12   Murphy Action continued as to defendants Mr. Murphy, Kinetic Homes, and Kinetic Partners,

13   Inc., until they eventually settled with Westwood.  (Doc. No. 104 at 26:3–27:3.)  AGK provided

14   the legal defense for Mr. Murphy, Kinetic Homes, and Kinetic Partners, Inc., because AGK

15   considered Mr. Murphy and the Kinetic entities to be part of the AGK "umbrella."[32]  (*See* Doc.

16   No. 105 at 32:24–33:2; 105 at 106:11–19.)  AGK states in this action that it incurred

17   $1,377,345.75 in legal fees and costs in connection with its defense (including the legal fees

18   incurred by Steyer Lowenthal and fees incurred in defending Mr. Murphy, Kinetic Homes, and

19   Kinetic Partners, Inc.) in the Murphy Action.  (Doc. No. 103 at 78:11–12.)  At the trial in this

20   case, attorney Gorry testified that AGK received an attorneys' fee award in the Murphy Action,

21   but that AGK has, once again, been unable to collect upon that award.  (Doc. No. 104 at 45:14–

22   20.)

23   **E.      The Present Litigation**

24           On April 17, 2015, AGK sent Comerica a demand letter seeking indemnification for the

25   attorneys' fees it incurred in the Westwood litigation.  (Doc. No. 103 at 79:17–80:16; JX-105.)

26   _____

27   [32]  Attorney Gorry testified that AGK's legal fees also included fees for AGRE, noting that AGK
     and AGRE were "both being represented under the [same] umbrella" while they were involved in
28   the Murphy Action.  (Doc. No. 104 at 24:9–14, 33:3–17.)

1   One week later, Comerica sent a written response indicating that it would not indemnify AGK for

2   the Westwood litigation.  (Doc. No. 84 at 4; JX-106.)

3          On April 29, 2015, AGK initiated this action against Comerica in the Placer County

4   Superior Court, asserting claims for breach of contract and declaratory relief.  (Doc. No. 1 at 5.)

5   On June 15, 2015, Comerica removed this action to this federal court on the basis of diversity

6   jurisdiction pursuant to 28 U.S.C. § 1441.[33]  (Doc. No. 1 at 1.)

7          AGK seeks indemnification from Comerica to cover its fees and costs incurred in the

8   Westwood litigation and in this action.  (*See* Doc. Nos. 1 at 9–10; 110 at 12, 18.)  As of the first

9   day of trial in this case, attorney Gorry testified that AGK's fees and costs in this action totaled

10  $1,143,481.24.  (Doc. No. 103 at 84:13–16.)  In its post-trial briefing, AGK provided an updated

11  figure of "at least" $1,146,337.24.  (Doc. No. 110 at 19.)  Thus, AGK seeks a total amount of

12  $5,246,469.11 in damages and prejudgment interest, comprised of:  (1) $1,000,311.09 in

13  attorneys' fees and costs from the Kincade Action, (2) $1,377,345.75 in attorneys' fees and costs

14  from the Murphy Action, (3) $1,146,337.24 in attorneys' fees and costs from this action, and (4)

15  $1,722,475.03 in prejudgment interest.  (*See* Doc. No. 110 at 12, 19, 27.)

16         In addition, AGK seeks declaratory relief in the form of "the parties' respective indemnity

17  rights and obligations" under the final ADR.  (Doc. No. 1 at 10; Doc. No. 105 at 108:9–13.)

18  Because of AGK's expressed view that "[t]he likelihood of litigation [with] Mr. Westwood is still

19  real and present," AGK asserts that "[i]t is vital if the Court finds that the indemnity obligation

20  from Comerica is proper, and enforceable, then the Court must find that it's continuing."  (Doc.

21  No. 105 at 108:11–13.)

22                              **CONCLUSIONS OF LAW**

23  **A.      AGK's Breach of Contract Claim**

24         In order to prove a breach of contract under California law, a party must show:  (1) the

25  existence of a contract; (2) plaintiff's performance under the contract or excuse for

26  ───────────────

27  [33]  The parties do not dispute that Comerica is a corporation incorporated in Texas with its principal place of business in Texas, nor that AGK is a limited partnership incorporated in Delaware with its principal place of business in New York.  (*See* Doc. No. 1 at 2, 5; *see also* JX-28  26 at 4; JX-100 at 1.)

1    nonperformance; (3) defendant's breach; and (4) resulting damages to the plaintiff.  *Oasis W.*

2    *Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

3        The agreement at issue in this breach of contract action is the final ADR, which contains

4    the indemnity paragraph.  The parties do not dispute the fact that Mr. Maruska signed and

5    executed the final ADR on Comerica's behalf.  (*See, e.g.*, Doc. Nos. 110 at 8–9; 116 at 20.)  The

6    parties also do not dispute that only Comerica was required to sign the final ADR and that Mr.

7    Maruska was authorized to sign closing documents on this deal on Comerica's behalf.  (*See* JX-

8    73; Doc. Nos. 110 at 8–9; 116 at 20.)  Therefore, the court concludes that absent proof of an

9    applicable defense, the final ADR is a valid, binding contract.

10        1.    Comerica's Affirmative Defense of Unilateral Mistake

11        Comerica raises the doctrine of unilateral mistake as an affirmative defense to the validity

12   of the final ADR.  As the party asserting this defense, Comerica must offer clear and convincing

13   evidence to prove its defense of unilateral mistake.  *See Grief v. Sanin*, 74 Cal. App. 5th 412, 442

14   (2022) (recognizing that defendant bore the burden of proving the defense of unilateral mistake

15   by "clear, convincing and satisfactory" evidence); *see also Century Sur. Co. v. Weir Bros. Const.*

16   *Corp.*, No. 3:14-cv-00687-WQH-NLS, 2015 WL 1608874, at *9 (S.D. Cal. Apr. 9, 2015).

17        Under California law, a party to a contract may rescind the contract if that party's consent

18   was given by mistake.  Cal. Civ. Code § 1689(b)(1).  "A mistake that gives rise to rescission may

19   be either a mistake of law or a mistake of fact.  *See Est. of Eskra*, 78 Cal. App. 5th 209, 221

20   (2022).  A mistake of fact—which is the defense Comerica asserts here—is defined as "a mistake,

21   not caused by the neglect of a legal duty on the part of the person making the mistake, and

22   consisting in [a]n unconscious ignorance or forgetfulness of a fact past or present, material to the

23   contract."  Cal. Civ. Code § 1577.  "A factual mistake by one party to a contract, or unilateral

24   mistake, affords a ground for rescission in some circumstances."  *Donovan v. RRL Corp.*, 26 Cal.

25   4th 261, 278 (2001).  "Unilateral mistake is ground for relief where the mistake is due to the fault

26   of the other party or the other party knows or has reason to know of the mistake."  *Architects &*

27   *Contractors Estimating Servs., Inc. v. Smith*, 164 Cal. App. 3d 1001, 1007–08 (1985).

28   /////

43

1    Even where a plaintiff has no reason to know of and does not cause a defendant's

2    unilateral mistake of fact, a defendant may obtain rescission of the contract by establishing the

3    following facts:  "(1) the defendant made a mistake regarding a basic assumption upon which the

4    defendant made the contract; (2) the mistake has a material effect upon the agreed exchange of

5    performances that is adverse to the defendant; (3) the defendant does not bear the risk of the

6    mistake; and (4) the effect of the mistake is such that enforcement of the contract would be

7    unconscionable."  *Donovan*, 26 Cal. 4th at 282.

8                    a.    *Unilateral Mistake Caused by AGK*

9    First, Comerica argues that it is entitled to partial rescission of the final ADR under the

10   contractual doctrine of unilateral mistake because its "mistake was caused by AGK's failure—

11   intentional or otherwise—to notify Comerica that it had asked the escrow officer to insert an

12   indemnity provision in favor of AGK."  (Doc. No. 89 at 24.)  Comerica asserts that Mr. Maruska

13   was mistaken as to the contents of the final ADR, specifically the inclusion of the indemnity

14   paragraph, because he assumed that the final ADR "was identical to the document both he and

15   [Mr.] Ferrer had reviewed and approved the previous day," that is, the June 27 ADR.  (*Id.*)

16   According to Comerica, Mr. Maruska signed the final ADR under the mistaken belief that the

17   final ADR was not substantively different from the June 27 ADR and did not contain any sort of

18   indemnity provision.  (*See id.*)

19   Comerica's arguments in this regard are not supported by the evidence presented at trial.

20   There is simply no evidence—let alone clear and convincing evidence—that AGK was at fault for

21   Comerica's mistake or had reason to know of Comerica's mistake.[34]  As the court has described

22   above, the evidence admitted at trial establishes that attorney Galstian explicitly flagged AGK's

23   ADR insert when he emailed it to Ms. Tresler, expecting her to "press forward and send" his

24   _____

25   [34]  The court will assume *arguendo* that Mr. Maruska indeed mistakenly thought the final ADR he
signed was substantively identical to the June 27 ADR.  Because the court determines that

26   Comerica has not satisfied its burden of proof as to the affirmative defense of mistake, the court
need not and does not make any factual determination as to whether Mr. Maruska had not noticed

27   the indemnity paragraph in the final ADR before signing it or whether Mr. Maruska made a
conscious "business decision" to sign the final ADR despite the inclusion of the indemnity

28   paragraph.

1    email directly to Comerica.  (JX-49 at 1; Doc. No. 102 at 143:6–7.)  In addition, both AGK and

2    Comerica understood that Ms. Tresler was serving as the "go-between" for the parties during the

3    final days of the deal, and indeed, FATCO's role as an intermediary on the drafting and exchange

4    of the assignment of declarant's rights was at Comerica's specific request.  (Doc. Nos. 102 at

5    68:2–5, 143:18–20; 104 at 177:5–8, 169:8–170:3, 176:12–20; 101 at 30:4–10, 35:23–25, 139:11–

6    12.)  The court also finds persuasive attorney Pakfar's testimony that AGK expected Comerica, a

7    "sophisticated party," to "read[] and review[]" the final ADR, especially in light of Mr.

8    Maruska's June 25, 2010 email instructing Ms. Tresler to send him completed closing documents

9    for "final blessing by our legal counsel."  (Doc. No. 101 at 140:2–15; JX-46 at 1.)  Given that

10   AGK reasonably expected Comerica to read and review the final ADR, it follows that AGK

11   reasonably believed that Comerica knew and approved of the indemnity paragraph once the final

12   ADR was signed and recorded in Placer County without any indication that Comerica had any

13   issue with the final ADR.  (*See* Doc. No. 101 at 138:16–139:4) (attorney Pakfar testifying that in

14   his experience parties sometimes agree to one-sided indemnities without negotiation and

15   explaining that AGK agreed to a one-sided indemnity in Comerica's favor in the PSA without

16   commenting on that provision before signing).  Indeed, there is no evidence before the court that

17   Comerica ever communicated anything to AGK that would suggest that Mr. Maruska was

18   unaware of the indemnity paragraph in the final ADR.  (JX-51.)  Instead, the evidence presented

19   at trial, even construed in the light most favorable to Comerica, suggests that Mr. Maruska's

20   mistake was borne from his failure to read the final ADR prior to signing, despite the fact that

21   Ms. Tresler's email attaching the June 27 ADR stated that she was "await[ing] the buyer's

22   comments" on the document and her email attaching the final ADR labeled the attachment as

23   "New Assign Dec Rights."  (JX-70 at 2; JX-72 at 1.)

24          Therefore, the court concludes that Comerica has failed to establish that it is entitled to

25   partial recission of the final ADR due to a unilateral mistake that was the fault of AGK.

26                    b.    *Unilateral Mistake Not Caused by, or known to, AGK*

27          Second, Comerica argues that it is entitled to partial recission of the final ADR even if its

28   mistake was not caused by AGK.  (*See* Doc. Nos. 89 at 24; 116 at 12.)  To prevail on this defense,

1   Comerica must prove that:  (1) Comerica "made a mistake regarding a basic assumption upon

2   which" it contracted with AGK to sell Sierra de Monsterrat; (2) "the mistake has a material effect

3   upon the agreed exchange of performances that is adverse to" Comerica; (3) Comerica "does not

4   bear the risk of the mistake"; and (4) the effect of Comerica's "mistake is such that enforcement

5   of the contract would be unconscionable."  *See Donovan*, 26 Cal. 4th at 282.  Comerica must

6   establish each of these requisite facts, often referred to by California courts as the "*Donovan*

7   factors," by clear and convincing evidence.  *See Grief*, 74 Cal. App. 5th at 442.

8          The court concludes that Comerica has established only the first two required factors in

9   support of this type of unilateral mistake defense.  As described in the court's findings of fact,

10  Comerica introduced ample testimony at trial in support of the proposition that Comerica

11  intended for the sale of the Sierra de Monsterrat lots to be "as is, where is."  (*See* Doc. Nos. 104 at

12  56:18–57:6, 74:10–17; 105 at 34:17–18; *see also* JX-27 at 13.)  It thus follows that the alleged

13  mistake here—Mr. Maruska's ignorance as to the inclusion of an indemnity provision favoring

14  AGK in the final ADR—pertains to a basic assumption upon which Comerica made the contract.

15  In Mr. Maruska's own words, such a provision "would be the complete opposite" of finality and

16  "would open the door for nonfinality" in the transaction because it would introduce "contingent

17  liability after the sale." (*See* Doc. No. 104 at 74:5–17.)  Moreover, an indemnity provision in

18  favor of AGK that opens Comerica up to the risk of post-sale liability certainly has a "material

19  effect upon the agreed exchange of performances" between the parties in this ostensibly "as is,

20  where is" sale, and that effect is adverse to Comerica.

21         With regard to the third *Donovan* factor—that the defendant does not bear the risk of the

22  mistake—the California Supreme Court has explained that "the risk of a mistake must be

23  allocated to a party where the mistake results from that party's neglect of a legal duty."  *Donovan*,

24  26 Cal. 4th at 283.  More specifically, "[a] party bears the risk of mistake when . . . he is aware, at

25  the time the contract is made, that he has only limited knowledge with respect to the facts to

26  which the mistake relates but treats his limited knowledge as sufficient." *Id.* (citing Rest. 2d

27  Contracts, § 154).  It is "well established" that under this third *Donovan* factor, "in the absence of

28  fraud, overreaching, or excusable neglect, that one who signs an instrument may not avoid the

46

1    impact of its terms on the ground that he failed to read the instrument before signing it." *Stewart*

2    *v. Preston Pipeline Inc.*, 134 Cal. App. 4th 1565, 1588 (2005) (citing *Hulsey v. Elsinore*

3    *Parachute Ctr.*, 168 Cal. App. 3d 333, 339 (1985)); *see also Rosenfeld v. JPMorgan Chase Bank,*

4    *N.A.*, 732 F. Supp. 2d 952, 965 (N.D. Cal. 2010) (noting that a party "has a duty to read the terms

5    of a contract before signing").

6          Comerica argues that Mr. Maruska's failure to read the final ADR prior to signing was

7    "based upon the reasonable belief that, except for the name of the buyer, it was the very same

8    Assignment that had been carefully reviewed and approved by [Mr.] Maruska and Comerica's

9    counsel the previous day [the June 27 ADR]." (Doc. No. 116 at 20.)  Therefore, Comerica asserts

10   that Mr. Maruska exhibited only "excusable neglect" by failing to read the ADR.  (*Id.*)

11         In support of its argument, Comerica points to the decision in *Reid v. Landon*, 166 Cal.

12   App. 2d 476 (1958), in which the court rescinded a contract even though the defendant had read

13   the contract, including the provision in question, before signing it.  (*See* Doc. No. 116 at 20.)  But

14   Comerica's attempt to compare the facts of this case to those of *Reid* is unavailing.  In *Reid*, the

15   defendant had agreed to give the plaintiffs a right of first refusal in the event the defendant

16   decided to sell certain real property.  *Reid*, 166 Cal. App. 2d at 479.  After the defendant's

17   attorney prepared the agreed-upon right of first refusal, the plaintiffs, without the defendant's

18   knowledge, told the defendant's attorney that the defendant had agreed that the plaintiffs would

19   have an option to buy the property, rather than the plaintiffs having only the right of first refusal.

20   *Id.* at 479–80.  Relying on the plaintiffs' word, and without advising or consulting his client, the

21   defendant's attorney drew "a new letter agreement" that gave the plaintiffs an option to buy the

22   property.  *Id.* at 480.  The plaintiffs then presented the document to the defendant for her

23   signature, and she read the document, saw the word "option," and assumed that "option" referred

24   to the right of first refusal that the parties had originally discussed, and signed the document.  *Id.*

25   The court in *Reid* held that this evidence justified rescinding the contract, noting that rescission

26   may be warranted where the mistake in question "does not amount to the neglect of a legal duty,"

27   particularly "in a situation in which false representations were made to induce the execution of

28   the instrument."  *Id.* at 482, 484.

1    Here, unlike in *Reid*, there was no evidence presented at trial supporting a conclusion that

2    AGK attempted to conceal the indemnity paragraph or induce Mr. Maruska to sign the final ADR

3    under false pretenses.  In addition, when taken together, several facts established by the evidence

4    at trial indicate that Mr. Maruska's failure to read the final ADR or notice the indemnity

5    paragraph stemmed solely from an error in his own judgment:  in her email attaching the June 27

6    ADR, Ms. Tresler informed Mr. Maruska that she was awaiting AGK's comments on the

7    document (a document which Mr. Maruska well knew needed to be "in form and substance"

8    acceptable to AGK pursuant to third amendment and upon which Comerica had not yet heard any

9    feedback or comment from AGK); in her email attaching the final ADR, Ms. Tresler labeled the

10   attachment as "New";[35] the final ADR was significantly longer than the June 27 ADR, containing

11   three substantive body paragraphs compared to the single-sentence paragraph constituting the

12   body of the June 27 ADR; and the indemnity paragraph in the final ADR was the last body

13   paragraph on the page, appearing directly above Mr. Maruska's signature line.  (*See* JX-70 at 2;

14   JX-72 at 1; JX-51 at 1; DX-B at 6.)  Thus, even assuming, without deciding, that Comerica and

15   AGK had never discussed the inclusion of an indemnity provision in the assignment of

16   declarant's rights prior to the deal's closing, Mr. Maruska's alleged belief that the final ADR was

17   identical to the June 27 ADR with the exception of the buyer's name was neither reasonable nor

18   an instance of "excusable neglect."  (*See* Doc. No. 116 at 20); *see also Donovan*, 26 Cal. 4th at

19   283 ("A party bears the risk of mistake when . . . he is aware, at the time the contract is made, that

20   he has only limited knowledge with respect to the facts to which the mistake relates but treats his

21   limited knowledge as sufficient.") (citing Rest. 2d Contracts, § 154); *Stewart*, 134 Cal. App. 4th

22   at 1589 (rejecting the "extreme proposition that a party who fails to read a contract but

23   nonetheless objectively manifests his assent by signing it—absent fraud or knowledge by the

24   other contracting party of the alleged mistake—may later rescind the agreement on the basis that

---

25   [35]  As noted above, Mr. Maruska testified at trial that he noticed that all of the attachments to Ms.
26   Tresler's email attaching the final ADR and other closing documents were marked "new," but he
     assumed that this denotation was only added to reflect the change to the buyer's name.  (Doc. No.
27   104 at 119:21–120:1,175:13–16.)  However, this mistaken and erroneous assumption was not
     reasonable, at the very least because some of the closing documents did not even include the
28   buyer's name.  (*See* Doc. No. 104 at 172:12–20; JX-72 at 6, 18.)

1   he did not agree to its terms").  Similarly, Comerica does not proffer any explanation for how the

2   decision in *Reid*—which pertains to a mistake "due largely to . . . the plaintiffs' [false]

3   representations that the document reflected the terms of her original agreement," 166 Cal. App.

4   4th at 484—is applicable to its defense here, which is not premised upon AGK causing the

5   mistake in this case.[36]

6         Accordingly, the court finds that the facts of this case are more comparable to those cases

7   in which California courts have found that a party's failure to read a contract prior to execution

8   constitutes a neglect of legal duty such that that party bears the risk of the mistake.  *See Stewart*,

9   145 Cal. App. 4th at 1588–89 ("We need look no further than the third *Donovan* factor to

10   conclude that [the party seeking rescission] raised no triable issue of material fact concerning

11   possible rescission of the settlement agreement. . . .  California authorities demonstrate that a

12   contracting party is not entitled to relief from his or her alleged unilateral mistake [of having

13   failed to read a contract before signing].") (citing cases); *see also Reed v. KPS Alarms, Inc.*, No.

14   2:15-cv-05482-DMG-E, 2016 WL 1729041 (C.D. Cal. Apr. 29, 2016) (noting that "California

15   contract law 'imputes to a person the intention corresponding to the reasonable meaning of [his]

16   words and acts' based on '[his] outward expression' and not '[his] unexpressed intent'" and

17   finding that "by signing the employee agreement, [plaintiff] signified that he received, read, and

18   agreed to the terms of the contract" and "cannot now claim that he did not understand what he

19   signed or was not aware of the terms in the employee agreement") (quoting *Edwards v. Comstock*

20   *Ins. Co.*, 205 Cal. App. 3d 1164, 1169 (1988)); *Matson v. S.B.S. Trust Deed Network*, 46 Cal.

21   App. 5th 33, 45 (2020) (finding that the buyer-plaintiff bore the risk of mistake where he

22   /////

23

---

24   [36]  Comerica's reliance on the decision in *Reid* is also unpersuasive because that decision predates

25   by nearly half of a century the California Supreme Court's decision in *Donovan*, which sets forth
the elements a defendant seeking to invoke the unilateral mistake defense must prove "[w]here

26   the plaintiff has no reason to know of and does not cause the defendant's unilateral mistake of
fact."  26 Cal. 4th at 282; *see also Est. of Eskra*, 78 Cal. App. 5th at 223 (explaining that in

27   *Donovan*, the California Supreme Court "adopt[ed] as California law the rule in section 153,
subdivision (a), of the Restatement, authorizing rescission for unilateral mistake of fact where

28   enforcement would be unconscionable") (citing *Donovan*, 26 Cal. 4th at 281).

"obtained a 94-page title report but did not read it thoroughly" before agreeing to pay a price above the fair market value).

Because Comerica has not established the third *Donovan* factor, Comerica is not entitled to partial recission of the final ADR based on its asserted unilateral mistake defense. However, even assuming Comerica had satisfied the third *Donovan* factor, Comerica has nonetheless failed to establish the fourth requirement necessary in order to invoke the unilateral mistake defense: that enforcement of the contract would be unconscionable in light of the effect of the mistake. *See Donovan*, 26 Cal. 4th at 282. "An unconscionable contract ordinarily involves 'both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results.'" *Winterrowd v. Am. Gen. Annuity Ins. Co.*, No. 2:00-cv-00677-CAS-RC, 2003 WL 27383464, at *4 (C.D. Cal. Aug. 11, 2003) (quoting *Armendariz v. Found. Health Psychcare Servs.*, 24 Cal. 4th 83, 114 (2000)). Although the standards of unconscionability warranting rescission for mistake are "similar" to those standards that courts consider when determining whether it would be unconscionable to enforce a contract or term, "[i]n ascertaining whether rescission is warranted for a unilateral mistake of fact, substantive unconscionability often will constitute the determinative factor, because the oppression and surprise ordinarily results from the mistake—not from inequality in bargaining power." *Donovan*, 26 Cal. 4th at 291. The court will thus focus its unconscionability analysis on the substantive element of unconscionability. "The substantive element concerns whether a contractual provision reallocates risks in an objectively unreasonable or unexpected manner." *Jones v. Wells Fargo Bank*, 112 Cal. App. 4th 1527, 1539 (2003). For a contractual provision to be found to be substantively unconscionable, it must "shock the conscience." *Id.* at 1540.

Comerica argues that enforcement of the final ADR would result in "oppression and surprise and an overly inequitable and harsh result" because "Comerica substantially discounted the purchase price of the 51 lots by $950,000 due primarily to AGK's concerns regarding Comerica's uncertain status as the Declarant." (Doc. No. 89 at 26–27.) The court disagrees. At the time of the mission critical email, Comerica was listing a purchase price for the 51 lots of

1   $8,200,000.  (*See* JX-38 at 3.)  AGK requested a $435,000 price reduction for a Wildlife Heritage

2   Foundation deposit issue and a $1,150,000 price reduction for the declarant issue risks, requesting

3   a new purchase price of $6,615,000.  (*Id.*)  Comerica countered with only a $500,000 price

4   reduction, which was reflected in the second amendment.  (JX-38 at 1; JX-61 at 6.)  The court

5   declines to strictly apportion this price reduction by ascribing certain amounts in consideration for

6   the Wildlife Heritage Foundation deposits and certain amounts in consideration for control-

7   related risks.  Regardless of any such apportionment, it appears plausible that at least some of this

8   $500,000 price decrease was not made by Comerica as consideration for the declarant's rights

9   issues, and whatever portion of this reduction was in consideration for the control risks associated

10  with this transaction, it was not enough to assuage AGK's concerns regarding the control risks.

11  In other words, the $500,000 price reduction that Comerica offered in response to Mr. Murphy's

12  mission critical email laying out the declarant's rights issue and attendant control risks was

13  insufficient to end the parties' bargaining related to the declarant's rights issue.  (*See* Doc. No.

14  102 at 95:12–22) (Mr. Murphy testifying that "[a]t that point, in my mind, had we gotten the full

15  reduction [to $6,615,000], . . . we would have closed "as is" with the full reduction and with the

16  transfer of declarant rights. . . . When that was not granted, . . . we required a release and/or

17  indemnity.")  The court's conclusion in this regard is supported by the significant evidence

18  presented at trial that the parties continued to negotiate the declarant's rights issue well after this

19  point.  For example, after the execution of the second amendment which provided for the

20  $500,000 price reduction, Mr. Murphy resent a revised version of the mission critical email, this

21  time with more detail describing the magnitude of the control risks.  (*See* JX-39 at 1–2.)  In that

22  email, Mr. Murphy reiterated AGK's request for a $435,000 price reduction for the Wildlife

23  Heritage Foundation deposit issue and a $1,150,000 price reduction for the declarant issue risks.

24  (*Id.* at 3.)  Indeed, as noted above, even Mr. Maruska believed this to be "an ongoing attempt to

25  lower the price."  (Doc. No. 104 at 97:3–4.)  AGK's continued expressed concerns surrounding

26  the declarant's rights issues is also demonstrated by the fact that a full week after the second

27  amendment was executed, the parties continued to negotiate for further concessions surrounding

28  the declarant's rights issue in the third amendment, which required that the parties enter into an

1    assignment of declarant's rights and that Comerica record an instrument revoking the

2    Supplemental Declaration.  (*See* JX-43 at 7–8.)  Thus, the evidence presented at trial does not

3    establish that the $500,000 price reduction contemplated by the second amendment was intended

4    to wholly and completely constitute AGK's compensation for the declarant's rights issue.

5          Following the $500,000 price reduction contemplated by the second amendment, the

6    parties agreed to yet another price reduction in the third amendment, this one to the tune of

7    $350,000, for a total reduction in price of $850,000.  (*See* JX-43 at 7.)  The resulting $7,350,000

8    price was the final price AGK paid to purchase the lots at Sierra de Montserrat.  (*See* Doc. No.

9    102 at 59:3–4.)  As noted above, at trial, Mr. Murphy could not precisely pinpoint what the

10   $350,000 price reduction was meant to address, stating that he believed "we were negotiating the

11   continuum of our concession requests, so our requests were a price reduction, with Assignment of

12   Declarant Rights.  We didn't get our full price reduction, so there were further concessions we

13   were negotiating, and on the continuum was price, control, and those sorts of things."  (Doc. No.

14   102 at 59:11–16.)  Similarly, Mr. Friedel testified that the roughly $700,000 difference between

15   the price AGK was comfortable paying for the property "as is" ($6,615,000) and the price

16   contemplated by the third amendment ($7,350,000) meant that "the risks [AGK was] willing to

17   assume were not the same as the risks [AGK was] willing to assume at the lower price."  (Doc.

18   No. 103 at 32:4–8.)  Mr. Friedel testified that, as a result of not getting the full price reduction,

19   AGK's options at that time were to "seek the indemnity, or . . . put our pencils down and walk

20   away with our deposit and go home."  (*Id.* at 33:1–3.)  Consistent with this testimony, the third

21   amendment provided for both the $350,000 price reduction *and* an assignment of declarant's

22   rights "in form and substance acceptable" to AGK.  (*See* JX-43 at 7.)  As attorney Pakfar

23   testified, this requirement was added because AGK "wanted to make it clear that AGK would

24   only close if the form of the declarant assignment was acceptable in [AGK's] sole and absolute

25   discretion" and that Comerica "would potentially be subject to an Assignment of Declarant Rights

26   they weren't 100 percent comfortable with."  (Doc. No. 100 at 122:7–15.)  This structure would

27   effectively retain the contingent nature of the deal (despite AGK waiving due diligence), because

28   in theory, AGK could insist on its preferred form and substance of an assignment of declarant

1   rights, and Comerica could walk away from the deal if the substance of the assignment of

2   declarant rights was unacceptable to Comerica.  (*See id.*)

3          Based upon this evidence admitted at trial, the court disagrees with Comerica's

4   characterizations both that Comerica discounted the Sierra de Montserrat lots by $950,000—it is

5   unclear to the court how Comerica computed this figure, and as noted above, the price reduction

6   in this case was $850,000—and that this price reduction on its own served to resolve all control

7   issues relating to the lots.  (*See* Doc. No. 89 at 26.)  Instead, the court concludes based upon the

8   evidence presented at trial that the parties negotiated for a price reduction of $850,000 *and* an

9   assignment of declarant rights in form and substance acceptable to AGK in order to address the

10   control issues related to the development.  On this view, the final ADR was precisely what was

11   contemplated by the parties' bargaining related to the declarant's rights issue.

12          In short, the evidence presented at trial establishes that the ambiguity surrounding whether

13   Comerica had actually become the declarant of Sierra de Montserrat remained a live issue

14   throughout the entire course of the negotiation of this deal.  Indeed, Comerica itself had "strong

15   concerns" about whether it held the declarant rights to Sierra de Monsterrat, but declined to

16   disclose those concerns, or even the fact of Comerica's ongoing litigation with Westwood, to

17   AGK, instead leaving AGK to discover this issue through its own due diligence research.  (*See*

18   Doc. No. 104 at 129:10–22, 132:12–133:35.)  Comerica knew the ambiguity surrounding who

19   was the development's declarant was a significant issue for AGK, with Mr. Maruska internally

20   citing it as the reason the sale might "fall[] apart."  (*See* JX-66 at 3.)  Comerica did not agree to

21   AGK's requested price reduction in full, which was necessary for AGK to close the deal "as is,"

22   with an assignment of declarant's rights that might not have included an indemnity provision.

23   (*See* JX-38; Doc. No. 103 at 26:16–21) (Mr. Friedel explaining that if AGK had received the full

24   price reduction and the assignment of declarant rights, AGK "would have still asked for" an

25   indemnification provision, but "would have closed without it").  Instead, Comerica agreed to a

26   partial price reduction in conjunction with an assignment of declarant rights in a form and in

27   substance acceptable to AGK.  (*See* JX-43 at 7.)  Comerica knew that the murkiness surrounding

28   declarant's rights could impact its ability to sell the property, with senior management at

53

Comerica going so far as to say that "any savvy buyer is going to figure this out," expressing openness to suing Westwood in order to resolve the issue, and stating that Comerica "need[s] to know what [its] options are via counsel" with regard to resolving the issue.[37]  (JX-66 at 1–2.) Nonetheless, Mr. Maruska unilaterally decided not to pass along Mr. Murphy's request for a call between attorney Pakfar and Mr. Ferrer to discuss these control challenges, believing "there was nothing for us to gain by [doing] that," and Mr. Ferrer was "generally hard to reach" throughout the deal, and especially as closing approached.  (*See* Doc. Nos. 104 at 98:8–10; 101 at 118:6–17.) With negotiations on this issue down to the wire, AGK at that time "likely . . . presumed [it] would get another extension" on the due diligence, but Comerica and/or Mr. Maruska were under pressure to close the deal by the end of the quarter on June 30, 2010, and another extension beyond that time never occurred.  (*See* Doc. No. 102 at 47:7–11, 63:24–64:1; 104 at 182:17–19). On June 27, 2010, Mr. Ferrer and Mr. Maruska were both made aware that Ms. Tresler was awaiting comments from AGK on the June 27 ADR, which Mr. Maruska described as "a special document for a special circumstance that usually counsel would be involved in," "nonordinary," and "pretty important."  (Doc. Nos. 104 at 107:17, 110:3–8; 105 at 17:25–18:1, 19:20–25.)  The final ADR contained an indemnity provision in favor of AGK, which was a standalone paragraph and the last body paragraph of the one-page document, located near Mr. Maruska's signature line, in the same size print as the other body paragraphs in the document.  (*See* JX-51.)  The final ADR was not the only deal document containing an indemnity provision, with the PSA also containing unrelated indemnity provisions in favor of Comerica.  (*See, e.g.*, JX-27 at 8, 9, 15, 20, 34; *see*

---

[37]  Ms. Kordoban's comments in this regard contribute to the court's skepticism that enforcement of the final ADR "would result in a windfall for AGK," as Comerica argues.  (*See* Doc. No. 89 at 26.)  Indeed, her comments suggest that at least some senior management at Comerica believed that significant concessions related to the Sierra de Montserrat property—potentially including the costs of Comerica litigating with Westwood—might be necessary in order for Comerica to successfully sell the property.  Comerica's internal concerns suggest that an indemnity provision in favor of the buyer (particularly one that would potentially indemnify AGK against the costs of litigating with Westwood over the declarant's rights, the very litigation Ms. Kordoban seemed to be suggesting that Comerica engage in), even if costly, would not necessarily be a windfall for AGK; instead, the economic value of such an outcome may have been somewhat proportional to what some members of Comerica management thought was necessary for the bank to expend in order for Comerica to receive the benefit of selling the property and getting off of its books.

*also* Doc. No. 101 at 138:17–23.)  Mr. Maruska—who, by his own estimate, had worked on the

marketing and sale of roughly ten to fifteen distressed properties within Comerica's Special

Assets Group by the time of the Sierra de Montserrat deal—was authorized by Comerica to

execute the deal's closing documents, and he signed the final ADR without reading it.  (*See* Doc.

Nos. 104 at 56:7–10, 175:25–176:3; JX-73.)  Mr. Ferrer, Comerica's lawyer working on the deal,

never reviewed the closing documents, nor did he ever follow up (with either Mr. Maruska or

AGK) to inquire as to the buyer's comments on the June 27 ADR or even as to the outcome of the

deal itself.  (*See* Doc. No. 105 at 67:21–68: 9.)

      Furthermore, there was ample evidence admitted at the trial before this court suggesting

that because Comerica declined to agree to a full price reduction or a settlement with Westwood,

AGK almost certainly would not have closed the deal without the inclusion of the indemnity

paragraph in the final ADR.  (*See* Doc. No. 103 at 33:1–3.)  Comerica wanted to sell distressed

properties "as reasonably quickly as [it] could" given that "every day that an asset is still owned,

it's still liability for the bank."  (Doc. No. 104 at 56:13–20, 182:10–13.)  As noted above,

Comerica was aware that "any savvy buyer" would identify the declarant's rights issue and that

remedying it could potentially be costly.  (*See* JX-66 at 1–2.)  The final ADR thus allowed the

bank to sell the lots by the end of the quarter, as it wanted to do, and it is at least plausible that the

potential cost of an indemnity provision was simply a price Comerica would have to pay with

almost any buyer as a result of the Sierra de Montserrat foreclosure documents failing to

unambiguously transfer the declarant rights from Westwood to Comerica.  Although the final

ADR contained a one-sided indemnity in favor of AGK, within the broader context of the deal, by

purchasing the property without Comerica having entered into a settlement with Westwood, AGK

was agreeing to take on control-related risks and difficulties in managing the development on a

day-to-day basis.  These risks and challenges would exist even with an indemnification from

Comerica, which was why AGK ranked indemnity as "a very bad result" and its least-preferred

solution to the control issues.  (*See* Doc. No. 100 at 136:4–138:23.)  Thus, both parties stood to

benefit from the deal's terms, including the final ADR, and both parties were subject to

obligations under those terms.  Given these facts, the court can hardly conclude that enforcement

1    of the final ADR would "shock the conscience" or yield "overly harsh or one-sided results."

2    *Donovan*, 26 Cal. 4th at 292; *Jones*, 112 Cal. App. 4th at 1540 (holding that a loan agreement

3    providing for an effective interest rate above ten percent was not substantively unconscionable

4    because "it is not unreasonable or unexpected" in light of the risks a lender takes on when funding

5    a transaction); *Five Points Mgmt. Grp., Inc. v. Campaign, Inc.*, No. 1:20-cv-02599-RBJ, 2021

6    WL 3710373, at *7 (D. Colo. Aug. 20, 2021) (finding that an agreement was not substantively

7    unconscionable under California law where both parties were subject to obligations under the

8    agreement and noting that the fact "[t]hat one party has more obligations or constraints under a

9    contract does not render the contract unconscionable"); *Rios v. Paramo*, No. 3:13-cv-02455-

10   WQH-JMA, 2015 WL 8492500, at *6 (S.D. Cal. Dec. 10, 2015) (finding that there was no

11   substantive unconscionability where the contract at issue provided benefits to both parties and

12   thus was not "overly harsh" or "one-sided") (citation omitted).

13        As attorney Pakfar testified at trial,

14        Sometimes parties agreed to one-sided indemnities, or broad
          indemnities.  You know, when we agreed to a universal buyer
15        indemnity [in] the Bill of Sale, I don't remember Comerica saying,
          ["]hey, did you notice that there's a buyer indemnity and there's no
16        seller indemnity.  Are you sure you don't want to ask for a mutual
          indemnity?  Are you sure you don't want to tighten this up a little
17        bit?["]

18        They didn't say that.  It was our job to look at the Bill of Sale and
          say, ["]are we okay with that language["] before we sign the PSA.
19

20   (Doc. No. 101 at 138:17–139:1.)  In this case, Comerica (and Mr. Maruska) had a duty to read the

21   terms of the final ADR before signing it.  *See Rosenfeld*, 732 F. Supp. 2d at 965.  Comerica failed

22   to do so, and it must now bear the risk of that mistake.  *See Greif*, 74 Cal. App. 5th at 442 (finding

23   that because the party seeking to rescind a contract bore the risk of the mistake, enforcing the

24   contract would not be unconscionable).  Therefore, the court concludes that Comerica has also

25   failed to establish the fourth required prong of its affirmative defense of unilateral mistake.

26   /////

27   /////

28   /////

1    Accordingly, Comerica is not entitled to partial rescission of the final ADR.[38]

2        2.       AGK's Performance Under the Contract or Excuse for Nonperformance

3    The final ADR does not require any action on the part of AGK, and Comerica does not

4    argue that AGK failed to perform its obligations pursuant to the final ADR. (*See generally* JX-

5    51.) In addition, the evidence presented at trial suggests that AGK paid the agreed-upon purchase

6    price for the lots at Sierra de Montserrat and took all other necessary steps to close the

7    transaction. Therefore, the court finds that AGK performed under the contract at issue.

8        3.       Comerica's Breach

9    Having found that the final ADR and the indemnity paragraph therein are valid and

10   enforceable, the court next considers whether Comerica breached the final ADR when it refused

11   to indemnify AGK for the fees and costs it incurred in the Westwood litigation. In order for AGK

12   to prove that Comerica breached the final ADR, it must prove that the Westwood litigation falls

13   within the scope of the indemnity paragraph.

14       a.       *Interpreting the indemnity paragraph*

15   The court first analyzes the meaning of the indemnity paragraph of the final ADR. *See*

16   *Ins. Co. of State of Penn. v. Gemini Ins. Co.*, No. 3:13-cv-029341-BAS-DHB, 2014 WL 7407466,

17   at *6 (S.D. Cal. Dec. 30, 2014) ("Under California law, contract interpretation is a matter of law

18   for the judiciary.").

19   

20   [38] Although AGK appears to believe that Comerica has also separately asserted unconscionability
     as an affirmative defense, Comerica only argues unconscionability within the context of its
21   unilateral mistake affirmative defense. (*See* Doc. No. 111 at 12, 15; *see also* Doc. Nos. 6; 84 at 5;
     89 at 24–27.) However, such an affirmative defense would nonetheless fail for the reasons
22   described above. Because of the California Supreme Court's guidance that "substantive
     unconscionability often will constitute the determinative factor" in an analysis of the applicability
23   of the unilateral mistake defense, the court's analysis set forth above focused primarily on the
     substantive element of unconscionability. *Donovan*, 26 Cal. 4th 261. Nevertheless, the court
24   notes that the final ADR also does not bear the hallmarks of procedural unconscionability. *See*
     *Jones*, 112 Cal. App. 4th at 1539 ("The procedural element requires oppression or surprise.
25   Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise
     where the allegedly unconscionable provision is hidden within a prolix printed form.") (internal
26   citation omitted). Here, the parties engaged in a lengthy negotiation process, both parties to the
     transaction were sophisticated and wielded comparable bargaining power, and the indemnity
27   paragraph was not hidden in the final ADR.

28

57

"The overriding goal of contract interpretation is to give effect to the mutual intention of the parties at the time of contracting, 'so far as the same is ascertainable and lawful.'" *S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*, 74 Cal. App. 4th 1232, 1240 (1999) (quoting Cal. Civ. Code § 1636).  "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." Cal. Civ. Code § 1639.  However, "[e]xtrinsic evidence . . . can be offered where it is obvious that a contract term is ambiguous, [and] also to expose a latent ambiguity." *S. Pac. Transp. Co.*, 74 Cal. App. 4th at 1241.  Furthermore, "[a]ny contract must be construed as a whole, with the various individual provisions interpreted together so as to give effect to all, if reasonably possible or practicable." *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998); *see also Ins. Co. of State of Penn.*, 2014 WL 7407466, at *6.  "Courts must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative or meaningless." *City of Atascadero*, 68 Cal. App. 4th at 473.

"Parties to a contract . . . may define therein their duties toward one another in the event of a third party claim against one or both arising out of their relationship." *Crawford v. Weather Shield Mfg., Inc.*, 44 Cal. 4th 541, 551 (2008).  "Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." Cal. Civ. Code § 2772.  Under California law, "[a]n indemnity against claims, or demands, or liability, . . . embraces the cost of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion." Cal. Civ. Code § 2778(3).  "[P]arties to an indemnity contract have great freedom of action in allocating risk, subject to certain limitations of public policy." *Hello Network, Inc. v. CityGrid Media, LLC*, No. 2:14-cv-04301-SJO-E, 2014 WL 12696797, at *3 (C.D. Cal. Nov. 24, 2014) (citing *Heppler v. J.M. Peters Co.*, 73 Cal. App. 4th 1265, 1277 (1999)).  "In general, such an agreement is construed under the same rules as govern the interpretation of other contracts." *Crawford*, 44 Cal. 4th at 552.  More specifically, "[e]ffect is to be given to the parties' mutual intent, as ascertained from the contract's language if it is clear and explicit." *Id.* (internal citations omitted).

/////

58

1       As noted above, the indemnity paragraph of the final ADR states:

2           The undersigned [Comerica] agrees to indemnify, defend and hold
            Successor Declarant [defined as "AGK Sierra de Montserrat, L.P., a
3           Delaware limited partnership"] harmless from and against *any and
            all loss, liability, claims or causes of action existing in favor of or
4           asserted by any party* **arising out of the undersigned's position as
            "Declarant" under the CC&Rs** <u>on or before the date first above
5           written</u>.   In accordance herewith, the undersigned expressly
            acknowledges that the undersigned shall remain responsible for all
6           obligations, responsibilities and liabilities that accrued before the
            date of this assignment.
7

8   (JX-51 at 1) (emphases added).  The court first concludes that this paragraph constitutes an

9   indemnity under California law.  *See* Cal. Civ. Code § 2772.  The court next concludes that the

10  indemnity paragraph is ambiguous, because the language "on or before the date first above

11  written" (the "date phrase") could modify either of the two preceding phrases:  the first phrase

12  "any and all loss, liability, claims or causes of action existing in favor of or asserted by any party"

13  (the "existence phrase") or the second phrase "arising out of the undersigned's position as

14  'Declarant' under the CC&Rs" (the "declarant phrase").  *See Reyes v. Wells Fargo Bank, N.A.*,

15  No. 3:10-cv-01667-JCS, 2011 WL 30759, at *12 (N.D. Cal. Jan. 3, 2011) ("A contract provision

16  is ambiguous when it is capable of two or more constructions both of which are reasonable.")  If

17  the date phrase is construed as modifying the existence phrase, the indemnity paragraph would be

18  read to require Comerica to indemnify AGK against any "any and all loss, liability, claims or

19  causes of action existing in favor of or asserted by any party . . . on or before the date first above

20  written."  Whereas, if the date phrase is construed as modifying the declarant phrase, the

21  indemnity paragraph would be read to require Comerica to indemnify AGK against any such

22  claims "arising out of [Comerica's] position as 'Declarant' under the CC&Rs on or before the

23  date first above written."  (*See* JX-51 at 1.)  Due to this ambiguity, the court will look to external

24  evidence to interpret the meaning of the indemnity paragraph as it appears in the final ADR.  *See*

25  *City of Atascadero*, 68 Cal. App. 4th at 474 ("The mutual intention to which the courts give effect

26  is determined by objective manifestations of the parties' intent, including the words used in the

27  agreement, as well as extrinsic evidence of such objective matters as the surrounding

28  circumstances under which the parties negotiated or entered into the contract; the object, nature

59

1   and subject matter of the contract; and the subsequent acts and conduct of the parties.") (citations

2   omitted).

3                    i.       The date phrase: "On or before the date first above written"[39]

4         Comerica argues that the phrase "on or before the date first above written" must modify

5   the phrase "any and all loss, liability, claims, or causes of action existing in favor of or asserted

6   by any party." (*See* Doc. No. 89 at 21.)  In mounting this argument, Comerica first emphasizes

7   that the following sentence in the paragraph begins with "[i]n accordance herewith" and proceeds

8   to refer to "all obligations, responsibilities, and liabilities that accrued before the date of this

9   assignment." (*Id.*)  Comerica argues that because this latter sentence addresses obligations and

10  liabilities that have accrued before the date of the assignment and states that this sentence is "in

11  accordance" with the first sentence, it follows that "on or before the date first above written" in

12  the first sentence also refers to the accrual of obligations and liabilities, i.e., "any and all loss,

13  liability, claims or causes of action existing in favor of or asserted by any party . . . on or before

14  [June 29, 2010]." (*Id.*; *see also* Doc. No. 116 at 5–6) (emphasis added).

15        Comerica next contends that "[t]he only time period during which Comerica could ever

16  have possibly have (sic) held the 'position as Declarant' was 'on or before the date first above

17  written," because the assignment of the declarant position to the successor declarant AGK

18  became effective on that date.  (Doc. No. 89 at 21–22.)  Thus, if the date phrase were interpreted

19  as modifying the declarant phrase, then the date phrase "would be meaningless surplusage." (*Id.*).

20  The court finds this particular argument to be persuasive.  Further, there is no evidence before the

21  court suggesting that the parties ever intended for the indemnity period to exclude some portion

22  of Comerica's purported time as declarant; in other words, the phrase "on or before the date first

---

[39]   As Comerica noted at trial, the final ADR did not contain a date written above the indemnity paragraph until after it was recorded and stamped by the Placer County Recorder on June 30, 2010.  (*See* JX-51 at 1; JX-72 at 8; Doc. No. 100 at 45:10–20.)  Thus, when Mr. Maruska signed the final ADR, the only date on the document presumably would have been June 29, 2010, reflecting the date of Mr. Maruska's signature and thus the assignment of Comerica's purported declarant rights.  (*See* JX-51 at 1.)  Though the distinction between June 29, 2010 and June 30, 2010 is immaterial for the purposes of these findings of fact and conclusions of law, the court interprets "the date first above written" in the indemnity paragraph as referring to "June 29, 2010," the only date on the document at the time it was executed.

1  above written" would serve no purpose if it were modifying the phrase "arising out of the

2  undersigned's position as 'Declarant.'"  *See Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1045

3  (9th Cir. 2015) (interpreting a contract clause so as to avoid "meaningless surplusage").  It does

4  not necessarily follow, however, that the date phrase was intended to modify the phrase "any and

5  all loss, liability, claims, or causes of action existing in favor of or asserted by any party."  (*See*

6  JX-51 at 1.)  Thus, the court is not persuaded by Comerica's first argument—that the date phrase

7  necessarily modifies the existence phrase.

8           Importantly, it is not clear that interpreting the date phrase as modifying the existence

9  phrase would align with the drafters' intentions.  *See S. Pac. Transp. Co.*, 74 Cal. App. 4th at

10  1240 (describing the "overriding goal of contract interpretation" as "giv[ing] effect to the mutual

11  intention of the parties at the time of contracting").  Attorney Pakfar, one of the two drafters of

12  the indemnity paragraph, addressed this issue and testified at trial as follows:

13              [W]e talked about, quite a bit, the key issue right—the gray area that
                we're talking about is the declarant position of Comerica prior to
14              assigning it to us.  So before this deal closes, is Comerica declarant
                or not?  . . . . we were intending to have them indemnify our client
15              for anything that arises out of that issue. . . . our intent was to make
                it as broad as possible.  Anything that pertained to whether Comerica
16              was declarant, would be covered.    So for example, if the
                supplemental declaration couldn't be revoked because they weren't
17              declarant, that would be covered.  If AGK's not the declarant after
                the date hereof because there wasn't an effective assignment, that
18              would be covered.  Anything that would arise out of Comerica not
                being the declarant [was] supposed to be covered.  If they are not the
19              declarant, and they don't control the DRC, . . . they couldn't have
                assigned [declarant status] to us, then we're not the declarant, then
20              we don't have control of the board, then we have problems.

21  (Doc. No. 101 at 56:9–57:15.)  This testimony strongly suggests that AGK intended for the date

22  phrase to modify the declarant phrase, even if that modification would result in the meaningless

23  surplusage as described above.  Moreover, the importance of interpreting the indemnity paragraph

24  in accordance with the drafters' intentions is heightened here, where the parties had agreed that

25  the final ADR must be "in form and substance acceptable to" AGK, the drafter of this portion of

26  the final ADR.

27           In short, the date phrase could reasonably be interpreted as modifying the existence phrase

28  *or* the declarant phrase.  However, the court need not determine which interpretation is correct

because the court ultimately concludes that either interpretation yields the same outcome when applied to the actions at issue—the Kincade Action and Murphy Action—in this case.[40]

As Comerica aptly points out, if the date phrase were to apply to the declarant phrase, the date phrase would be meaningless surplusage:  any action that arose out of Comerica's position as declarant would necessarily have arisen out of Comerica's position as declarant on or before June 29, 2010, the last day upon which Comerica purported to be the declarant.  As a result, the indemnity paragraph would include within its scope any action arising out of Comerica's position as declarant, regardless of when the action was brought.

Furthermore, as AGK aptly points out, even if the date phrase were to apply to the existence phrase, the indemnity paragraph would not limit Comerica's indemnity obligations to claims that had actually been filed as of that date (when the final ADR was executed).  (*See* Doc. No. 111 at 17.)  If the date phrase were to modify the existence phrase, the plain language of the indemnity paragraph would state in relevant part:  "loss, liability, claims or causes of action *existing in favor of <u>or</u> asserted by any party . . . on or before the date first above written.*"  (JX-51 at 1) (emphases added).  Comerica's position as declarant ceased as of that date and, as the court explains further below, a claim that arises out of Comerica's position as declarant necessarily *existed* as of that date.  Thus, the indemnity paragraph includes within its scope losses, liabilities, claims, and causes of action that arise out of Comerica's position as declarant, even if no formal lawsuit or other proceeding had yet been initiated as of the time the final ADR was executed, because such claims necessarily *existed* at that time.

/////

---

[40]  Comerica also argues, without any supporting authority, that "[i]f the Court is unable to resolve any ambiguities in the first sentence of the indemnity provision . . . the Court must construe any ambiguities against AGK, the drafter of the indemnity provision."  (Doc. No. 116 at 6.)  Because the court finds that the ambiguity in the first sentence of the indemnity paragraph does not impact the court's analysis regarding the application of that paragraph of the final ADR to the Kincade and Murphy Actions, the court need not address this argument advanced by Comerica.  However, the court notes that "unlike insurance policies, which are adhesion contracts, there is normally no reason to construe indemnity agreements against the drafter."  *City of Watsonville v. Corrigan*, 149 Cal. App. 1542, 1549 (2007); *see also Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal. 3d 622, 633 (1975) (noting that when parties bargain for protection pursuant to an indemnity agreement, "the protection should be afforded").

1     There was ample evidence admitted at the trial of this action suggesting that this

2  interpretation would align with the drafters' intentions regarding the scope of the actions

3  encompassed by the indemnity paragraph.  As explained above, attorney Pakfar testified that it

4  was AGK's intent for the indemnity paragraph to be "as broad as possible."  (Doc. No. 101 at

5  56:24.)  Attorney Galstian, the other drafter of the indemnity paragraph of the agreement, also

6  testified that it was his intent for the indemnity paragraph to encapsulate future lawsuits, as

7  opposed to only lawsuits already in existence at the time the final ADR was executed:

8          I believe the reason we drafted it in this way was we intended it to be
           as broad as possible. . . . in summary, what we were trying to say
9          was, any claim arising, or asserted by anyone while Comerica was
           the declarant, up until the date it was no longer declarant, would be
10         a claim that is—that they indemnify us over, even if the filing of the
           claim happens whenever.
11

12  (Doc. No. 102 at 140:2–3, 140:25–141:4.)[41]  This trial testimony is likewise consistent with the

13  above-described additional evidence before the court pertaining to AGK's serious concerns

14  regarding future litigation with Westwood and/or Mr. Westwood over control issues.  (*See* JX-38

15  at 2–3; JX-39 at 2–3); (*see also* Doc. No. 101 at 186:24–187:10) (Mr. Murphy describing due

16  diligence research revealing Mr. Westwood's reputation that "he was a difficult person [with] a

17  propensity to be litigious").  Thus, even if the date phrase were to modify the existence phrase,

18  the indemnity paragraph would nonetheless encompass future claims filed by third parties, so

19  long as those claims arose out of Comerica's purported position as declarant.  Such an

20  interpretation would be necessary in order to "give effect" to the parties' intentions at the time of

21  /////

22

23  [41]  Attorney Galstian also testified that he "believe[s]" the words "on or before the date first above
    written" was meant to modify "the undersigned's position as 'Declarant'" in the indemnity
24  paragraph.  He based this belief on his recollection that he intended the indemnity paragraph to
    cover claims pertaining to Comerica's status of declarant, regardless of when any such lawsuit
25  was filed.  (*See* Doc. No. 102 at 140:23–141:4.)  Although the court declines to determine which
    phrase in the indemnity paragraph is modified by "on or before the date first above written," the
26  court's conclusion regarding the scope of the indemnity paragraph under either potential
    modification is consistent with attorney Galstian's stated intent that the indemnity would cover
27  claims arising out of Comerica's status as declarant, regardless of when any such claim or lawsuit
    is filed.  (*See id.*)
28

1    contracting and to "explain [the final ADR] by reference to the circumstances under which it was

2    made." *S. Pac. Trans. Co.*, 74 Cal. App. 4th at 1240.

3          As the court will explain further below in analyzing whether the fees and costs AGK

4    incurred in connection with the Westwood litigation are covered by the indemnity paragraph, the

5    court concludes that the Kincade and Murphy Actions fall within the scope of the indemnity

6    paragraph, regardless of whether the date phrase modifies the existence phrase or the declarant

7    phrase.  Therefore, the court need not and does not determine the correct interpretation of the date

8    phrase, because doing so is not necessary in order to resolve the remaining issues in this case.  In

9    other words, because the application of the date phrase to either the declarant phrase or the

10   existence phrase yields the same result here, the court's analysis in this regard "give[s] effect to

11   every part" of the final ADR—including the date phrase—even without strictly determining

12   which phrase the date phrase modifies.  *See* Cal. Civ. Code § 1641 ("The whole of a contract is to

13   be taken together, so as to give effect to every part, if reasonably practicable, each clause helping

14   to interpret the other.").

15                    b.    *Whether the Kincade Action falls within the scope of final ADR*

16          As noted above, the Kincade Action was initiated in the Placer County Superior Court, but

17   was eventually submitted to arbitration.  (*See* JX-6, JX-9.)  That arbitration was bifurcated into

18   two phases (*see* Doc. No. 103 at 61:18–21), which can roughly be summarized as follows.  The

19   first phase pertained to whether the declarant rights had transferred to Comerica, and then by

20   extension, AGK.  (*See* Doc. Nos. 103 at 61:25; 104 at 17:8–23.)  The second phase of the

21   arbitration addressed whether AGK's purported exercise of those declarant rights—through the

22   use and approval of design features such as fence caps and chimney caps on homes in the

23   development—was permissible.  (*See* Doc. Nos. 103 at 63:4–64:4, 67:10–15; 116 at 10–11.)

24                           i.    Whether the Kincade Action arose out of Comerica's position as

25                                 declarant

26          AGK asserts that the Kincade Action falls within the scope of the final ADR because each

27   of Westwood's three causes of action "arose out of Westwood's assertion [that] it owned the

28   Declarant rights."  (Doc. No. 110 at 14.)  For example, "Westwood contended that AGK

                                              64

1  improperly purported to be the Declarant, AGK refused to recognize Westwood as the rightful

2  Declarant, AGK wrongfully wielded Declarant powers to create an 'illegal' [DRC] for the

3  Development, and AGK misrepresented to [the Kincades] that the DRC AGK created had to

4  approve the Kincades' plan submittals." (*Id.*) (citing JX-6 at 7–8.)  AGK thus argues that the

5  claims asserted in the Kincade Action arose out of Comerica's position as declarant.  (*See id.*)

6      Comerica, on the other hand, contends that Westwood's claims against AGK in the

7  Kincade Action did not arise out of Comerica's position as the declarant.  (Doc. No. 89 at 22–23.)

8  In Comerica's view, Westwood's claims were "based on AGK's repeated, deliberate, and

9  calculated attempts to exercise its purported rights as the Declarant over the objections of

10  Westwood and with full knowledge that its status as the Declarant was 'grey,'" and these claims

11  "were not 'arising out of *Comerica's position* as 'Declarant.'" (Doc. No. 89 at 23) (emphasis in

12  original).  This wholly unpersuasive argument conveniently ignores the fact that AGK's ability to

13  validly exercise the declarant rights *Comerica assigned to it* squarely hinges on whether

14  Comerica held and wielded those rights to begin with, such that it could validly assign them to

15  AGK.  Comerica does not dispute that the Kincade Action arose out of AGK's attempt to exercise

16  declarant's rights.  (*See* Doc. No. 89 at 23.)  However, whether AGK could exercise those

17  declarant's rights is inextricably intertwined with the question of whether Comerica was the

18  declarant following its foreclosure on Westwood's lots at Sierra de Montserrat.  In the court's

19  view these claims plainly arise out of Comerica's purported position as declarant.

20      Moreover, to the extent Comerica asserts that Westwood's claims in the Kincade Action

21  did not arise out of Comerica's status as declarant because those claims instead arose out of

22  AGK's "affirmative conduct and fault," its argument is unavailing.  (*See* Doc. No. 89 at 23.)  The

23  "affirmative conduct" Comerica condemns—"AGK's repeated, deliberate, and calculated

24  attempts to exercise its purported rights as the Declarant over the objections of Westwood"—was

25  precisely what was contemplated by the parties when they negotiated the assignment of

26  declarant's rights.  (*See id.*)  In Mr. Murphy's June 21, 2010 mission critical email, he wrote:

27      When we put in our offer for the property the view from the Bank
       was that we could easily gain full control of the property (i.e., the
28     HOA, Design Review Committee (DRC), and Board) via gaining

1
2
3
4
5

declarant rights.  In reality, it is not explicitly stated in the CC&Rs that the declarant rights transfer upon bulk sale and/or upon foreclosure. . . . it hurts the value of the property by not being able to make changes and/or to have total control. . . . lack of control creates significantly more return risk in addition to [legal costs, delays, and muddy waters] . . . . If we waive tomorrow we would require that the PSA be modified such that the bank would record an assignment of declarant rights to us to at least create as [sic] additional hurdle for Westwood to clear.

6    (JX-39 at 1–3.)  Without some sort of resolution on the issue of AGK being able to wield and

7    exercise declarant's rights, Comerica acknowledged that the deal might "fall[] apart."  (*See* JX-66

8    at 3.)  As the court has already described in painstaking detail above, the parties did in fact enter

9    into an assignment of declarant's rights.  The evidence at trial overwhelmingly demonstrated that

10   this assignment was meant to help put AGK in the "best position" possible (short of Comerica

11   settling with Westwood, which Comerica was not willing to do) for AGK to be able to assert

12   declarant's rights.  (*See* Doc. No. 101 at 160:18–161:2.)  Therefore, Comerica's assertion that

13   "[t]here is no language . . . in the indemnity provision suggesting that the parties intended

14   Comerica's indemnity obligation to extend to claims based on AGKs own affirmative conduct

15   and fault, all of which was entirely out of the control of Comerica" verges on the absurd in the

16   court's view.  (*See* Doc. No. 89 at 23.)  Comerica cannot now seek to wash its hands of the clear

17   connection between its prior purported status as declarant and AGK's subsequent exercise of the

18   declarant's rights which Comerica purported to assign to it.

19        Comerica also argues that the issues arbitrated in the second phase of the arbitration of the

20   Kincade Action did not arise out of Comerica's position as declarant because the second phase of

21   the arbitration pertained to AGK's and the Kincades' alleged violations of the CC&Rs.  (Doc. No.

22   116 at 10–11.)  Comerica asserts that these alleged violations, which include the installation of

23   pointed spikes on wrought iron fences and painted metal chimney caps, had "nothing to do

24   whatsoever with Comerica's 'position as the Declarant.'"  (*Id.* at 11.)  While the court recognizes

25   that these alleged design decisions do not at first blush appear to directly pertain to Comerica's

26   status as declarant, they all in fact stem from AGK's attempt to exercise the declarant rights

27   Comerica assigned to it.  As noted above, this exercise of control over Sierra de Montserrat was

28   precisely the sort of issue that underpinned the parties' decision to enter into the final ADR and

1 informed AGK's intentions when drafting the indemnity paragraph that was ultimately adopted.

2 The connection between Comerica's status as the declarant and the issues addressed in the second

3 phase of the arbitration in the Kincade Action is supported by attorney Gorry's testimony as a

4 witness in the trial of this case in which he recalled that the parties "continued to discuss" the

5 ruling from the first phase of the arbitration—in which the arbitrator determined that the declarant

6 rights had not transferred to Comerica and thus that Westwood remained the declarant—in the

7 second phase of that arbitration.  (*See* Doc. Nos. 103 at 61:22–25; 104 at 18:13–25.)  As AGK

8 argues, a conclusion that the arbitration of specific alleged CC&R and DRC violations in the

9 second phase of the arbitration arose from Comerica's position as declarant is further

10 strengthened by Westwood's own framing of the assertions in Westwood's complaint in the

11 Kincade Action.  (*See* Doc. No. 110 at 14.)  In that complaint, Westwood asserted, *inter alia*, that

12 AGK's and the Kincades' alleged "[c]ontinued violations of the Governing Documents . . .

13 interfere with the Westwood's rights as the Declarant to interpret and enforce the Association

14 Governing Documents [and] its ability to appoint the majority of DRC members."  (JX-6 at ¶ 46.)

15 While Westwood's framing of the issues in the Kincade Action is certainly not determinative of

16 the outcome to be reached by the court here, the court does find persuasive the fact that the

17 plaintiff in the Kincade Action drew a direct connection between alleged violations of CC&Rs

18 and the status of the declarant; in other words, Westwood argued that these violations were

19 actionable because Westwood remained the declarant even after Comerica foreclosed upon the

20 lots at Sierra de Montserrat.

21     For all of these reasons, the court concludes that the Kincade Action arose out of

22 Comerica's position as declarant.[42]

23 ───────────────

24 [42]  Although in the somewhat different context of insurance policies, the court notes that "California courts have consistently given a broad interpretation to the terms 'arising out of' or

25 'arising from,'" finding that this language "broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship."

26 *Acceptance Ins. Co. v. Syufy Enters.*, 69 Cal. App. 4th 321, 328 (1999); *see also Searles Valley Minerals Operations Inc. v. Ralph M. Parsons Serv. Co.*, 191 Cal. App. 4th 1394, 1403 (2011)

27 (recognizing that "insurance indemnity law differs from contract indemnity law," but "[n]evertheless" finding insurance indemnity law "instructive" on issues of contract indemnity

28 law).

1             ii.        Impact of the date phrase on this analysis

2         The court next analyzes the impact of the date phrase on its analysis of whether the

3  Kincade Action falls within the scope of the indemnity paragraph.

4         If the date phrase were to modify the declarant phrase, the indemnity paragraph would

5  cover claims arising out of Comerica's position as declarant on or before June 29, 2010.  Because

6  the Kincade Action arose out of Comerica's position as declarant, and Comerica was the

7  declarant on or before June 29, 2010, this reading of the indemnity paragraph would clearly

8  include the Kincade Action within its scope.

9         If, on the other hand, the date phrase were to modify the existence phrase, the indemnity

10  paragraph would cover any and all loss, liability, claims or causes of action *existing in favor of or*

11  *asserted by* any party on or before June 29, 2010.  Comerica argues that under this interpretation,

12  the Kincade Action does not fall within the protection of the indemnity paragraph.

13         Comerica asserts that Westwood's claims asserted in the Kincade Action were not "in

14  existence or asserted" by June 29, 2010, the date the final ADR was executed.  (*See* Doc. No. 89

15  at 22.)  Because Westwood "did not formally assert its claims against AGK until March 14,

16  2011" and "[a]ll of AGK's and the Kincade's [sic] claimed violations of the CC&Rs and Design

17  Guidelines occurred after AGK's acquisition of the 51 lots," Comerica argues that the Kincade

18  Action falls outside of the scope of the indemnity paragraph.  (*Id.*)  The court finds this argument

19  to be unpersuasive.

20         The court agrees with AGK that Westwood's claims in the Kincade Action "all stem from

21  the dispute over whether Comerica assumed the Declarant rights when it foreclosed on most of

22  the lots in the Development, as AGK's later assertion of those rights was necessarily predicated

23  on Comerica's transfer of them to AGK through the [final ADR]."  (Doc. No. 86 at 22.)  This

24  dispute existed on or before June 29, 2010, the date the final ADR was executed and, as the court

25  found above, all of the claims asserted in the Kincade Action arose from this dispute.  Because

26  the court concludes that Westwood's claims arose out of Comerica's position as declarant, it

27  necessarily follows that Westwood's claims existed on or before June 29, 2010, the last day on

28  which Comerica could have been the declarant.  Westwood could have litigated this issue through

1   a declaratory relief action on or before June 29, 2010, but it appears that he waited until the time

2   of the Kincade Action to seek, among other relief, a declaration that Westwood was the

3   Declarant.  (*See* Doc. No. 86 at 21; JX-6 at 15.)  The fact that Westwood waited for AGK to

4   exercise its purported control rights before seeking declaratory and other relief in the Kincade

5   Action does not preclude the inclusion of this action in the scope of the indemnity paragraph,

6   particularly where, as here, litigation such as the Kincade Action is precisely what AGK clearly

7   intended to include within the scope of the indemnity paragraph that its lawyers drafted and was

8   ultimately accepted as part of the final ADR.

9          Similarly, as argued by AGK, there was no active litigation between Westwood and AGK

10   when the final ADR was signed.  (Doc. No. 110 at 14.)  If the date phrase were read to modify the

11   existence phrase, a narrow interpretation of the indemnity paragraph that does not encompass

12   lawsuits filed after that time even where claims asserted therein arose out of Comerica's status as

13   /////

14   /////

15   /////

16   /////

17   /////

18   /////

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

1  declarant, it "would be irrational and render the provision meaningless."[43]  (Doc No. 110 at 14)

2  (citing *City of Atascadero*, 68 Cal. App. 4th at 473).  As the court described above, the indemnity

3  paragraph was in direct response to AGK's concerns over *future* litigation with Westwood

4  pertaining to the declarant's rights issue.  Therefore, the court's interpretation of the indemnity

5  paragraph here—as encompassing lawsuits filed after June 29, 2010 so long as the claims asserted

6  therein arose out of Comerica's purported rights as declarant and thus necessarily existed on or

7  before June 29, 2010—"'give[s] effect to the mutual intention of the parties as it existed' at the

8  time the contract was executed."  *Colonies Partners LP v. County of San Bernardino*, No. 5:18-

9  /////

---

10  [43]  Although its argument in this regard is not entirely clear, it appears that Comerica counters that

11  an interpretation of the indemnity paragraph that does not encompass lawsuits filed after June 29, 2010 would not actually render the provision meaningless.  (*See* Doc. No. 116 at 7.)  Comerica

12  bases this argument on its assertion that the indemnity paragraph could still cover a dispute surrounding the Wildlife Heritage Foundation Deposits because "AGK became aware of the

13  dispute between the [Wildlife Heritage Foundation] Conservation Steward and Comerica regarding the payment of the Security Deposits during the due diligence period" and flagged this

14  issue in the mission critical email.  (*See* Doc. No. 116 at 7.)  This argument, however, is

15  unpersuasive for multiple reasons.  First, based on the evidence admitted at trial, it is unclear

16  whether the Wildlife Heritage Foundation dispute had anything whatsoever to do with declarant's rights, and accordingly, whether that dispute would even fall within the scope of the final ADR's

17  indemnity.  Second, even assuming *arguendo* that the Wildlife Heritage Foundation dispute arose out of Comerica's position as declarant and would fall under the purview of the indemnity

18  paragraph, it appears unlikely that AGK would have drafted the indemnity paragraph in the final ADR with the intent that the indemnity *only* cover the Wildlife Heritage Foundation dispute.  The

19  amounts AGK would need to pay for the Wildlife Heritage Foundation were discernable, with Mr. Murphy stating in the mission critical email that each deposit would be $15,000 per lot, for a

20  total of $765,000.  (*See* JX-38 at 2.)  Unlike the unknown amounts AGK might have to spend

21  defending its position as declarant, the value of the Wildlife Heritage Foundation deposits was not a black box.  Indeed, in the mission critical email, Mr. Murphy stated that AGK "assume[d] [it]

22  would be putting the [deposit] money up."  (JX-38 at 2.)  In light of this statement, the evidence

23  at trial suggesting that AGK simply planned to pay the readily calculable deposits, and the testimony that from AGK's perspective an indemnity was a "very bad result" in which the

24  indemnitee is merely "inheriting a lawsuit," it appears unlikely that AGK viewed the Wildlife Heritage Fund deposit issue as a risk meriting indemnification for future lawsuits.  (*See* Doc. No.

25  100 at 137:3–6, 137:22–23.)  As Mr. Murphy testified, the Wildlife Heritage Foundation deposit issue "wasn't as legal[ly] intensive of an issue as the HOA control issue."  (*See* Doc. No. 101 at

26  14:19–21.)  Finally, the court notes that the evidence at trial regarding AGK's concerns about the Wildlife Heritage Fund deposits is eclipsed by the immense evidence introduced of AGK's

27  concerns regarding control rights.  Therefore, the court finds that it was practically impossible that the parties merely intended for the indemnity paragraph to apply to disputes surrounding the

28  Wildlife Heritage Foundation Deposits.

1  cv-00420-JGB-SHK, 2019 WL 8621438, at *5 (C.D. Cal. Nov. 14, 2019) (quoting Cal. Civ. Code

2  § 1636).

3         Accordingly, the court concludes that the Kincade Action falls within the scope of the

4  final ADR, regardless of whether the date phrase is read to modify the declarant phrase or the

5  existence phrase.  Thus, Comerica must indemnify AGK for the attorneys' fees and litigation

6  costs AGK incurred in defending itself in that action.  The next question is whether Comerica

7  must also pay for the attorneys' fees and litigation costs that AGK incurred in defending the

8  Kincades due to AGK's own decision to indemnify the Kincades in that action.

9                    iii.        Whether Comerica must indemnify AGK for its defense of the

10                               Kincades

11         At the trial of this action, attorney Gory testified that it was his understanding that AGK

12  provided a defense to the Kincades because the underlying claims all arose from Westwood's

13  purported status as declarant.  (*See* Doc. No. 104 at 8:3–13.)  Because all of Westwood's claims

14  "came from the same operative core of rights," AGK "agreed to indemnify the Kincades."  (Doc.

15  No. 103 at 63:18–22.)  In its closing argument at trial, AGK asserted that its indemnification of

16  the Kincades "really was not that big of a deal, because all of the arguments, all of the law,

17  everything was the same" and that indemnifying the Kincades was "the right thing to do."  (Doc.

18  No. 105 at 106:3–6.)

19         However, as Comerica aptly points out, "AGK has not established that its provision of a

20  defense to the Kincades was anything other than voluntary."  (Doc. No. 116 at 11.)  AGK has

21  cited no authority in support of the contention that Comerica has a legal obligation to effectively

22  indemnify the Kincades—who are nowhere mentioned in the final ADR—merely because AGK

23  volunteered to provide them with a legal defense.  Nor does AGK cite any authority or evidence

24  suggesting that AGK may recover its fees and costs incurred in defending the Kincades because

25  that defense was one-and-the-same with AGK's own defense in that action.  Rather, at trial, the

26  parties presented evidence of the briefing submitted to the arbitrator in the Kincade Action in

27  which AGK had provided the arbitrator with the amount of fees and costs AGK incurred

28  specifically in its defense of the Kincades.  (*See* JX-139 at 13–14.)  AGK cannot now

71

1    persuasively argue that its defense of the Kincades was identical to its own defense and required

2    no separate expenditures in attorneys' fees and costs.

3        Accordingly, although Comerica must indemnify AGK for the expenses it incurred

4    defending itself against the Kincade Action, that indemnification does not extend to the expenses

5    AGK incurred in defending the Kincades in that action.[44]  *See S. Cal. Gas Co. v. Ventura Pipe*

6    *Line Const. Co.*, 150 Cal. App. 2d 253, 257 (1957) (noting that it is "well settled" that "an

7    indemnitee cannot recover beyond the terms of the indemnity contract, and that a voluntary

8    payment made by the indemnitee, without regard to its legal liability, is not recoverable

9    thereunder") (citation omitted).

10        c.    *Whether the Murphy Action falls within scope of final ADR*

11        As described above, the Murphy Action pertained to Westwood's attempt to exercise his

12   rights as declarant under the Supplemental Declaration and buy back certain lots at Sierra de

13   Montserrat.  (*See* Doc. No. 103 at 68:18–25; JX-37 at 1–2; *see also* Doc. Nos. 118, 142.)  The

14   Supplemental Declaration was dated October 27, 2009 and provided that Westwood, as declarant,

15   had the right to repurchase certain unbuilt lots in the development if they were not built on within

16   three years of the declarant transferring those rights to another person or entity.  (*See* Doc. No. 37

17   at 1–2.)  Comerica foreclosed on the 51 lots at Sierra de Montserrat on November 6, 2009.  (Doc.

18   No. 84 at 2.)  On November 9, 2012, just over three years after Comerica foreclosed upon the 51

19   lots, Westwood notified AGK that it intended to repurchase certain lots at a reduced price

20   pursuant to the Supplemental Declaration.  (*See* JX-15.)  AGK responded to Westwood stating

21   that

22           Westwood's belief that it may repurchase these 10 lots at a price
             significantly  less  than  market  value  appears  to  be  based  on
23

24   ───────────────────────

     [44]  To the extent that Comerica believes that AGK also seeks recovery for fees it incurred in
25   providing a defense to Mr. Murphy and/or Kinetic Partners in the *Kincade Action*, that belief is
     mistaken.  (*See* Doc. No. 116 at 11).  At trial, attorney Gorry testified that the Kincade Action
26   was filed against AGK, the Sierra de Montserrat HOA, and the Kincades.  (*See* Doc. No. 103 at
     59:6–9.)  He further testified that AGK provided a defense for itself and the Kincades, whereas
27   the HOA "had their own counsel."  (Doc. No. 103 at 61:12–13.)  Thus, there is no indication that
     AGK seeks indemnification for legal fees and costs incurred in defending any party other than
28   itself and the Kincades with respect to the Kincade Action.

1    Westwood's claim that it is the "Declarant" of the Development, and
     as the Declarant, Westwood has repurchase rights under a
2    Supplemental Declaration . . . . [AGK] is the Development's
     Declarant.  As you know, Comerica Bank foreclosed on Westwood's
3    interest in the vast majority of the Development, later selling the lots
     to AGK. . . . Upon foreclosure, Comerica became the Development's
4    Declarant, and Comerica Bank then transferred its rights as Declarant
     to AGK through an unambiguous written Assignment of Declarant
5    Rights, which was recorded on June 30, 2010. . . . Second, the
     Supplemental Declaration through which Westwood purports to
6    exercise rights to repurchase the lots is no longer valid, if it ever was.
     Comerica Bank rescinded the Supplemental Declaration through a
7    Rescission of Declaration of Restrictions, recorded on June 30, 2010
     . . . [which] extinguished any repurchase rights created by the
8    Supplemental Declaration.

9    (JX-16 at 1–2.)

10          Subsequently, on January 25, 2013, Westwood filed a complaint against AGK, Colliers

11   International, Mr. Murphy, and Mr. Chamberlain in the Placer County Superior Court.  (*See* JX-

12   118 at 1.)  Because the Kincade Action was ongoing at that time, the Murphy Action was stayed

13   pending resolution of the Kincade Action.[45]  (*See* Doc. No. 104 at 22:8–18; *see also* Doc. No 100

14   at 96:14–16.)  On February 3, 2017, Westwood filed a fourth amended complaint in the Murphy

15   Action, which became the operative complaint.  (*See* JX-142; Doc. No. 103 at 69:16–24.)

16   Therein, Westwood asserted claims against AGK, Mr. Murphy, AGRE, Kinetic Homes, and

17   Kinetic Partners, Inc. (an entity controlled by Mr. Murphy), and FATCO.  (*See* JX-142 at 1; Doc.

18   No. 104 at 24:19–22.)  Eventually, the case proceeded to a bifurcated bench trial in the Placer

19   County Superior Court, in which the court found that Westwood's claims against AGRE and

20   AGK were barred by the doctrine of *res judicata* because Westwood's claims in the Murphy

21   Action "seek[] to vindicate the same primary right [that was] at issue" in the Kincade Action,

22   where a final judgment on the merits had been issued.  (*See* JX-144 at 2, 9–10, 32; *see also* Doc.

23   No. 104 at 26:3–18.)  The court in the Murphy Action also found that there was "insufficient

24   evidence at [that] time" for the court to determine that the doctrine of *res judicata* applied to Mr.

25   Murphy, Kinetic Homes, and Kinetic Partners, Inc., and the action continued as to those

26   ─────────────────────
     [45]  At trial, attorney Gorry testified that he could not recall whether the Murphy Action was
27   stayed pending an outcome only on the first phase of the Kincade Action arbitration or if it was
     stayed pending a final ruling in the Kincade Action arbitration, but he believed that it was the
28   latter.  (*See* Doc. No. 104 at 22:8–13.)

1    defendants until they settled with Westwood "shortly thereafter."  (*See* JX-144 at 32; Doc. No.

2    104 at 35:22–36:1.)

3                          i.      Whether the Murphy Action arose out of Comerica's position as

4                                  declarant

5            Comerica once again argues that the claims in the Murphy Action did not arise out of

6    Comerica's position as declarant because those claims instead arose out of "AGK's affirmative

7    conduct" of "attempt[ing] to exercise its purported rights as the Declarant."  (*See* Doc. No. 89 at

8    22–23.)  The court finds this argument unavailing for the same reasons the court rejected it when

9    made by Comerica with regard to the Kincade Action.  In short, any attempt by AGK to exercise

10   its declarant rights arises out of Comerica's status as declarant because AGK's ability to validly

11   do so depends entirely on whether Comerica actually held the position of declarant when it

12   transferred those rights to AGK.

13           Moreover, the allegations in Westwood's fourth amended complaint make clear that the

14   dispute arose out of Comerica's status as declarant.  Therein, Westwood quoted the mission

15   critical email, noting that AGK required that the PSA "be modified such that the bank would

16   record an assignment of declarant rights to [AGK] to at least create an additional hurdle for

17   Westwood to clear."  (JX-142 at 10; *see also* JX-38 at 3.)  Westwood described the final ADR as

18   "an obstacle maliciously intended to unlawfully obstruct [Westwood] from exercising its lawful

19   rights as Declarant" and further alleged that "Comerica was not the Declarant [and] did not have

20   authority to transfer such rights."  (JX-142 at 10.)  In light of these allegations, it is apparent that

21   the claims brought in the Murphy Action arose out of Comerica's position as declarant.

22           The court's finding in this regard is also compelled by the fact that Comerica's purported

23   status as declarant was precisely why Comerica asserted that it had the authority to revoke the

24   Supplemental Declaration pursuant to the final RDR.  The sole sentence of the final RDR states

25   the Comerica, "*as declarant*, herby rescinds, cancels, and revokes" the Supplemental Declaration.

26   (JX-103 at 1) (emphasis added).  Likewise, as the court found above, when Ms. Tresler

27   questioned how Comerica had "the authority" to sign a revocation of the Supplemental

28   Declaration, the issue was resolved when FATCO determined it felt "comfortable enough" to

                                                    74

1  "take the position that Comerica is the declarant" and to record the final RDR.  (*See* JX-45 at 1–3;

2  Doc. No. 101 at 36:1–7.)  Thus, there is little question that the Murphy Action—in which

3  Westwood sought to exercise his rights as declarant pursuant to the Supplemental Declaration—

4  arose out of Comerica's position as declarant, because Comerica's status as declarant was the

5  precise authority Comerica purported to wield in order to transfer the declarant rights to AGK and

6  rescind Westwood's rights under the Supplemental Declaration.

7  ii.      Impact of the date phrase on this analysis

8  The court next considers whether the phrase that is modified by the date phrase bears any

9  impact on the court's conclusion that the Murphy Action falls within the scope of the indemnity

10  paragraph.

11  As noted above, if the date phrase were to modify the declarant phrase, the indemnity

12  paragraph would cover claims arising out of Comerica's position as declarant on or before June

13  29, 2010.  Because the Murphy Action arose out of Comerica's position as declarant, and

14  Comerica was the declarant on or before June 29, 2010, this reading of the indemnity paragraph

15  would clearly include the Murphy Action within its scope.

16  Conversely, if the date phrase were to modify the existence phrase, the indemnity

17  paragraph would cover any and all loss, liability, claims or causes of action *existing in favor of or*

18  *asserted by* any party on or before June 29, 2010.  Comerica asserts that under this interpretation,

19  the Murphy Action would not fall within the protection of the final ADR's indemnity paragraph.

20  Comerica advances the unpersuasive argument that Westwood's claims in the Murphy

21  Action were not existing in favor of, nor asserted by, any party on or before June 29, 2010

22  because Westwood "first invoked its purported right to repurchase lots from AGK under the

23  Supplemental Declaration on November 9, 2012" and did not file its complaint in the Murphy

24  Action until January 25, 2013.  (*See* Doc. No. 89 at 22; *see also* Doc. No. 116 at 8.)  The court

25  rejects this argument for the same reasons it has rejected Comerica's argument that the claims in

26  the Kincade Action did not exist on or before June 29, 2010.  The central claim of the Murphy

27  Action was that Westwood was the declarant—not Comerica and not AGK thereafter—and as a

28  result, Westwood's declarant rights pursuant to the Supplemental Declaration had not been

75

1    extinguished.  This dispute existed at the time the final ADR was executed and could have been

2    adjudicated through an action for declaratory relief brought at that time.  That Westwood delayed

3    litigating this dispute until after AGK rejected Westwood's request to repurchase certain lots is

4    immaterial.  As described at length above, it is clear that the final ADR was intended to apply to

5    later filed lawsuits such as the Murphy Action.

6          Therefore, the court concludes that, regardless of whether the date phrase is read to

7    modify the declarant phrase or the existence phrase, the Murphy Action falls within the scope of

8    the final ADR, and Comerica must indemnify AGK for the attorneys' fees and litigation costs

9    AGK incurred in defending itself in that action.  The next question is whether Comerica must also

10   pay for the attorneys' fees and litigation costs that AGK incurred in defending third parties Mr.

11   Murphy, Kinetic Homes, and Kinetic Partners, Inc. in the Murphy Action.[46]

12                    iii.       Whether Comerica must indemnify AGK for its defense of Mr.

13                               Murphy, Kinetic Homes, and Kinetic Partners, Inc. in the Murphy

14                               Action

15         As a preliminary matter, the court notes that the parties do not appear to dispute that it was

16   appropriate for AGK's legal defense to include a defense of AGRE, which Westwood alleged was

17   an alter ego of AGK.[47]  (*See* Doc. Nos. 105 at 142:5–12; 116 at 11–12; *see also* JX-144 at 28.)

---

18   [46]  Comerica does not assert that AGK ever provided Mr. Chamberlain or Colliers International

19   with a defense in the Murphy Action.

20   [47]  In its post-trial brief, Comerica appears to attempt to challenge the notion that AGK paid for

21   AGRE's legal fees by devoting half of one sentence to the statement that "AGRE paid half of the
     remaining legal fees" in the Murphy Action after the parties deducted portions of those fees that

22   were payable by Mr. Murphy.  (Doc. No. 116 at 21.)  In support of this contention, Comerica
     cites a brief portion of attorney Gorry's trial testimony on this subject.  (*See id.*; Doc. No. 104 at

23   31:16–32:17.)  At trial, attorney Gorry testified that Mr. Murphy paid 5% of the attorneys' fees in
     the Murphy Action, with AGK paying the other 95% of attorneys' fees.  (Doc. No. 104 at 32:24–

24   33:2.)  For the purposes of submitting a motion for attorneys' fees in the Murphy Action, the
     parties apportioned half of the remaining 95% of attorneys' fees to AGRE and half to AGK,

25   merely "for the purposes of the [Murphy] court's determination as to fees between the two . . .
     entities, because they were both being represented under the [same] umbrella."  (*Id.* at 33:3–10.)

26   Thus, there is no indication that any entity other than AGK actually paid the remaining 95% of
     the legal fees in that action, and Comerica's brief reference to the possibility that AGRE

27   contributed to the payments of legal fees in that action does not amount to disputing whether it
     was proper for AGK to pay for legal fees incurred on AGRE's behalf.

28

1   Indeed, Comerica acknowledged that the court in the Murphy Action found that, as alleged by

2   Westwood, there was sufficient privity between AGK and AGRE for the claims against both

3   parties to be barred by the doctrine of *res judicata*, despite AGRE having not been a party to the

4   Kincade Action.  (*See* Doc. Nos. 104 at 25:4–26:18; 89 at 19; *see also* JX-144 at 26–29, 32.)  In

5   addition, up until closing, when AGRE assigned its interests in the Sierra de Montserrat sale to

6   AGK, all of the deal documents in the transaction were executed between AGRE and Comerica,

7   AGRE assigned its interests in the Sierra de Montserrat sale to AGK, the final ADR lists various

8   AGRE-owned entities as comprising AGK, and the signatories for both AGRE and AGK were

9   identical.  (*See, e.g.*, JX-27 at 1, 25; JX-43 at 7–9; JX-100 at 1, 3; JX-51 at 2.)  Therefore, AGK's

10   provision of a defense to AGRE in the Murphy Action clearly falls within the scope of the final

11   ADR.

12          However, the final ADR does not mention or reference Mr. Murphy, Kinetic Homes, or

13   Kinetic Partners, Inc., and there is no evidence before the court suggesting that AGK had any

14   legal obligation to tender a defense to these parties.  Nor does AGK submit any authority in

15   support of its contention that Comerica is obligated under the final ADR to indemnify AGK

16   against fees and costs it incurred in defending Mr. Murphy, Kinetic Homes, or Kinetic Partners.

17   Although Mr. Murphy testified that he was the "primary point person" directing the Westwood

18   litigation on behalf of AGK "as the manager of the property," AGK has also cited no authority in

19   support of the contention that Mr. Murphy's managerial role in AGK brings him and the entities

20   he owns under the protection of the indemnity paragraph of the final ADR.  (*See* Doc. No. 102 at

21   75:6–12.)

22          Accordingly, the court concludes that AGK has failed to meet its burden to prove that it is

23   entitled to indemnification for any fees and costs incurred in providing a defense to Mr. Murphy,

24   Kinetic Homes, and Kinetic Partners, Inc. in the Murphy Action.  *See S. Calif. Gas Co.*, 150 Cal.

25   App. 2d at 257.

26   /////

27   /////

28   /////

iv.      Whether Comerica must pay AGK for the fees and costs FATCO

incurred in defending AGK in the Murphy Action

As the court has described above, FATCO appointed the Steyer Lowenthal firm to defend

AGK in the Murphy Action against claims that FATCO deemed were covered by AGK's title

insurance.  (*See* Doc. No. 103 at 73:22–25.)  AGK seeks indemnification for these fees, which

were paid by FATCO, apparently based on an unpled subrogation theory.  (*See* Doc. No. 110 at

18.)  In its closing arguments at the trial of this case, AGK argued that FATCO "retains

subrogation rights, and a recovery of fees for [FATCO] will be paid on a *pro rata* basis under

those subrogation rights to [FATCO]."  (Doc. No. 105 at 107:1–5.)  Comerica disputes that these

expenses are recoverable in this action because AGK has "produced no evidence that [FATCO]

assigned its subrogation rights to AGK" and "did not plead or establish any proof of the elements

of an assigned cause of action for subrogation."  (Doc. No. 116 at 21.)

"Subrogation is defined as the substitution of another person in the place of the creditor or

claimant to whose rights he or she succeeds in relation to the debt or claim."  *Fireman's Fund Ins.

Co. v. Maryland Gas Co.*, 65 Cal. App. 4th 1279, 1291 (1998).  In the insurance context,

"subrogation takes the form of an insurer's right to be put in the position of the insured in order to

pursue recovery from third parties legally responsible to the insured for a loss which the insurer

has both insured and paid."  *Id.* (citations omitted).  An insurer entitled to subrogation, or

subrogee, is "in the same position as an assignee of the insured's claim, and succeeds only to the

rights of the insured," the subrogor.  *Valley Forge Ins. Co. v. Zurich Am. Ins. Co.*, No. 4:09-cv-

02007-SBA, 2010 WL 3769378, at *6–7 (N.D. Cal. Sept. 22, 2010).

In this case, because FATCO paid legal fees to Steyer Lowenthal on AGK's behalf,

FATCO would be the subrogee.  *See id.*  An insurer's cause of action for equitable subrogation

includes several elements, including that "the insured suffered a loss for which the defendant is

liable[;] . . . the insurer has compensated the insured in whole or in part for the same loss for

which the defendant is primarily liable; . . . [and] the insurer has paid the claim of its insured to

protect its own interest and not as a volunteer . . . ."  *Fireman's Fund Ins. Co.*, 65 Cal. App. 4th at

1292 (emphasis added).  In order for AGK to recover FATCO's legal fees here under a theory of

78

1    equitable subrogation, AGK would have needed to plead and prove not only a cause of action for

2    equitable subrogation, but also that FATCO had assigned AGK its subrogation rights. *See id.*;

3    (*see also* Doc. No. 116 at 21.)  AGK has not done so and thus may not recover in this action for

4    expenses FATCO incurred and paid in the Murphy Action under a subrogation theory.

5            In addition, the court is not persuaded by AGK's argument that "an insured may bring a

6    suit for damages in its own name, even where an insurer has paid funds on the insured's behalf,"

7    because the cases it cites in support of this contention are inapplicable here.  This is because AGK

8    seeks to recover certain fees that have already been paid in their entirety by an insurer.  (*See* Doc.

9    No. 110 at 18); *see also Hausman v. Farmers Ins. Exch.*, 213 Cal. App. 2d 611, 613 (1963)

10   (noting that where an insurer only pays for part of a loss, both the insurer-subrogee and the

11   insured-subrogor will have claims against the liable party) (citation omitted); *Patent Scaffolding*

12   *Co. v. William Simpson Const. Co.*, 256 Cal. App. 2d 506, 514 (1967) (holding that "[w]here two

13   parties are contractually bound by independent contracts to indemnify the same person for the

14   same loss, the payment by one of them . . . does not create in him equities superior to the

15   nonpaying indemnitor, justifying subrogation, if the latter did not cause or participate in causing

16   the loss").  AGK is essentially seeking application of the collateral source rule, which  provides

17   that an injured party who receives compensation for her losses from a collateral source

18   independent of the tortfeasor may still recover damages from the tortfeasor.  But that rule "has not

19   been generally applied in cases founded upon breach of contract, unless the 'breach has a tortious

20   or willful flavor.'"  *Patent Scaffolding Co.*, 256 Cal. App. 2d at 510–511 (quoting *City of Salinas*

21   *v. Souza & McCue Const. Co.*, 66 Cal. 2d 217, 226–27 (1967)); *Bramalea Cal., Inc. v. Reliable*

22   *Interiors, Inc.*, 119 Cal. App. 4th 468, 472 (2004) (barring the recovery of attorneys' fees

23   pursuant to an indemnity agreement where such fees had already been paid by the insurer and

24   holding that collateral source rule did not apply because "the collateral source rule applies to tort

25   damages, not to damages for breach of contract"); *see also Travelers Cas. and Sur. Co. of Am. v.*

26   *Dunmore*, No. 2:07-cv-02493-LKK-DAD, 2010 WL 5200940, at *8 (E.D. Cal. Dec. 15, 2010)

27   ("It is a basic rule of California law that 'conduct amounting to a breach of contract becomes

28   tortious only when it also violates a duty independent of the contract arising from principles of

1    tort law.'") (quoting *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999)).  Moreover, another element

2    of an equitable subrogation cause of action suggests that an insured may not recover against a

3    defendant where it has already been compensated for its loss by its insurer.  *See Fireman's Fund*

4    *Ins. Co.,* 65 Cal. App. 4th at 1292 (stating one of the elements of an equitable subrogation claim

5    as "the insured has an existing, assignable cause of action against the defendant which the insured

6    could have asserted for its own benefit had it not been compensated for its loss by the insurer").

7           Thus, AGK has fallen well short here of proving that Comerica is obligated to pay AGK

8    for expenses and attorney fees that have been fully paid by AGK's title insurer, FATCO.  *See*

9    *Bramalea Cal., Inc.*, 119 Cal. App. 4th at 472–73.

10                    d.      *Whether the present action falls within scope of the final ADR*

11          AGK asserts that it is entitled to recover the costs of litigating against Comerica in the

12   action between the parties in this court because such costs were a "necessary consequence of

13   Comerica's refusal to provide indemnification as monetary damages."  (Doc. No. 110 at 18.)

14          The Ninth Circuit has interpreted California caselaw as holding that "costs and attorney's

15   fees for prosecuting an indemnification claim may be included in the indemnification award."

16   *DeWitt v. W. Pac. R.R. Co.*, 719 F.2d 1448, 1453 (9th Cir. 1983) (acknowledging a split in

17   California authority on the subject).  Nearly a decade after deciding *DeWitt*, the Ninth Circuit was

18   asked to "reevaluate" its holding in *DeWitt* in light of an intermediate California appellate court

19   decision issued after *DeWitt*.  *See Jones Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973

20   F.2d 688, 696 n.4 (9th Cir. 1992).  The Ninth Circuit declined to do so, recognizing that an

21   "intermediate appellate court decision on one side of a clear split . . . does not provide the kind of

22   indication that our past interpretation of California law was incorrect that would cause us to

23   revisit our holding in *DeWitt*."  *Id.*

24          "*DeWitt*'s interpretation of California law is 'binding in the absence of any subsequent

25   indication from the California courts that [the Ninth Circuit's] interpretation was incorrect.'"  *Id.*

26   (quoting *Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983)).  Although Comerica cites

27   additional intermediate California appellate court decisions that decline to follow *DeWitt*, these

28   opinions are merely "on one side of a clear split" and do not indicate that the Ninth Circuit's past

                                                    80

1    interpretation of California law in *DeWitt* and *Jones* was incorrect.  *See Monolithic Power Sys.,*

2    *Inc. v. Taiwan Sumida Elecs., Inc.*, No. 4:05-cv-03522-CW, 2007 WL 1831118, at *10 (N.D. Cal.

3    June 25, 2007) (finding that "the additional intermediate appellate cases" cited by plaintiff "do

4    'not provide the kind of indication' that the Ninth Circuit's 'past interpretation of California law

5    was incorrect'") (quoting *Jones*, 973 F.2d at 696 n.4).  Because the decisions in *DeWitt* and *Jones*

6    remain binding caselaw, the court concludes that AGK may recover the fees and costs it incurred

7    in this action to enforce the indemnity paragraph of the final ADR.  *See DeWitt*, 719 F.2d at 1453;

8    *Jones*, 973 F.2d at 696 n.4; *Monolithic Power Sys., Inc.*, 2007 WL 1831118, at *10 (noting that

9    the court is "bound" to follow *DeWitt* and *Jones* "[a]bsent any ruling from the California Supreme

10   Court or the Ninth Circuit on this issue); *see also Krag v. Kaiser Found. Hosp.*, No. 3:89-cv-

11   03042-TEH, 1993 WL 226108, at *6 (N.D. Cal. June 15, 1993) (holding that an indemnitee is

12   entitled to recover its fees incurred in prosecuting its indemnity claims against an indemnitor)

13   (citing *DeWitt*, 719 F.2d at 1452–53).

14        Because Comerica has refused to indemnify AGK for its losses and costs incurred in its

15   defense in both the Kincade and Murphy Actions, as well as AGK's losses and costs incurred in

16   enforcing the indemnity paragraph in this action, the court thus concludes that Comerica has

17   breached the final ADR.  *See Clear Connection Corp. v. Comcast Cable Comms.*, 501 F. Supp.

18   3d 886, 894 (E.D. Cal. 2020) (holding that indemnitor breached contract by not indemnifying

19   indemnitee for costs and losses arising from third party litigation).

20        4.    Damages

21        "For a breach of an obligation arising from contract, the measure of damages . . . is the

22   amount which will compensate the party aggrieved for all the detriment proximately caused

23   thereby, or which, in the ordinary course of things, would be likely to result therefrom."  Cal. Civ.

24   Code § 3300.  These damages are meant to "put the injured party in as good a position as [it]

25   would have been had performance been rendered as promised."  *JMR Const. Corp. v. Env't*

26   *Assessment & Remediation Mgmt.*, 243 Cal. App. 4th 571, 585 (2015) (citation omitted).  An

27   indemnitor in a breach of contract action has an "obligation . . . to make good a loss or damage

28   [the indemnitee] has incurred."  *Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1023 (2011)

81

1   (citing *Rossmoor*, 13 Cal. 3d at 628). "[A] promise of indemnity against claims, demands, or

2   liability embraces the costs of defense against such claims, demands, or liability insofar as such

3   costs are incurred reasonably and in good faith." *Clear Connection Corp.*, 501 F. Supp. 3d at

4   894–95. That is, "costs and attorney's fees for prosecuting an indemnification claim may be

5   included in the indemnification award." *DeWitt*, 719 F.2d at 1453.

6       For the reasons explained above, the court concludes that Comerica must compensate

7   AGK for the damages it incurred (i.e., attorneys' fees and costs) in defending itself in the

8   Westwood litigation, but AGK cannot recover for the attorneys' fees and costs it incurred in

9   defending the Kincades, Mr. Murphy, Kinetic Homes, and Kinetic Partners. The court will now

10  turn to determining what specific amounts in damages AGK has proved at trial (fee amounts from

11  the Kincade Action, the Murphy Action, and this action) and is thus entitled to recover from

12  Comerica.[48]

13          a.      *Damages in the Kincade Action*

14      AGK requests $1,000,311.09 in damages incurred in the Kincade Action, representing its

15  fees and costs incurred in defending both itself and the Kincades. (*See* Doc. No. 110 at 12.)

16  Through its voluminous billing records and witness testimony at trial, AGK met its burden of

17  demonstrating that it suffered a loss of this amount in the Kincade Action. (*See* JX-108, 109;

18

---

19  [48] Because the attorneys' fees AGK seeks to recover that are part of an indemnification damages
    award and are not sought by way of a noticed motion for attorneys' fees filed after trial, the court
20  need not conduct a lodestar analysis in this case. *See DeWitt*, 719 F.2d at 1453; Cal. Civ. Code
    § 2778(3) ("An indemnity against claims, or demands, or liability, . . . embraces the cost of
21  defense against such claims, demands, or liability incurred in good faith, and in the exercise of a
    reasonable discretion."); *Zalkind*, 194 Cal. App. 4th at 1024 (describing an indemnitor's
22  obligation to "reimburse the indemnitee for *any damages* the indemnitee becomes obligated to
    pay third persons) (emphasis added); *c.f. Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978
23  (9th Cir. 2008) (describing the "lodestar" method in the context of a motion for an award of costs
    and attorneys' fees provided for by statute). Apart from its argument that AGK is not entitled to
24  receive a damages award for expenses it incurred on behalf of third parties, Comerica dose not
    otherwise challenge the reasonableness of the rates or hours underlying the attorneys' fees AGK
25  seeks to recover as damages in this action. (*See* Doc. Nos. 116 at 20–21; 116-1; 116-2.)
    Nonetheless, the court notes that the trial exhibits of billing records admitted into evidence pertain
26  to attorneys' fees and expenses spanning over a decade of litigation in three separate actions,
    encompass thousands of hours of legal work, and include reasonable hourly rates ranging from
27  $395 for associates through $650 for partners. (*See* JX-108–JX-111, JX-113–JX-15; PX-3.)

28

1    Doc. No. 103 at 78:8–12.)  However, this amount sought also includes expenses AGK incurred

2    due to its voluntary defense of the Kincades, which totaled $389,499 according to the request for

3    attorneys' fees submitted by AGK in the Kincade Action.  (*See* Doc. No. 103 at 63:18–19; JX-

4    139 at 13–14.)  Because the court concludes that AGK is not entitled to indemnification from

5    Comerica pursuant to the final ADR with regard to its defense of the Kincades, the court will

6    subtract $389,499 from AGK's requested damages in connection with the Kincade Action,

7    resulting in recovery of $610,812.09.[49]

8

---

9    [49]  Comerica disputes that several of the billed time entries submitted by AGK are recoverable

10   here because, it argues, those entries were incurred on behalf of third parties.  In support of this
     contention, Comerica attaches (in the form of an exhibit to its post-trial brief) a spreadsheet that

11   purports to list $407,602.48 in attorney time entries from the Kincade Action that it argues were
     "paid or incurred on behalf of third parties who were not parties to the indemnity agreement."

12   (*See* Doc. Nos. 116 at 21; 116-1 at 1–8.)  But, there is no indication that some or all of those
     entries reflected fees that were incurred or paid on behalf of third parties.  (*See, e.g.*, Doc. No.

13   116-1 at 1) (listing entry for "review correspondence from Don Murphy" among entries for which
     Comerica argues AGK should not be indemnified).  Thus, although Comerica has attempted to

14   identify billing entries that pertained or potentially pertained only to the Kincades, the court
     instead relies on the sworn declaration AGK submitted in the Kincade Action as a more reliable

15   indicator of the attorneys' fees and costs incurred on the Kincades' behalf in that action.  (*See* JX-
     139 at 13–14.)  The arbitrator in that case found that the Kincades were entitled to an award of

16   attorneys' fees and costs, but AGK was not entitled to an award of attorneys' fees and costs
     incurred in its own defense, because "as between AGK and Westwood there was no prevailing

17   party."  (*Id.* at 13.)  Because the court in this case awards damages to AGK only for the fees and
     costs it incurred in its own defense in the Kincade Action, AGK's fee award in this case is not

18   duplicative of the fee award it received with respect to its defense of the Kincades in that action.
     In addition, when the arbitrator awarded attorneys' fees and costs for the Kincades' defense, the

19   arbitrator reduced that award to $124,764 from the $389,499 that AGK had requested, based in
     part on a reduction of hourly rates to match local attorney rates.  (*See* JX-139 at 14.)  The fact that

20   the arbitrator reduced the amount *awarded* for AGK's defense of the Kincades does not change
     the fact that AGK nonetheless *incurred* the full $389,499 in expenses on their behalf; in other

21   words, AGK would have had to pay the full $389,499 in attorneys' fees and costs regardless of
     whether the fee award fully compensated those expenses.  (*See id.* at 13–14.)  Therefore, the court

22   uses the $389,499 figure as a reasonable estimate of the portion of AGK's $1,000,311.09 in
     expenses that are attributable solely to AGK's defense of the Kincades and thus not recoverable

23   as damages in this action.  The court also notes that the $389,499 amount the court excludes from
     damages award here does not differ significantly from the $407,602.48 figure for which Comerica

24   asserts AGK incurred on behalf of third parties in the Kincade Action.  *See also JMR Const.*

25   *Corp.*, 243 Cal. App. 4th at 585 ("Where the *fact* of damages is certain [in a breach of contract
     action]. . . the *amount* of damages need not calculated with absolute certainty.  The law

26   requires only that some reasonable basis of computation be used, and the result reached can be a
     reasonable approximation.").

27

28

1    Therefore, the court concludes that AGK has proved that it is entitled to recover

2    $610,812.09 in damages from Comerica in connection with the Kincade Action.

3         b.    *Damages in the Murphy Action*

4         AGK seeks $1,377,345.75 in damages incurred in the Murphy Action, representing the

5    fees and costs it incurred in defending AGK, AGRE, Mr. Murphy, Kinetic Homes, and Kinetic

6    Partners, Inc., as well as the fees and costs FATCO paid to Steyer Lowenthal to defend AGK

7    against covered claims.  (*See* Doc. No. 110 at 12.)  Through its voluminous billing records and

8    witness testimony at trial, AGK met its burden of demonstrating its attorneys' fees and costs for

9    that action totaled this amount.  (*See* JX-110–JX-113; Doc. No. 103 at 78:13–16.)

10        However, as the court has concluded above, AGK is not entitled to recover as damages the

11   $426,372.23 in fees and costs FATCO paid Steyer Lowenthal for AGK's defense, or the fees and

12   costs AGK incurred in its defense of Mr. Murphy, Kinetic Homes, or Kinetic Partners, Inc., for

13   which AGK has not clearly delineated a specific amount from the remaining $950,973.52.  (*See*

14   JX-112; Doc. Nos. 102 at 77:9–78:5, 110 at 17, 32–33.)  Nonetheless, at trial, attorney Gorry

15   testified that at the time AGK sought and received an attorneys' fee award in the Murphy Action,

16   AGK apportioned 5% of its fees as being the financial responsibility of Mr. Murphy.[50]  (*See* Doc.

17   No. 104 at 32:16–32:2.)  Therefore, the court will subtract the $47,548.68 (i.e., 5% of

18   $950,973.52) attributable to Mr. Murphy and his entities, Kinetic Homes and Kinetic Partners,

19   Inc., from the expenses AGK incurred in the Murphy Action.[51]  *See JMR Const. Corp.*, 243 Cal.

20   ────────────────────

21   [50]  At trial, attorney Gorry testified that AGK's fee award in the Murphy Action has not been
     collected upon because "the Westwood Homes entity has no assets."  (Doc. No. 104 at 45:14–20.)

22   Comerica does not dispute that AGK can nevertheless recover damages in this action for amounts
     that AGK has been unable to collect from the fee award rendered in the Murphy Action.

23   [51]  Comerica has submitted an exhibit analyzing attorney time entries from the Murphy Action for

24   which it argues AGK is not entitled to recover damages.  (*See* Doc. Nos. 116 at 21; 116-2 at 1–
     11.)  Some of these entries are downward adjustments on time entries to reflect that Mr. Murphy

25   paid 5% of invoices from the Murphy Action.  (*See* Doc. No. 116-2 at 1–2.)  The court has
     already accounted for these reduced amounts above.  Some of the other entries Comerica lists as

26   non-recoverable are attorney time entries that Comerica asserts were *only* in the defense of Mr.
     Murphy and his entities, because these time entries were made after the court in the Murphy

27   Action issued its May 2, 2018 tentative order disposing of any claims against AGK and AGRE.

28   (*See, e.g.* Doc. No. 116-2 at 3.)  This court does not agree that the mere fact that an attorney time

1  App. 4th at 585 ("Where the *fact* of damages is certain . . . the *amount* of damages need not be

2  calculated with absolute certainty.  The law requires only that some reasonable basis of

3  computation be used, and the result reached can be a reasonable approximation.") (citing *Acree v.*

4  *Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385, 398 (2001)).

5          Thus, the court concludes that AGK has established that it is entitled to $903,424.84 in

6  damages in connection with the Murphy Action.

7                    c.    *Damages in the Present Action*

8          AGK seeks $1,146,337.24 in damages for the attorneys' fees and costs it has incurred in

9  its litigation of this action to enforce Comerica's indemnity obligations.  (*See* Doc. No. 110 at

10  19.)  Through its voluminous billing records and witness testimony at trial, AGK has met its

11  burden of demonstrating it incurred $1,146,337.24 in attorneys' fees and costs in this action.  (JX-

12  114–JX-15; PX-3; Doc. No. 103 at 84:8–16.)  Comerica does not challenge the reasonableness of

13  this amount and instead argues only that AGK cannot recover damages for its expenses incurred

14  in prosecuting this case, an argument which the court has already rejected for the reasons

15  explained above.  (*See* Doc. No. 116 at 23.)  Based on the evidence presented at trial, there is "no

16  _____

17  entry was entered after May 2, 2018 necessarily means that it pertained only to Mr. Murphy,
   Kinetic Homes, and Kinetic Partners, Inc.  After the May 2, 2018 tentative order was issued,

18  Westwood filed a request for statement of decision bearing on that tentative order, and the court
   ruled on that request on June 29, 2018.  (*See* JX-145 at 7.)  It is plausible that Westwood's filing

19  may have implicated AGK's legal defense.  Indeed, some of the entries Comerica flags include
   entries for attorney work on a response to Westwood's request for decision.  (*See* Doc. No. 116-2

20  at 3.)  The court also observes that attorney Gorry testified at trial that there may have been post-
   judgment proceedings as to AGK and AGRE that occurred after the May 2, 2018 tentative ruling.

21  (Doc. No. 104 at 26:15–18.)  Thus, the court finds that a 5% reduction in the attorneys' fees to
   account for amounts attributable to and paid by Mr. Murphy and his entities is the most reliable

22  method of estimating AGK's damages stemming from the Murphy Action.  Finally, because the
   court concludes above that there is no indication that AGRE actually paid 47.5% of the legal bills

23  in the Murphy Action, and Comerica does not substantively challenge whether AGK's defense of
   AGRE falls within the scope of the indemnity paragraph, the court declines to consider

24  Comerica's proposed 47.5% fee reductions to certain attorney billing entries after AGRE became
   a defendant in the Murphy Action.  (*See* Doc. No. 104 at 32:24–33:10) (Attorney Gorry

25  explaining that AGK paid 95% of the legal bills in the Murphy Action, but that the parties made
   an apportionment between AGRE and AGK for the Murphy court's purposes of awarding fees in

26  that action); *see also State v. Pac. Indem. Co.*, 63 Cal. App. 4th 1535, 1549 (1998) (explaining

27  that once plaintiff has met its burden of proving damages, the burden shifts to defendant to rebut
   those damages); *Clear Connection Corp.*, 501 F. Supp. 3d at 896.

28

1   basis whatsoever for concluding that plaintiff is asking indemnification for services not rendered

2   to [it] in good faith or for which [it] has not in good faith been billed." *Arenson v. Nat'l Auto. &*

3   *Cas. Ins. Co.*, 48 Cal. 2d 528, 539 (1957).  Because "costs and attorney's fees for prosecuting an

4   indemnification claim may be included in the indemnification award," *DeWitt*, 719 F.2d at 1453,

5   the court will award AGK $1,146,337.24 in damages for the fees and costs AGK incurred in the

6   prosecution of this case.

7                    d.    *Prejudgment Interest*

8           "Prejudgment interest in a diversity action is a substantive matter governed by state law."

9   *U.S. Fid. & Guar. Co. v. Lee. Invs. LLC*, 641 F.3d 1126, 1139 (9th Cir. 2011).  Under California

10  law,

11          Every person who is entitled to recover damages certain, or capable
            of being made certain by calculation, and the right to recover which
12          is vested in the person upon a particular day, is entitled also to
            recover interest thereon from that day, except where the debtor is
13          prevented by law . . . .

14  Cal. Civ. Code § 3287(a).  "[A] defendant's denial of liability does not make damages uncertain

15  for purposes of [California] Civil Code section 3287." *Wisper Corp. v. Cal. Com. Bank*, 49 Cal.

16  App. 4th 948, 958 (1996).  Rather, the test for awarding prejudgment interest under this provision

17  entails "a determination of whether the 'defendant actually knows the amount owed or from

18  reasonably available information could the defendant have computed that amount." *U.S. Fid. &*

19  *Guar. Co.*, 641 F.3d at 1139 (quoting *Children's Hosp. and Med. Ctr. v. Bonta*, 97 Cal. App. 4th

20  740, 774 (2002)).  "The statute does not authorize prejudgment interest where the amount of

21  damage, as opposed to the determination of liability, depends on a judicial determination based

22  on conflicting evidence and is not ascertainable from truthful data supplied by the claimant to his

23  debtor." *Fireman's Funds Ins. Co. v. Allstate Ins. Co.*, 234 Cal. App. 3d 1154, 1173 (1991).

24          The court agrees with AGK that it is entitled to recover prejudgment interest with respect

25  to its damages in the form of attorneys' fees and costs incurred in the litigation of this action.

26  "What is critical is not whether the defendant *actually* knows how much it should pay; rather, it is

27  whether the defendant *could have* calculated how much it should pay, *if* it had known how a court

28  would ultimately rule on the legal issues." *State of California v. Cont'l Ins. Co.*, 15 Cal. App. 5th

                                                86

1   1017, 1043 (2017) (emphasis in original).  If Comerica knew how a court would rule on the legal

2   issue of whether AGK's attorneys' fees and damages in enforcing the indemnity paragraph is

3   recoverable as damages, Comerica could have readily calculated the amount of AGK's damages

4   stemming from its action to enforce the indemnity paragraph on the date of each of AGK's billing

5   statements in this action.  Although there is no evidence before the court suggesting that AGK

6   sent Comerica each of its legal bills as they accrued, AGK's expenses incurred in litigating this

7   action could have been "reasonably determined . . . with simple inquiries."  *U.S. Fid. & Guar.*

8   *Co.*, 641 F.3d at 1140 (holding that the district court properly applied California law in awarding

9   prejudgment interest where the amounts owed were "reasonably available" and "could be

10   reasonably determined . . . with simple inquiries").  Put simply, the calculation of AGK's

11   damages in this regard turned exclusively on resolution of the legal issue of whether AGK could

12   recover as damages the expenses it incurred in enforcing the indemnity paragraph of the final

13   ADR.  *See Westport Ins. Corp. v. Cal. Cas. Mgmt. Co.*, 916 F.3d 769, 782 (9th Cir. 2019) ("When

14   the allocation of liability turns on factual issues, damages are uncertain; however, when the

15   allocation turns exclusively on legal issues, damages are certain and interest is available.")  AGK

16   has provided an accounting of its individual legal billing invoices in this action, the dates of those

17   invoices, the amounts of those invoices, and the amount of interest accrued between the invoice

18   dates and the dates of post-trial briefing calculated at a 10% per annum rate.[52]  (*See* Doc. No. 110

19   at 34); *see also Westport Ins. Co.*, 916 F.3d at 781 (noting that under California law, the

20   prejudgment interest rate on contract actions is 10% per annum if the rate is not otherwise

21   stipulated in the contract) (citing Cal. Civ. Code § 3289).  Having reviewed these figures and

22   calculations, the court thus concludes that AGK is entitled to $216,720.19 in prejudgment interest

23   on its damages incurred in enforcing the final ADR by bringing this lawsuit.  (*See* Doc. No. 110

24   at 34); *see also Westport Ins. Co.*, 916 F.3d at 781 (holding that district court did not abuse its

25   discretion in awarding prejudgment interest running from the dates plaintiff paid each of several

26

27   ──────────────
    [52]  AGK has requested only prejudgment interest for its damages incurred from bringing this

28   litigation through the date of post-trial briefing and only pertaining to its legal billing invoices for
    this action dated though September 30, 2020.  (*See* Doc. No. 110 at 34.)

87

1    underlying settlements); *Com. & Indus. Ins. Co. v. Carter*, No. 2:15-cv-02059-TLN-KJN, 2017

2    WL 4355045, at *4 (E.D. Cal. Oct. 2, 2017) (awarding prejudgment interest at a 10% per annum

3    rate running from dates invoices were due and payable through the filing date of plaintiff's

4    motion for default judgment).

5            However, the court concludes that AGK is not entitled to prejudgment interest with

6    respect to its damages stemming from the Murphy and Kincade Actions because the proper

7    amount of those damages depended on a "judicial determination based on conflicting evidence"

8    and was "not ascertainable from truthful data supplied by" AGK to Comerica.  *See id.*  The

9    damages for Comerica's breach of the final ADR are comprised of some portion of the legal bills

10   for nearly a decade's worth of litigation in which the same counsel represented multiple

11   codefendants at different stages of that litigation, with some billing entries and costs attributable

12   to several codefendants, including some who were not covered by the indemnity paragraph of the

13   final ADR at issue in this case, and other billing entries for which the applicable defendants are

14   not readily discernible.  In other words, even with a full, truthful disclosure of AGK's billing

15   records in the Westwood litigation, the proper amount of damages could not "be reasonably

16   determined thereafter with simple inquiries."  *U.S. Fid. & Guar. Co.*, 641 F.3d at 1140.  AGK's

17   argument that its damages were certain "on the dates that AGK became liable for those expenses"

18   is belied by the fact that AGK truthfully divulged its Kincade Action and Murphy Action billing

19   records to Comerica during the litigation of this case, and upon a very detailed review of those

20   billing records, Comerica came to a different conclusion as to the billed amounts that are

21   attributable to the parties not covered by the indemnity paragraph.  (*See* Doc. Nos. 110 at 21–22;

22   116-1; 116-2.)  There is no indication that Comerica's analysis of AGK's billing records was not

23   careful or in good faith, nor is there any indication that AGK's prior declarations filed in the

24   Kincade Action and Murphy Actions regarding the amounts of its fees that were attributable to

25   third parties were not careful or not made in good faith.  Although some of the parties'

26   disagreement on the correct damages amount related to the question of liability—i.e., which

27   parties were and were not covered by the indemnity paragraph—much of the difficulty in

28   determining the correct amount of damages here relates to the question of how to allocate AGK's

1    long, detailed, and overlapping billing entries among the different co-defendants sharing counsel

2    in two actions spanning nearly a decade of litigation.  Thus, the court concludes that it is not the

3    case here that "once liability was determined, there could be 'essentially no dispute between the

4    parties concerning the basis of computation of damages.'"  *U.S. Fid. & Guar. Co.*, 641 F.3d at

5    1140 (quoting *Fireman's Fund*, 234 Cal. App. 3d at 1173).  The calculation of damages in this

6    case required a judicial determination as to the fees that were appropriate to attribute to AGK's

7    own legal defense in the Murphy and Kincade Actions.  Therefore, the court finds that AGK is

8    not entitled to an award of prejudgment interest on its damages stemming from the Westwood

9    litigation.  *See Chesapeake Indus., Inc. v. Togova Enter., Inc.*, 149 Cal. App. 3d 901, 914 (1983)

10   (holding that prejudgment interest not appliable where there are "indicia that the sum [of

11   damages] was not capable of calculation within the meaning of section 3287(a)").

12   **B.     Statute of Limitations**

13   Under California law, "[t]he ordinary statute of limitations for breach of a written contract

14   is four years." *Vu v. Prudential Prop. & Cas. Ins. Co.*, 26 Cal. 4th 1142, 1148 (2001) (citing Cal.

15   Civ. Proc. § 337).  A declaratory judgment action must be brought within the same period "as an

16   action for damages or injunction on the same liability." *Howard Jarvis Taxpayers Ass'n v. City

17   of La Habra*, 25 Cal. 4th 809, 821 (2001) (citing *Abbott v. City of Los Angeles*, 50 Cal. 2d 438,

18   462–64 (1958) and *Dillon v. Bd. of Pension Commrs*., 18 Cal.2d 427, 429-430 (1941)).

19   Comerica has asserted an affirmative defense that AGK's causes of action for breach of

20   contract and declaratory relief are barred by the applicable statute of limitations.  (*See* Doc. No.

21   89 at 27.)  The parties do not dispute that the statute of limitations applicable to AGK's breach of

22   contract and declaratory relief claims is four years.  (*See id.*; Doc. No. 110 at 23.)  Rather,

23   Comerica argues that AGK's claims are time-barred because AGK "became liable for attorneys'

24   fees no later than April 18, 2011, when its counsel provided a written response to [Westwood's]

25   'Request for Resolution,'" but AGK did not file the instant action until April 30, 2015, more than

26   four years later.  (Doc. No. 89 at 27.)  Comerica thus appears to assume that the AGK's breach of

27   contract claim accrued when AGK incurred its first legal bill in connection with the Westwood

28   litigation.

Comerica is incorrect in this regard.  "A cause of action for breach of contract does not accrue before the time of breach." *Romano v. Rockwell Int'l*, 14 Cal. App. 4th 479 (1996); *see also Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975) ("There can be no *actual* breach of a contract until the time specified therein for performance has arrived.").  In this case, AGK's causes of action did not accrue until April 24, 2015, the day that Comerica breached the final ADR by refusing to indemnify AGK.  (*See* JX-106); *see also Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005) (noting that "statutes of limitation do not begin to run until a cause of action accrues" and that '[g]enerally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements'") (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999).  AGK timely filed the instant action four days later, on April 29, 2015, well within the four-year statute of limitations period applicable in this case.[53]  (*See* Doc. No. 1 at 5.)  Therefore, the court concludes that Comerica has not proved that AGK's claims in this case are barred by the applicable statute of limitations.

## C.    Declaratory Relief

AGK brings its state law declaratory relief claim pursuant to California Code of Civil Procedure § 1060 and seeks a declaration from this court regarding the parties' "respective rights and obligations" under the indemnity paragraph of the final ADR.[54]  (*See* Doc. Nos. 1 at 9; 86 at 14.)

"The purpose of declaratory relief is 'to set controversies at rest before they lead to the repudiation of obligations, invasion of rights or commission of wrongs.'"  *Env't Def. Project of Sierra Cnty. v. County of Sierra*, 158 Cal. App. 4th 877 (2008) (quoting *Travers v. Louden*, 254

---

[53]  Even assuming that Comerica was correct that AGK's breach of contract claim accrued when AGK incurred its first legal bill in connection with the Westwood litigation, the evidence before the court indicates that AGK's first legal bill in connection with the Kincade Action is dated June 13, 2011.  (*See* JX-108 at 1.)  Thus, even applying Comerica's reasoning, AGK brought this action within the applicable four-year statute of limitations.

[54]  AGK does not seek declaratory relief pursuant to the federal Declaratory Judgment Act, which provides that that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . *may* declare the rights and other legal relations of any interested party seeking such declaration . . . ."  28 U.S.C. § 2201(a) (emphasis added).

90

1   Cal. App. 2d 926, 931 (1967)).  "[T]he remedy is to be used to in the interests of preventative

2   justice, to declare rights rather than execute them."  *Travers*, 254 Cal. App. 2d at 931.  To this

3   end, California Code of Civil Procedure § 1060 provides that "[a]ny person interested under a . . .

4   contract . . . who desires a declaration of his or her rights or duties with respect to another, . . .

5   may, in cases of actual controversy relating to the legal rights and duties of the respective parties"

6   bring an action "for a declaration of his or her rights and duties."  To qualify for declaratory

7   relief, a plaintiff must demonstrate that its action presents "two essential elements: '(1) a proper

8   subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating

9   to [plaintiff's] rights or obligations.'"  *Wilson & Wilson v. City Council of Redwood City*, 191

10  Cal. App. 4th 1559, 1582 (2011).  With respect to the second of these elements, "[t]he 'actual

11  controversy' language in [California] Code of Civil Procedure section 1060 encompasses a

12  probable future controversy relating to the legal rights and duties of the parties."  *Env't Def.*

13  *Project of Sierra Cnty.*, 158 Cal. App. 4th at 885.  "It does not embrace controversies that are

14  'conjectural, anticipated to occur in the future, or an attempt to obtain an advisory opinion from

15  the court.'"  *Wilson & Wilson*, 191 Cal. App. 4th at 1582 (quoting *Brownfield v. Daniel Freeman*

16  *Marina Hosp.*, 208 Cal. App. 3d 405, 410 (1989)).  Rather, in order "[f]or a probable future

17  controversy to constitute an 'actual controversy,' . . . the probable future controversy must be

18  ripe."  *Env't Def. Project of Sierra Cnty.*, 158 Cal. App. 4th at 885.  If an "actual controversy"

19  exists, "it is within the trial court's discretion to grant or deny declaratory relief."  *Id.*

20          Even assuming, without deciding, that AGK has proved that its claim is a proper subject

21  of declaratory relief, AGK has nonetheless failed to meet its burden to prove the second essential

22  element of its declaratory relief claim.  AGK argues that it satisfies the actual controversy

23  requirement because "there remains ongoing litigation and the threat of future litigation by

24  Westwood."  (*See* Doc. No. 86 at 14.)  With respect to ongoing litigation with Westwood, AGK

25  asserts that the Murphy Action is not yet complete, citing attorney Gorry's trial testimony that an

26  appeal in the Murphy Action was recently resolved in AGK's favor and he had received notice of

27  a substitution of attorney in that action the previous day.  (*See* Doc. Nos. 111 at 24; 104 at 34:23–

28  35:7.)  A post-appeal substitution of attorney in the Murphy Action does not, however, give this

91

1    court a basis on which to conclude that the Murphy Action continues to be an actual controversy

2    as to which declaratory judgment is appropriate or even helpful.  This is particularly the case in

3    light of the court's conclusion that AGK is entitled to indemnification for certain expenses it

4    incurred in the Murphy Action and the parties' ability to apply the court's analysis herein to any

5    future fees incurred.[55]  There was simply not enough evidence presented at the trial of this action

6    regarding the nature of the potentially ongoing proceedings in the Murphy Action for the court to

7    conclude that these proceedings constitute a "controversy relating to the legal rights and duties of

8    the parties." *Env't Def. Project of Sierra Cnty.*, 158 Cal. App. 4th at 885.

9         AGK's arguments regarding the prospect of litigation with Westwood in other future

10   actions are similarly unavailing.  In its closing argument at trial, AGK asserted that Mr.

11   Westwood had attended some of the trial and that "[t]he likelihood of litigation for Mr.

12   Westwood is still real and present."  (Doc. No. 105 at 108:7–10.)  As Comerica persuasively

13   argues, however, even if "AGK might reasonabl[y] believe that there might be future litigation

14   between Westwood and AGK, AGK has not identified the specific subject matter of such

15   potential future litigation," and without further information regarding the nature of Westwood's

16   potential future claims or causes of action, this court "cannot properly provide any declaration of

17   AGK's right to be indemnified from and against such unknown claims and causes of action."

18   (*See* Doc. No. 116 at 20.)  A declaration from the court in this case would "require [the] court to

19   speculate about unpredictable future events in order to evaluate the parties' claims." *PG&E*

20   *Corp. v. Pub. Utils. Com.*, 118 Cal. App. 4th 1174, 1217 (2004); *see also Wilson & Wilson*, 191

21   Cal. App. 4th at 1582–83 (explaining that an issue is not ripe for judicial resolution if "the

22   abstract posture of [the] proceeding makes it difficult to evaluate the issues" or "if the court is

23

24   _____

[55]  Similarly, to the extent AGK argues that "there is an undeniable dispute between the parties
concerning Comerica's indemnity obligations under the [final ADR] and the construction and
25   validity of that indemnity provision," that dispute pertained to Comerica's obligations regarding
the Kincade Action and Murphy Action.  That dispute has been resolved by the court's
26   conclusions of law with respect to AGK's breach of contract claim in this action.  Thus, the court
concludes that there remains no actual controversy in this action for which the elements of
27   declaratory relief are met.  *See Burke v. City and County of San Francisco*, 258 Cal. App. 2d 32,
34 (1968) (explaining that declaratory relief not available "to determine a matter which is or has
28   become moot").

1    asked to speculate on the resolution of hypothetical situations") (citation omitted).  The mere

2    potential for a future action between AGK and Westwood does not give rise to a justiciable

3    controversy.  If Westwood does sue AGK again at some point in the future, and if AGK believes

4    that it is entitled to indemnification from Comerica for its defense in that future action, and

5    Comerica refuses to indemnify AGK, AGK may challenge Comerica's actions at that time.  In the

6    absence of a ripe controversy, AGK has failed to prove the necessary elements of its declaratory

7    relief claim.  Accordingly, the court thus will dismiss AGK's declaratory relief claim as

8    nonjusticiable.  *See id.* at 1585 (holding that trial court abused discretion in granting declaratory

9    relief because such relief pertained to an uncertain future controversy that was not ripe and thus

10   was nonjusticiable).

11                                    **CONCLUSION**

12        Pursuant to the above findings of fact and conclusions of law, the court determines that

13   Comerica breached its contract with AGK, and judgment will be entered in favor of AGK on its

14   breach of contract claim.  The court awards AGK $2,660,574.17 in damages (comprised of

15   $610,812.09, $903,424.84, and $1,146,337.24 in damages incurred in connection with the

16   Kincade Action, the Murphy Action, and this case, respectively); and $216,720.19 in prejudgment

17   interest.  AGK's claim for declaratory relief is dismissed.  This order constitutes the findings and

18   conclusions required by Rule 52(a) of the Federal Rules of Civil Procedure.

19        In accordance with Federal Rule of Civil Procedure 58(b), the Clerk of the Court is

20   directed to enter judgment in favor of plaintiff AGK Sierra de Montserrat, L.P. in the total amount

21   of $2,877,294.36 with respect to its breach of contract claim brought under California law.  The

22   Clerk of the Court is also directed to close this case.

23        IT IS SO ORDERED.

24   Dated:  __January 27, 2023__                    _Dale A. Drozd_

25                                             UNITED STATES DISTRICT JUDGE

26

27

28

                                             93